**FILED**

APR 1 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT FOR THE
DISCTRICT OF COLUMBIA

ABDULWAHAB NATTAH,                          )
ABDULWAHAB NATTAH as                        )
lead plaintiff in a class of Titan employees, )
and                                         )          Jury Demand
XXX (Redacted)      8491 Bradshaw Rd.       )
            Plaintiffs   ElkGrove, CA       )
                            95624           )
                                            )
v.                                          )
                                            )
                                            )
GEORGE W. BUSH,                             )   CASE NUMBER  1:06CV00700
        in his individual capacity          )
DICK CHENEY,                                )   JUDGE: Royce C. Lamberth
        in his individual capacity          )
DONALD RUMSFELD,                            )   DECK TYPE: Employment Discrimination
        in his official capacity            )
Six Unknown United States Government        )   DATE STAMP: 04/19/2006
employees, and                             )
L-3 Communications Titan Group             )
        Defendants                          )

**JURY ACTION**

## COMPLAINT

1. Six unknown United States Government employees are sued in their individual capacity.
Some of these officials formulated the administration policy authorizing detention and
suspension of the writ of habeas corpus for anyone found on the battlefield in Iraq and
Afghanistan.

2. Plaintiff Abdulwahab Nattah (hereinafter "Nattah" or "Plaintiff") brings Count I
Misrepresentation and Count VII War Crimes against defendant Cheney in his official capacity.

3. Plaintiff Nattah brings Count I Misrepresentation, Count II Promissory Estoppels, Count III
Suspension of the Writ of Habeas Corpus, and Count VI Geneva Convention, and Count VII War Crimes
against defendant Bush in his official capacity.

**RECEIVED**

MAR 2 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**RECEIVED**

MAR 29 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

4. Plaintiff brings Count VII against defendant Bush and Cheney in their individual capacity.

5. Plaintiff Nattah brings Count IV Due Process, Count V First, Third, and Fourth Amendment; Count VI Geneva Convention, Count VII Slavery; Count VIII Right to Travel against defendant Rumsfeld.

6. Plaintiff Nattah brings Count VI Geneva Convention, Count VII Slavery, Count VIII Right to Travel against all defendants.

7. Plaintiff brings Counts IX through XX are solely against Titan.

8. Plaintiff brings Count XVII, XVIII, and XIX for himself and as a representative of a class of similarly situated Titan employees and former employees.

9. Plaintiff XXX (Name redacted is under Seal) brings Count XX solely against Titan.

10. Defendant Bush is the President of the United States, resides in Washington D.C. and has his principal place of business in Washington, D.C.

11. Defendant Cheney is the Vice-President of the United States and resides in Washington D.C. and has a principal place of business in Washington, D.C.

12. Defendant L-3 Communications Titan Group is a successor corporation to Titan and inherited Titan's liabilities.   L-3 Communications acquired Titan, and the Titan Group is now a

division of L-3 Communications.   Titan purchased plaintiff and later sold him.   L-3 Communications is hereinafter referred to as simply Titan.

13. Plaintiff Nattah is a United States citizen of African and Libyan descent.   Plaintiff worked as a slave for defendant Titan and later defendant Rumsfeld.   Plaintiff currently resides in California.   Nattah is also an Arab National.

## **Statement of Facts**

14. Plaintiff has suffered and will continue to suffer irreparable harm without judicial intervention, and plaintiff's remedies at law are insufficient.

15. Education from his native country and later in the United States taught him to become a very highly skilled Arabic and English speaking interpreter.

16. During the winter of 2003-2004, the United States Department of Defense initiated a massive mobilization of troops and resources to Kuwait in preparation for an armed invasion of Iraq.   At the time, Iraqi compliance with previous United Nations Security Council resolutions was pending before the Security Council.   In an effort to secure U.N. approval of the operation, United States Secretary of State Collin Powell testified before the Security Council and made numerous false and misleading statements about the Iraqi efforts to acquire weapons of mass destruction.   In fact, the United States government knew many of the statements made by Powell were false, and the weapons of mass destruction issue, was utilized by the United States as a pretext to obtain a legal caucus belum.

17. Negotiations at the United Nations and between Iraq and U.N. officials secured Iraqi compliance with an inspection regime.   Progress in implementing the inspection regime gave the appearance that the United States would not_ invade Iraq and U.S. officials including the President George W. Bush, III repeatedly assured the plaintiff and other Americans and neutral nations that war was not inevitable and resolution of the inspection issue would obviate the need for war.

18. Subsequently, top secret memos leaked by British officials stated that the United States had made a final decision to go to war in the summer of 2002.   Other British documents revealed a manipulation of intelligence findings to support a pre-determined strategy to invade Iraq.

19. British government officials subsequently revealed that coalition intelligence reports on Iraq's WMP capabilities were "sexed up" to fit pre-determined policy conclusions.

20. U.S. officials knowingly based Intelligence assessments on unverified statements by scalawags, rapscallions, and scoundrels even though they knew the informants were wholly unreliable and had a personal stake in deposing the Iraq regime.

21. The Bush administration delaying action at the United Nations was merely an effort to enable the U.S. time to build up sufficient forces and obtain the assent and cooperation of various foreign governments such as Turkey.

22. In the Security Council, the Bush administration bribed various foreign governments to vote for authorization of military operations in Iraq.

23. Because Security Council members and the Congress would not authorize hostilities to depose the Iraqi government, the Bush administration used the weapons of mass destruction as a cover story to mask the administration's true motivations.

24. Without false intelligence assessment and testimony of U.S. officials to the United Nations and Congress, the Congress and the U.N. would not have authorized any action against Iraq.

25. Congress and the U.N. authorized military intervention in Iraq only if Iraq failed to comply with United Nations resolutions dealing with weapons of mass destruction.   Military action was not authorized to overthrow the Iraqi regime.

26. Subsequently, the United States launched a pre-mediated war of aggression against Iraq to depose Saddam Hussein and thereby advance U.S. security interests, access to oil, privatization, and economic interests in the region.

27. The United States sent Joseph Wilson to determine whether Iraq was purchasing "yellow cake", an indispensable substance for making nuclear weapons.   Mr. Wilson reported to the appropriate administration officials that Iraq was not attempting to purchase "yellow cake" for Niger and reports about the purchases were completely false.   Despite the fact that the administration knew the "yellow cake" allegation was completely fabricated, President Bush issued a State of Union speech seeking support for possible war against Iraq utilizing the "yellow cake" allegation.   He employed the unfounded "yellow cake" claim to mislead the American people into believing that Iraq was presently working to construct and deploy atomic weapons for use against the United States.

28. The President and other administration officials knowingly and falsely claimed that intelligence suggested Iraq was presently planning an attack against U.S. interests, would send WMP to terrorists, and was actively working to expand production and deployment of nuclear, chemical, and biological weapons.  The administration knowingly and falsely claimed that an attack against U.S. interests was imminent and the invasion was necessary for self-defense. Through these efforts, the Bush administration succeeded in defrauding the American people, including plaintiff.

29. Vice-President Cheney and other administration officials knowingly and falsely stated that Iraq cooperated and assisted in 9/11 attacks against the Pentagon and World Trade Center. Once again the purpose of Cheney's statements was to mislead the American people into supporting future military intervention.  Despite proof that Iraq played no role in 9/11, a large number of American people continue to believe Cheney's statement that the former Iraqi regime participated in the attacks of September 11th.

30. United Nations appointed, arms inspector Hans Blix, stated that the United States invasion of Iraq violated international law, because the war was allegedly premises on Iraqi violation of U.N. weapon inspection regime and Iraq was actually in compliance with United Nations resolutions.

31. United States troops occupying Iraq found no weapons of mass destruction.  Following the war, the Bush administration sought to deter and silence critics.  Due to Joe Wilson's criticism of the administration and his failure to falsify evidence of nuclear components in Niger, Vice-President Dick Cheney began an investigation to find dirt on Wilson and asked Scooter Libbey to spearhead the effort to get Wilson.  Subsequently, Libbey and White House Deputy Chief of Staff Carl Rove retaliated by leaking the identity of Wilson's wife, CIA operative Valerie Plane.

32. Defendant and other war profiteers and merchants of death gave large campaign donations to the Republican candidates to assist in the election of pro-war candidates and encourage U.S. intervention in Iraq.

33. Prior to the invasion of Iraq, defendant Titan knew the invasion was a foregone conclusion; however, the defendant misled plaintiff and others about U.S. intentions.    Plaintiff further relied upon statements made by President Bush and other U.S. officials that war with Iraq was avoidable.    Plaintiff consistently informed defendant that due to moral, philosophical, religious, and personal safety concerns he would not accept employment with defendant if he might be sent into Iraq.  Plaintiff correctly saw that Kuwait was a relatively safe venue in comparison to Iraq. Also, plaintiff drew a distinction between interpreting between U.S. military officials and Kuwait government officials, and he believed the type of interpreting envisioned by defendant would not involve participating in a war and therefore would not violate his religious and other convictions.

34. Prior to agreeing to work for defendant, plaintiff attended an orientation workshop for applicants.  The speakers at the orientation either actually had the authority to contract on behalf of defendant or held themselves out as able to contract on behalf of defendant.  To get a contract with the United States government, defendant Titan falsely assured the Department of Defense that it had a more than sufficient supply of Arabic interpreters.  In fact, the defendant had not signed up nearly enough personnel to fulfill its contract with DOJ.  Due to an extremely high demand for Arabic language interpreters, defendant found it very difficult to hire a sufficient number of interpreters to meet its obligations under contracts between defendant and the United States Department of Defense.  In order to meet its contractual obligations to the government,

defendant resorted to trickery to dupe a sufficient number of stooges to go to Kuwait and later Iraq.

35. Agents of defendant represented that the contract with the government only covered interpreting in Kuwait and under no circumstances would the interpreters be sent into Iraq.

36. Agents of defendant further stated that each of the interpreters hired would immediately be placed into a luxury air-conditioned apartment building including a fitness center and a pool. Defendant promised each applicant that they would at all times receive their own bedroom and bathroom, running water, electricity, mail service, and phone service. Defendant assured plaintiff and all other applicants, access to restaurants and stores where he could purchase food, beverages, and other necessities. Defendant represented that the company had already obtained each of the accommodations listed above and that the facilities were fully constructed, operational, and available in sufficient numbers for immediate occupancy by plaintiff and other applicants. The defendant actually knew that no apartment building or any other structure had been or would be procured and that plaintiff would instead live under the conditions described below. The defendant's sole purpose of intentionally lying to plaintiff and others was to induce them into traveling to Iraq.

37. At the orientation, the defendant offered the plaintiff and other applicants the opportunity to work for the company under the terms described in the orientation employment.

38. After careful consideration and relying on the promises made by defendant and President Bush, plaintiff accepted defendant's offer of employment.

39. On January 17, 2003, Abdulwahab Nattah signed an employment contract with Titan

Systems Corporation. Titan Systems Corporation employed Mr. Nattah as a CAT II Arabic

Linguist assigned solely to Kuwait. Although the contract indicated that the defendant called for

plaintiff to only serve in Kuwait, defendant actually knew plaintiff would be sent into Iraq

shortly after his arrival. Even though defendant knew plaintiff would be sent into combat,

defendant did not provide for combat pay. The contract called for a starting annual base salary

of $70,000 ($2,692.31 biweekly), plus a $3,250 completion bonus at 6 and 12 months. Mr.

Nattah was to report to Kevin Hopkins in the Operational Analysis and Training Group with a

start date of January 19, 2003.

40. Plaintiff flew to Kuwait only based on and in reliance on the defendants' promises

enumerated above.

41. Upon arriving in Kuwait, defendant sequestered plaintiff in a rustic barbaric military

encampment in the middle of the desert without any access to the outside world. Defendant and

the United States troops guarding him required him to live in a tent with 40 soldiers. The tent

did not include phone, mail, air-conditioning, running water, or electricity. Defendant required

plaintiff to consistently eat distasteful food and live under the most wretched conditions. Upon

arrival, an officer responsible for supervising plaintiff promised plaintiff he would not be asked

to leave Kuwait, would not be assigned to any combat operations, and he would not have to go

into Iraq. The military further told plaintiff his only duties would consist of interpreting and

translating behind the lines within Kuwait.

42. During the two months leading up to the American invasion of Iraq, the military forces

guarding plaintiff consistently moved deeper into the desert and closer and closer to the frontier

with Iraq. Plaintiff consistently maintained and told the appropriated military and civilians and supervisors for Titan that he would not go into Iraq.

43. Prior to the invasion of Iraq, defendant Titan knew that plaintiff would not voluntarily go into Iraq and further knew that military officials wanted to impress and draft him into military service. Defendant could have pulled plaintiff out of Kuwait and prevented him from serving in Iraq. Instead, defendant sold plaintiff as a slave to the military. Defendant then sent the military invoices to consummate the sale. The military purchased the plaintiff slave and paid invoices for his slave labor.

44. After the military bought plaintiff from the defendant, the U.S. military seized plaintiff using physical force and made plaintiff one of the first prisoners of war. With the defendant's permission, military forces displaying firearms took plaintiff into Iraq.

45. On March 20, 2003, Mr. Nattah was deployed to Iraq as an Arabic-English interpreter for the military. At this time the military was engaged in military operations in Iraq. Plaintiff served in the vanguard of the coalition's invasion force and was among the very first military units entering Iraq. Plaintiff's placement on the battlefield made him particularly susceptible to injury. Defendants required plaintiff to ride in a Home V with no protection against small arms or explosives. Due to the lack of protection, bullets ripped through the Home V on several occasions nearly killing plaintiff. During his tenure as an interpreter, Mr. Nattah was stationed on the front line in Iraq. In fact, Mr. Nattah even served time in a tank. Plaintiff endured days of driving up and down mountains and through the desert. While the nights were bone chillingly cold, plaintiff's jaw froze shut because of the defendants' refusal to provide winterized gear. Daylight unleashed unbearable heat and sandstorms. Plaintiff challenged his confinement and

objected to his confinement, but neither the military nor Titan would agree to release him from bondage.

46. The Home V crew drove for four days continuously, without any stops, except for ten-minute breaks to refill the fuel tank. Plaintiff could not sleep due to the extreme cold and rough terrain. Plaintiff did not receive any sort of overtime, combat or hazardous duty pay to compensate for the risks or conditions.

47. Plaintiff witnessed mistreatment of prisoners of war including the needless infliction of pain, broken legs and ribs, refusal of medical care, deprivation of food and water, and a fight injuring numerous prisoners. As prisoners died due to lack of medical care, plaintiff counseled the dying victims. Defendants' subjected plaintiff to the horrors of war. Plaintiff observed prisoners with intestines protruding from their abdomen and blood gushing slashed throats.

48. A rocket propelled grenade nearly hit plaintiff, and he spent the night in a bunker under constant shelling.

49. Plaintiff's unit fought their way into Saddam Hussein's castle and ordered plaintiff to translate documents for clues about weapons of mass destruction.

50. Plaintiff's unit experienced incessant exposure to thick toxic black smoke and flames. During his tenure, Mr. Nattah was exposed to loud noise as a result of excessive shelling and explosions. During the campaign, plaintiff worked under highly dangerous conditions. His outfit became caught up in a full-fledged battle including artillery duals. The explosion of mortar shells severely injured plaintiff.

51. Defendants next conscripted plaintiff to serve in a Bradley tank crew, but they provided no training in operating a tank. Iraqi forces hit the tank using a variety of weapons. Comrades serving with plaintiff described him as a war hero. Soldier noted that plaintiff's indispensable role in the unit's mission success. Plaintiff later received the Medal of Honor.

52. Plaintiff later served in Mosul and Baghdad. Due to the suspension of the writ of habeas corpus and unavailability of U.S. or Iraqi courts, plaintiff could not seek his freedom.

53. During this time period, Mr. Nattah experienced loss of hearing and ringing sounds in his ears, difficulty sleeping, and recurring nightmares of bodies reaching out to choke him. Mr. Nattah was examined at the American Clinic in Iraq. They recommended Mr. Nattah be flown to Germany for a detailed medical examination. While en route to Germany, two doctors examined Mr. Nattah in Qatar.

54. On May 16, 2003, Dr. Curry Morton examined Mr. Nattah at the American Army Hospital in Landstuhl, Germany. Dr. Morton discovered Mr. Nattah had experienced tremendous loss in his hearing. Dr. Morton also discovered Mr. Nattah had a severe injury on the left side of his head. He recommended immediate surgery and tried to make arrangements for it to take place at the American Army Hospital. However, the hospital was not equipped for the type of brain surgery that Mr. Nattah required, so Dr. Morton advised Mr. Nattah to transfer to the University of Hamburg Hospital to have surgery.

55. On June 17, 2003, Rob Hansen, Deputy Directory for Operations, came into the barracks Mr. Nattah shared with other recovering soldiers. Mr. Hansen began raising his voice and asking one of the soldiers if he was Mr. Nattah. The soldier responded he was not Mr. Nattah, but told him

that Mr. Nattah had just left for the hospital in Landstuhl Hospital. Mr. Hansen responded by disclosing to the soldier Mr. Nattah's personal information and saying he did not belong there anymore. He said Mr. Nattah needed to go back to the United States, as he was on leave without pay as of May 12, 2003. Mr. Hansen then wrote a small memo and put it in clear view on Mr. Nattah's bed for everyone to read.

56. The next day Mr. Nattah placed calls to Mr. Hansen and tried to set up an appointment to discuss the situation, however Mr. Hansen refused saying he did not have time for Mr. Nattah because he was leaving for Afghanistan the upcoming Friday. Mr. Nattah requested leave as a reasonable accommodation of disability as well as leave under the Family and Medical Leave Act. Mr. Nattah stated that he needed to stay in Germany, because turbulent associated with a flight back to the United States would result in his death. Hansen stated he could care less whether Nattah lived or died. Hansen next told Mr. Nattah he was terminated adding "Titan does not need crippled camel jockeys like you anymore."

57. On June 21, one day before Mr. Nattah entered the hospital, two thugs employed by Titan entered the barracks without knocking or acknowledging their presence. The henchmen approached Mr. Nattah, assaulted him, and told him to gather his belongings so they could take him to see a doctor. One of the hoodlums said, "Come on you nigger, let's go." Mr. Nattah said, "It is Sunday and there are no doctors on Sunday." Mr. Nattah began to raise his voice so his roommate could wake up and summon the MPs to get the two men to leave the barracks. The MPs intervened and told the two men to leave, advising Mr. Nattah to call the MPs again if the men returned.

58. Mr. Nattah entered the University of Hamburg Hospital on June 22, 2003, and his surgery took place the next day, on June 23. Unfortunately, there were complications from the surgery, and the doctors had to perform a second surgery on July 8. Mr. Nattah was subsequently released from the hospital on July 23. He flew home the next day, on July 24.

59. Despite both surgeries, Mr. Nattah has lost all hearing in his left ear and partial hearing in his right ear. Mr. Nattah also has head, neck, and back pain, as well as symptoms of post-traumatic stress syndrome.

60. When Mr. Nattah returned home from the hospital, on July 22, 2003 he received a memo from Adam (Titan's driver) dated June 25, 2003. I asked the driver to change the date to July 22, 2003. He refused. On July 25, 2003, Mr. Nattah sent a communication to Ben Adams, Senior Vice President of Titan, about a memorandum he sent to Mr. Nattah.

61. Mr. Nattah told Mr. Adams that the military personnel in Landstuhl Hospital had never directed him to go back to the US.

62. Mrs. Nattah attempted to contact Mr. Hansen to inquire about her husband's condition and Titan refused to cooperate and they replied that Mr. Hansen was not available. She contacted Congressman Dough Ose for assistance.

63. In August 2003, Dough Ose answered Mr. Nattah's letter. He said Mr. Nattah's case has been assigned to Michelle Smira in the Sacramento District Office and that in accordance with the Federal Privacy Act of 1974, she needed a written authorization on record before she could proceed. Mr. Nattah signed the authorization form and gave authority to Dough Ose to get

involved and resolve the case. That same month, Mr. Nattah received a letter from Titan dated in July, which informed him he had been terminated. No reason was stated.

64. On October 15, 2003, Kimberly L. Clausen, Congressional Coordinator of the Inquiry Division of the Department of the Army, (Mr. Ose had corresponded with Kimberly L. Clausen asking for assistance in the situation) sent a letter to Mr. Ose to inform him the US Army does not have jurisdiction over relationships between contractors and their employees. Therefore, she was unable to offer any assistance in the matter. She also said if Mr. Nattah believes he was treated inappropriately, he should contact his Human Resource Office at Titan.

65. On October 31, 2003, the law firm of Laughlin Falbo Levy & Moresi LLP sent a letter to Dr. William F. Boyle, MD asking him to examine Mr. Nattah and determine what the cause of the loss of hearing was and to respond by December.

66. On November 28, 2003, Dr. Boyle sent his medical report to Roger A. Levy, Titan's attorney. Dr. Boyle's diagnosis was as follows:   1. Total deafness, left ear; 2. sensorineural hearing loss, right ear; 3.Chronic tinnitus.

67. On December 13, 2003, Mr. Nattah asked Dr. Boyle to correct his report. Mr. Nattah said the audiogram was never an issue and was not requested by Titan. He said the audiogram showed an equal amount of hearing loss in both ears before surgery. Mr. Nattah asked Dr. Boyle if his hearing could be improved, and he responded, "What is lost cannot be retrieved. Sorry, I can't help you."

68. On January 7, 2004, Dr. Boyle sent a response to Mr. Levy's letter, correcting his report and stating Mr. Nattah must be aware there is no medical or surgical treatment available at this time to improve his hearing.

## Count I.  Misrepresentation

69. Plaintiff incorporates paragraphs 1-11 above by reference.

70. Defendant Bush stated during 2003 and early 2004 that his administration had not decided whether or not he wanted to go to war against Iraq. In fact, the agents of Bush notified the government of the United Kingdom in the summer of 2002 that the decision to go to war in Iraq was a foregone conclusion.

71. Defendant Bush further stated Iraq was currently producing and deploying weapons of mass destruction.  In fact, Iraq was not producing or deploying such weapons. Infrastructure previously used for weapons productions had been destroyed, converted for civilians use, or dormant, mothballed and under U.N. supervision.

72. Defendant Bush also said Iraq was in the process of reconstituting its nuclear weapons program, purchasing component part for bombs, Iraq would construct nuclear weapons without American intervention. In the 2003 State of the Union address, Bush called Saddam Hussein, "The dictator who is assembling the world's most dangerous weapons". The word "assembling" places the phrase in the present tense.  At the time of the address though, Iraq was not assembling WMP or other banned weapons. In fact, Iraq had not taken any steps to restart nuclear weapons productions, would not have been able to build nuclear weapons had the U.S. not intervened, and was not purchasing components for nuclear weapons.

73. The President and other administration officials pointed to Iraqi involvement in the 9-11 attacks. President Bush stated, "And this Congress and the American people must recognize another threat. Evidence from intelligence sources, secret communications, and statements by people now in custody reveal that Saddam Hussein aids and protects terrorists, including members of al Qaeda. Secretly, and without fingerprints, he could provide one of his hidden weapons to terrorists, or help them develop their own. Before September the 11th, many in the world believed that Saddam Hussein could be contained. But chemical agents, lethal viruses and shadowy terrorist networks are not easily contained. Imagine those 19 hijackers with other weapons and other plans -- this time armed by Saddam Hussein. It would take one vial, one canister, one crate slipped into this country to bring a day of horror like none we have ever known. We will do everything in our power to make sure that day never comes." In fact, Iraq played no role in the 9/11 attacks and was not aiding, protecting, or harboring al Qaeda or its members.

74. The administration also claimed Iraq violated United Nations resolutions by retaining weapons of mass destruction.

75. President Bush asserted that Iraq had a stockpile of WMP. In fact, Iraq did not have stockpiles of WMD. Although he stated repeatedly that the stockpile was a fact and said he knew this fact based upon secret intelligence, no such intelligence existed and the United States did not have any spies inside Iraq. Although Bush stated the WMD possession was a hard fact, the administration assumed that any unaccounted for chemical agents and munitions had not been destroyed.

76. The President stated that violation of U.N. violations was the caucus beli of the war and the motivating factor behind efforts to win approval of the war. However, Bush failed to disclose that campaign contributions from merchants of death including but not limited to defendant Titan motivated the administration to invade Iraq thereby necessitating the awarding of contracts to Titan and others.

77. Defendant Bush claimed throughout 2003 and early 2004 that he hoped the United Nations would find a method to resolve the WMD dispute without resorting to war. Furthermore, he claimed the United States would not go to war if Iraq complied with U.N. Resolution. Although Iraq complied with U.N. resolutions regarding inspections and disarmament, the United States launched a war of aggression against Iraq.

78. Defendant Bush claimed Iraq posed a direct and imminent threat to the United States and Iraq would shortly attack the United States itself or would transfer WMD to terrorists who would in turn use the weapons on the United States. The White House Web site, the White House claimed, without attribution, that Iraq "could launch a biological or chemical attack 45 minutes after the order is given." The White House claimed it had secret information backing up the claim. In fact, no such intelligence or other data existed. The White House made the web page statement without any factual basis, and Bush issued the statement purely to deceive the American people into supporting an invasion of Iraq. Upon occupying Iraq, inspectors learned that Iraq had no ability to launch an attack on the United States and at the time of the invasion Iraq posed no imminent threat to the United States, and Iraq had no ability to launch a chemical or biological attack on anyone. Further, Iraq had no procedure or intention of transferring WMD to a terrorist organization.

79. Prior to war, the President said if the United States attacked Iraq, the campaign would not involve a long complicated occupation effort and would minimize the risks and costs. British officials and the United States State Department warned about inadequate preparation for occupation and criticized overly rosy administration projections. The war led to a prolonged occupation and insurgency.

80. President Bush claimed the war was necessary to cleanse Iraq of terrorists and reduce the number of terrorists. In fact, Iraq was not a haven for terrorists prior to the war and played little role in supporting international terrorism. Iraq's financial support of terrorism was little to encouraging suicide bombers in Israel. The war has in fact tremendously inflamed, inspired, increased, and rallied terrorist recruitment efforts. As a direct result of the American invasion, the number of terrorists residing in Iraq has grown exponentially.

81. Shortly after the conquest of Iraq, President Bush gave a speech under the banner "Mission Accomplished". However, to date the mission has not been accomplished. To date, the mission is a moving target and accomplishment a chimera. Although defendant Cheney asserted that based on secret intelligence the insurgency was in the throws of its final days and collapse, no such intelligence existed, and the insurgency has continued with no end in sight.

82. Based upon the statements made by President Bush and his surrogates, plaintiff Nattah believed a war between Iraq and the United States war unlikely, because the United Nations was making progress she thought the issue of inspections could be resolved.

83. The new Iraqi government is not engaged in the production, deployment, or research into WMD.

84. WMD provided the original justification for the war, but since the conquest of Iraq, the rationale for the occupation has changed. President Bush now asserts the rationale for attacking Iraq was to change the regime and promote democracy in the Middle East.

85. Prior to plaintiff's departure to Kuwait, President Bush promised plaintiff and others the United States would not initiate a draft to conscript Americans to serve in Iraq. Subsequently, the United States military drafted plaintiff by purchasing him from defendant Titan.

86. President Bush and other administration officials described above were statements of fact and were not statements of opinion.

87. Numerous statements of facts made above were later found to be inaccurate and untrue at the time they were uttered.

88. President Bush also made predictions about the success, safety, timing, and outcome of operations in Iraq. He transmitted these rosy forecasts to the American people including plaintiff and military personnel. American military engaged in military operations in Iraq were not prepared for the insurgency, and President Bush's predictions have not come to fruition.

89. President Bush's actual knew or a reasonable person would not that the above statement would play a significant role in inducing a reasonable person to enter into contracts with the United States government or indirectly through corporate contractors. At the time of the State of Union in fact, the administration was issuing contracts to defense contractors such as Titan, and Bush knew the contractors would hire employees to work on these contracts.

90. President Bush also knew that individuals considering working on government contracts would rely on his statements.

91. Plaintiff traveled to Kuwait in reliance on each of the President and administration statements listed above.

92. In particular, Plaintiff traveled to Kuwait and accepted a job there on Bush's promise that he would not and could not be drafted.

93. Plaintiff traveled to Kuwait in reliance on Bush's promises, assurances, and predictions that the war in Iraq would be swift and would not entail fighting an insurgency. Based on the President's statements, plaintiff reasonably believed he would and could be called upon to go into battle and participate in urban warfare. Had he known of this risk, he would not have gone to Iraq. Prior to the war, the United States State Department and the British government strongly cautioned about the chaos and insurgency that would be let loose by an invasion. However, the Bush administration opted to play down and hide these risks from the American people including the plaintiff.

94. Moved and inspired by Bush, plaintiff traveled to Kuwait to serve his country under the false impression that the United States was at risk of imminent attack. Had plaintiff known that (1) the United States not been under threat of attack, Iraq was not supporting al Qaeda and was not involved in 9/11, (3) did not possess weapons of mass destruction, and (4) Iraq was in compliance with U.N. resolutions, plaintiff would not have been moved to serve his country.

95. Bush intentionally placed plaintiff under the false impression that the purpose of the war was to disarm Iraq. This very limited objective could have been accomplished disarming the Iraqi