military, capturing those associated with WMD production and use, and then leaving the country. The United States would have suffered vastly less casualties had the military executed the mission originally assigned to it, because most casualties have been suffered since the end of "major combat operations." The true motivation for the war required a vastly more arduous mission and placed plaintiff at far greater risk. Had plaintiff known that the goal of the war would become the broader mission of promoting democracy in the Middle East, he would not have volunteered, because this mission entailed greater personal risk.

96. Plaintiff's reliance on Bush's statements, promises, and predictions was reasonable. The defendant hired 4,000 interpreters to perform its contract. The sheer number of people signing up for jobs with defendant establishes that plaintiff was not unique relying on the President's words, and therefore plaintiff reasonably relied on Bush's words.

97. The United States Congress approved military operations in Iraq based upon the President's representations discussed above. Congressional approval indicates the President's statements were capable of convincing a reasonable person.

98. The plaintiff had to rely on statement made by the President, because he could not independently investigate the President's claims. The President purported to summarize classified top secret intelligence reports. Plaintiff did not have access to this data.

99. Due his reliance on Bush's misstatements, plaintiff found himself in an urban combat zone. Bush's placement of plaintiff on the battlefield made it foreseeable that plaintiff would be injured in battle. Numerous press reports have described interpreters in Iraq as having the "world's most dangerous job". During combat, plaintiff sustained grievous injury.

100. After plaintiff's war injury, the agents of defendant Rumsfeld continued to mislead plaintiff. Plaintiff and his Congressman wrote agents of Rumsfeld to complain of Titan's mistreatment of plaintiff. The Department of Defense stated it had no jurisdiction over defense contractors and could not take any action whatsoever against Titan. Indeed, the Department would not any responsibility for conduct of U.S. military personnel. The Department would not investigate, apologize for, acknowledge, or settle plaintiff's claims. The failure of investigation plaintiff's claim indicates that Rumsfeld condones or is apathetic about mistreatment of Arab civilian working on behalf of DOD.

101. The DOD statement that it had no jurisdiction either was a lie or accurately captured the Department's view of Defense contractors.   DOD regulations prohibit trafficking in persons. Plaintiff alleged Titan trafficked in persons by selling him to DOD. The agency has legal authority to monetarily sanction the contractor for this regulation. The agency further had the authority to terminate defendant's contract or simply not renew the contract.

102. Plaintiff further alleged defendant did not pay him combat pay during the conflict and placed him on leave without pay while plaintiff was still working for defendant. The failure to pay no less than the rate of pay determined by the Department of Labor constituted a violation of the contract. The DOD had the option of either contacting the contractor and seeking contract compliance or terminating the contract due to the violation of the wage determination.   DOD took no action to look into the allegation.

103. The Defense Base Act applies workers compensation abroad to all foreign military operations and facilities. Within 10 days of any injury, the Defense Base Act required Titan to file a form notifying the government of the plaintiff's injury. Memories fade over time, and

proper clearance to interpret in a highly classified environment. DoD declined to take any action against the companies or the individuals. Therefore, federal taxpayers actually paid for time spent raping and torturing detainees.

108. After learning of plaintiff's enslavement by defendant, contract violations, and torture of Muslim prisoners, the DoD placed its imperator on the misconduct by renewing Titan's contract. The DOD took no action against soldiers it knew had purchased plaintiff from Titan and made him a slave of the U.S. military.

109. Plaintiff has exhausted all administrative remedies, because he notified defendants of the illegal and tortuous conduct, and defendants issued a final denying his claim.

110. False statements made by Rumsfeld and his agents saying they had no method of policing DoD contractors amplify and build upon previous inaccurate false statements made by Bush prior to the war.

## Count II.  Promissory Estoppel

111. Plaintiff incorporates paragraphs 1-27 by reference.

## Count III.  Suspension of the Writ of Habeas Corpus

112. Plaintiff incorporates paragraph s 1-14 above by reference.

113. Article II of the United States Constitution provides, "The privilege of the writ of habeas corpus shall not be suspended, unless when in cases of rebellion or invasion the public safety

121. Defendant Titan knew, facilitated, and approved of the suspension of the writ of habeas. Specifically, defendant Titan refused to allow plaintiff to communicate with the outside world. When contacted by plaintiff's parents, defendant Titan stated that plaintiff was safe, well, and residing in an apartment in Kuwait. Defendant knew plaintiff was not safe, well, or residing in Kuwait. The purpose and affect of defendant's knowingly false statements were to dissuade his parents from seeking a writ of habeas corpus to obtain their son's release from custody.

122. Plaintiff's profession is Arabic interpreter. The present suspension of the writ of habeas corpus deters plaintiff from seeking employment in his field, and plaintiff will suffer irreparable harm until writ is restored.


## Count IV.  Due Process

123. Military officials placed plaintiff under arrest and made him a prisoner of war.

124. Prior to and after his arrest, plaintiff received no notice of his impending arrest. To the contrary, he was assured he would not be arrested. Prior to and after his arrest, plaintiff received no opportunity to be heard and no opportunity to challenged or redress his illegal detention.

125. Plaintiff had a liberty interest in his own safety, security, and freedom to travel.

126. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." Marbury v. Madison, 1 Cranch 137, 163 (1803).

127. The Fifth Amendment states, "nor be deprived of life, liberty, or property, without due process of law".

128. Defendant Rumsfeld deprived plaintiff of his liberty.

129. Due process required Rumsfeld to accord plaintiff, notice of the charges against him and a hearing to obtain his release.

130. Prior to, during, or even after his detention, defendant Rumsfeld gave plaintiff no notice of his impending detention, did not provide any method of contesting his detention, and did not give plaintiff any opportunity to be heard.

131. Furthermore, United States law specifically precluded the military from impressing any American citizen into military service.

132. The United States military breached its duty to respect plaintiff's liberty by detaining him for an indefinite period without means of escape or redress.

133. As a direct and proximate result of plaintiff's illegal detention, plaintiff was severely wounded by a mortar shell, has sustained great mental distress damages, and is unable to pursue his career and earn wages due to loss of hearing.

134. Taken as a whole, the facts demonstrate a violation of substantive due process, because the facts described "shocks the conscience".

# Count V First, Third, and Fourth Amendments of the United States Constitution

135. The Fourth Amendment to the United States Constitution provides that persons shall be secure in their persons absent probable cause and warrant for their arrest.

136. The First Amendment includes a freedom of association as well as the corollary right to abstain from association, and defendants' violated plaintiff's rights by requiring him to associate with the military despite his status as a conscious objector.

137. The United States military did not charge plaintiff with any crime and indeed had no evidence or even suspicion plaintiff committed any crime.

138. The military lacked any warrant or any other claim of authority to detain plaintiff. The military acted under an administration policy under which warrants are not necessary. The military lacked authority to detain plaintiff, because the invasion of Iraq was a war of aggression violating international law and prohibited by the United Nations Charter.

139. The Security Council did not authorize the war. Rather the council authorized action in the event of Iraqi non-compliance. Since Iraq was in compliance with U.N. resolutions, the war was not authorized.

140. Further, the Security Council lacks authority to abrogate the U.N. Charter.

141. Under international law and law of foreign relations, the United States is sovereign;
however, it must fulfill existing international law obligations. Prior to the Iraq war, the United
States had a choice of withdrawing from the United Nations or foregoing military operations.
By launching a war of aggression without first withdrawing from the U.N., the United States
violated the U.N. charter.

142. The military breached its duty to respect plaintiff's physical privacy and integrity and seized
him, and Plaintiff's impressments into the military amounts to a search and seizure as defined by
the 4th Amendment.

143. The Third Amendment provides, "No Soldier shall, in time of peace be quartered in any
house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by
law."

144. A penumbra or conjuncture between the First, Third, Fourth, and Fifth Amendments
prohibits utilization of a draft in an arbitrary or capricious manner.

145. These three Amendments in combination with the First Amendment preclude drafting
conscious objectors.

146. Plaintiff's moral and religious convictions preclude him from participating in military
operations. The contract plaintiff originally signed called for plaintiff to interpret behind the
scenes without direct participation in combat operations.

147. Rumsfeld's purchase of plaintiff and deployment of him into Iraq violated plaintiff's
constitutional rights by drafting him notwithstanding his status as a conscious objector.

148. As a direct and proximate result of plaintiff's illegal detention, plaintiff was severely wounded by a mortar shell, has sustained great mental distress damages, and is unable to pursue his career and earn wages due to loss of hearing.

## Count VI Geneva Convention/War Crimes Act

### Customary International Law

149. At the direction of defendant Bush, White House Counsel and the Department of Justice concocted a scheme to by pass and violate the procedures and law governing the treatment of prisoners of war. The purpose of the new policy was to aid American forces win wars in Iraq and Afghanistan.

150. The Geneva Convention relative to the Treatment of Prisoners of War was adopted on 12 August 1949 by the Diplomatic Conference for the Establishment of International Conventions for the Protection of Victims of War, held in Geneva from 21 April to 12 August, 1949 and went *into force* 21 October 1950.

151. Under the Bush policy, United States law enforcement, intelligence, and military officials received the authorization that anyone found on the battlefield for any reason and deprived prisoners of war notice of the charges against them and an opportunity to be heard (unclear). Bush authorized this policy to be applied to United States citizens as well as foreign fighters.

152. Bush authorized Rumsfeld, law enforcement, and intelligence services to hold prisoners of war without declaring them and making them available for outsiders to inspect them and ensure

their health and safety treatment.   Also, at Bush's direction, White House Counsel drew of methods of torturing prisoners.

153. Pursuant to a much broader policy regarding detention, agents of Rumsfeld purchased and captured while on the battlefield and made him a prisoner of war.

154. Article 3 of the Geneva Convention states:

In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each party to the conflict shall be bound to apply, as a minimum, the following provisions:

155. Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, color, religion or faith, sex, birth or wealth, or any other similar criteria.

To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

(a) Violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

(b) Taking of hostages;

(c) Outrages upon personal dignity, in particular, humiliating and degrading treatment;

(d) The passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

156. Article III precedes the portion of the treaty dealing with prisoners of war. Unlike Article IV, applies not only to persons in the hands of an "enemy" but rather to all "persons taking no part in hostilities". Persons falling into the category outlined in Article III include a broader ranger of persons, but persons falling only under Article III are entitled to less protection than those also protected by Article IV.

157. Plaintiff was either one of the "Persons taking no activity role in the hostilities" as defined by Article III and a war prisoner as defined Article IV, because under Article Four (4) includes: Persons who accompany the armed forces without actually being members thereof, such as civilian members of military aircraft crews, war correspondents, supply contractors, members of labor units or of services responsible for the welfare of the armed forces, provided that they have received authorization from the armed forces which they accompany, who shall provide them for that purpose with an identity card similar to the annexed model.

158. Agents of Rumsfeld implementing the policies of Rumsfeld and Bush subjected plaintiff to "violence to life and person" within the meaning of the Convention by knowing and intentionally placing him on the battlefield. Agents of Rumsfeld knew the assignments given to plaintiff subjected plaintiff to intense and highly dangerous enemy fire. Press accounts described interpreters as having the "Most dangerous job in Iraq."

159. Although plaintiff was subjected to the same risks encountered by American troops, Rumfeld's agents did not issue body armor to plaintiff. The failure to provide body armor evinces a lack of concern for plaintiff safety.

160. The Convention further obligated Rumsfeld to abstain from "outrages to personal dignity".

161. The Merriam-Webster on-line dictionary defines outrages as "**a:** INJURY, INSULT, and **b:** an act that violates accepted standards of behavior or taste."

162. The Merriam-Webster on-line dictionary defines "dignity" as "the quality or state of being worthy, honored, or esteemed".

163. Agents of Rumsfeld treated plaintiff like sub-human slave. By impressing him into service through threat and brandishing weapons, agents of defendant severely violated plaintiff's personal dignity.

164. Agents of Rumsfeld purchased plaintiff as a slave, impressed him into the military, and required him to participate in combat.   These activities constitute outrages, because they do not conform to "acceptable standards of behavior". International and domestic norms and values dating back to the 19th century made the purchase of slaves utterly repugnant. Further, United States norms treat the arbitrary and capricious drafting of persons as unacceptable behavior.

165. Article Three of the Convention further precludes adverse treatment based upon race, religion, and national origin. Agents of defendant reckoned that because plaintiff was an African of Libyan national origin and Islamic faith, plaintiff was an "enemy" as is defined in the

Convention and could be purchased and sent into combat. Caucasian, non-Arab, and Christian interprets did not receive the adverse treatment experienced by plaintiff.

166. Like numerous other Arabs, Rumsfeld did not declare and permit inspection of plaintiff by international organizations as required by the Geneva Convention.

167. Article 5 provides:

Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal.

168. Bush made and Rumsfeld implemented an official policy violating Article 5. Their policy held that in the event that there is doubt over whether a person falls into one of the categories listed in Article 4, the person is NOT treated as though they fall into one of the categories listed in Article 4.   Their policy specifically did not provide for review of their status by a competent tribunal, and in legal proceedings they have consistently fought against permitting review by a competent tribunal of whether detainees falls within the scope of Article 4. Bush administration policy mandated the secret detention of dozens of individuals including plaintiff. The administration withheld notification and inspection of the Red Cross and other organizations to enable their secret detention and facilitate torture of secret detainees.

169. Even assuming plaintiff actually did not fall under the provisions of Article 4; defendant violated the treaty by failing to provide the protections guaranteed to prisoners until such time as their status could be determined.

170. Under customary international law and rules of warfare, no nation may seize a person found on the battlefield or force them to work for the occupying power unless the person has been adjudicated to have committed some offense.

171. Plaintiff has been permanently traumatized by atrocities and violations of the Geneva Convention he witnessed in Iraq. Due to extreme mental anguish, plaintiff has suffered and will continue to suffer damages.

172. As a translator, he assisted in interrogating prisoners. He witnessed human mutilation, decapitation, carnage, human body parts, and dismemberment and experienced near death incidents.

173. Defendants compelled plaintiff to assist in violations of the Geneva Convention. Plaintiff translated conversations where U.S. troops withheld water from prisoner of war and refused to provide medical treatment to prisoners of war until such time as the Iraqi soldier confessed and/or provided intelligence information. On other occasions, plaintiff witnessed a strict rationing of medical care and water attributable to negligence or poor planning. Due to rationing, he observed injured Iraqi's left to die without medical care, while other prisoner endured needless suffering and inhuman conditions due to lack of water and medical care.

174. Defendant Titan knew of and participated in the violations of the Geneva Convention alleged above.

## Count VII International Law Launching a War of Aggression

175. The United Nations Charter forbids the initiation of a "war of aggression".

176. Prior to and at the time of the U.S. invasion of Iraq, the United States was in no danger of an attack by Iraq, Iraq planned no offensive operations against the United States, and Iraq had no means of manufacturing, possessing, deploying or distributing weapons of mass destruction.

177. The Security Council's permission to use force only applied if Iraq failed to comply with Security Council resolution.   Although Iraq had in fact come into compliance with those resolutions, the United States launched an unprovoked attack upon Iraq nevertheless.

178. The Merriam Webster dictionary defines aggression as, "The act of initiating hostilities or invasion".

179. Customary and international treaty law stemming from the Nuremberg principals holds that governmental officials are personally liable for war crimes including the initiation of a war of aggression.

180. Defendant Cheney formulated a plan to launch a war of aggression against Iraq and defendant Bush approved his plans.

181. At the time of initiation of the war of aggression against Iraq, the military took plaintiff into custody. Had Bush and Cheney not launched a war of aggression, plaintiff would never have been taken into custody, would not have experienced the horrors of war, would never have suffered a combat injury, and would never have experienced reduced wages and earning potential. The war of aggression was the sole, actual, proximate, and direct cause of all these indignities and injuries.

182. A damages remedy is essential to deter future egregious violations of international law.

## Count VIII Slavery

189. Plaintiff incorporates paragraphs 1-100 above by reference.

## Count IX.  Assault (German Law)

190. Plaintiff incorporates paragraphs 1-100 above by reference.

191. The ruffians retained by Titan intent burst into plaintiff's hospital room. They words, mannerism, and body language were intended to cause fear and thereby coerce and intimidate plaintiff into leaving with them.

192. The threats placed plaintiff in actual apprehension and fear of immediate, harmful, and offensive bodily contact.

193. Plaintiff summoned military police intervened at the last moment prevented the battery. The ruffians only left the premises upon pain of arrest by military police.

## Count X Right to Travel

194. Plaintiff incorporates paragraphs 1-100 above by reference.

## Count XI Outrageous Conduct under Kuwaiti, Iraq, and German Law

195. Plaintiff incorporates paragraphs 1-30 above by reference.

196. The totality of the facts alleged above demonstrate defendants conduct was beyond all the standards and bounds of decency shared by civilized nations.

197. The defendant's actions intentionally, recklessly, and actually caused shock, anxiety, stress, and great emotional trauma. A reasonable person in plaintiff's position would find defendant's conduct to be outrageous.

198. Based upon information given to Titan as well as his personal appearance and presence in an emergency recovery room, defendant Titan was well aware of plaintiff's particular susceptibility to coercion and inability to resist mentally or physically to an assault and battery.

199. Titan's actions succeeded in causing plaintiff extreme and debilitating mental anguish, anxiety, stress, confusion, consternation, and upset. Wherefore, plaintiff suffered damages.

## Count XII Intentional Infliction of Emotional Distress Kuwaiti, Iraqi, and German Law

200. Plaintiff incorporates paragraphs 1-100 above by reference.

## Count XIII    Racial Discrimination in Contractual Relations Count

201. Plaintiff incorporates paragraphs 1-100 herein above by reference.

202. Defendant hired plaintiff as an employee and made a contract with him. At the time of the formation of the contract, Titan had no intention of abiding by the contract. The contract provided plaintiff would only work in Iraq translating between the army and Kuwaiti officials and would not be sent to Iraq. As mentioned above, Titan promised numerous fringe benefits and living conditions which at the time of formation of the contract defendant actually did not offer and had no intention of ever offering.

203. Evidence of Titan's racial bias towards persons of Arabic national origin is further established by Titan's pattern of collaborating in the torture of Arab detainees at the notorious Abu Grave prison and other facilities. To assist U.S. intelligence and military personnel obtain information, a Titan translator raped a prisoner within the Abu Grave prison.

204. Plaintiff became uneasy about the proximity of his unit to the Iraqi border, as he attempted to enforce his contract with Titan. He contacted the military and Titan. None of the Titan employees would take his call. Defendant intended all along to send plaintiff into the fighting in Iraq. After receiving plaintiff's phone call, defendant Titan sold plaintiff into slavery and made him the property of the U.S. armed forces. The conditions of captivity prevented plaintiff from enforcing his employment contract with defendant. Plaintiff had no access to a phone and could not escape to file a case in court.

205. Breached its employment contract with plaintiff and terminated plaintiff based upon his race African and Arabic and national origins Libyan, and Arabic.

## Count XIV.  Fraud

206. Plaintiff incorporates paragraphs 1-100 above by reference.

## Count XV.   Rehabilitation Act/Americans with Disabilities Act

207. Plaintiff herein incorporates paragraphs 1-100 above by reference.

208. Plaintiff is an employee. Defendant is a recipient of massive amounts of federal funds and thereby obligated to comply with the Rehabilitation Act of 1973.

209. At the time of plaintiff's injury, he experienced severe loss of hearing causing a substantial limitation on his ability to hear, and the ability to hear is a major life activity. Plaintiff also suffered and continues to suffer from immense physical and mental pain. His pain substantially limits his ability to concentrate. Plaintiff informed Titan of his disability on several occasions. Plaintiff asked for leave as a reasonable accommodation of his disability. Plaintiff further requested assignment to a non-combat or light duty assignment. Titan agents saw plaintiff and his doctors and were well aware of plaintiff's hardship and need for a brief period of leave. Plaintiff further requested transfer to a position translating written documents. Defendant had vacant positions to translate written materials. However, defendant denied each of plaintiff's requests for a reasonable accommodation.

210. Shortly after plaintiff requested reasonable accommodations, defendant terminated his employment.

211. Remarks made by Titan demonstrate that a bias against people with disabilities played a substantial role in his termination.

212. Defendant did not fire or discipline similarly situated able-bodied employees who requested leave.

## Count XVI Breach of Contract

213. Plaintiff incorporates paragraphs 1-100 above herein by reference.

214. Titan offered plaintiff employment only in Kuwait.

215. Plaintiff accepted Titan's offer.

216. Subsequently, defendant breached the contract by selling him to Rumsfeld for service in Iraq.

217. Defendant did not provide the fringe benefits promised to plaintiff under the contract such as an apartment, food and recreational facilities.

218. Contrary to Iraqi and Kuwati law the contract of employment was not in Arabic.

219. To the extent Titan asserts defenses under the contract, Iraqi and Kuwaiti law provides the employer may be enforce any contractual provision or defense against the employee where the employment contract is not in Arabic

## Count XVII. Iraqi Labor and Social Affairs Notification (Class Action)

220. Plaintiff and class members re-allege paragraphs 1-100 above.

221. Plaintiff Natah brings Count XVII against defendant Titan upon behalf of himself and a class of all Titan employees of Arab national origin who have ever worked in Iraq.

222. Plaintiff is of Arab national origin.

223. Iraqi law provides non-Iraqi Arabs shall legally be treated the same as Iraqi nationals.

224. Plaintiff and the class he represents are employees for purposes of Iraqi labor and employment law, because they labored in Iraq for a wage.

225. Defendant Titan is an employer, because (1) it employed one or more employees within Iraq and (2) it is a private or mixed employer.

226. Defendant Titan had a clear mandatory duty under Iraqi law to inform the Ministry of Labor and Social Affairs and the President of the General Federation of Employees' Trade Unions any time it terminates an employee.

227. Titan terminated thousands of employees working in Iraq including plaintiff.

228. Titan never informed and to this day still does not inform the Iraqi Ministry of Labor and Social Affairs or the President of the General Federation of Employees' Trade Unions of any of these terminations.

229. Titan willfully refused and continues to refuse to comply with the said notification provision of Iraqi law.

230. Plaintiff and the class he represents have been prejudiced by the failure to notify, because had Titan notified the Ministry and Union neither nor the class members would have been

terminated. Also, none of the terminations are legally valid and must be vacated as null and void. Class members are therefore entitled to lost wages and damages, and Titan must pay the Ministry and Union fines.

## Count XVIII.  Wrongful Termination

231. Plaintiff and class members re-allege paragraphs 1-100 above.

232. When employer terminates or suspends an employee, the employer must make an accusation against the employee and provide a specific reason for the termination or suspension.

233. The termination is wrongful where either (1) the accusation is false, (2) the employer is mistaken, or (3) vexatious.  Any one of these three is a reason for the termination to be wrongful and illegal.   Wrongfully terminated employees are entitled to lost wages, damages, and reinstatement.

234. Titan's stated reasons for terminating plaintiff and hundreds of class members were false, mistaken, and vexatious.

## Count XIX.  Hours of Work and Overtime

235. Plaintiff and class members re-allege paragraphs 1-104 above.

236. No employer may require an employee to work more than one shift per pay. The maximum night shift shall be seven hours per night, the maximum shift including some day and some nighttime shall be seven and one-half, and the maximum day shift shall be eight hours per day.

237. Titan required plaintiff and thousands of others to work must than one shift per day. Titan also required plaintiff and thousands of other employees to work more than seven hours at night, to work more than a seven and one-half hours of a mixed day and night shift, and to work more than and an day hour day shift. Plaintiff for example had to work 20 hours per day.

238. Employers may not require employees to work on their day of rest.

239. Titan required plaintiff and thousands of class members to work on their day of rest without the employee's consent or approval.

240. Where an employee voluntarily agrees to work more than the above specified number of hours, work more than one shift, or work on their day of rest, the employer must pay both salaried and hourly employees overtime. The employee must be paid double the rate of normal pay for night work or dangerous work. The employee must be 1.5 times the normal rate of pay for non-dangerous daytime work.

241. Titan has and continues to willfully refuse to pay any employee's overtime.

242. Plaintiff and the class members he represents worked massive amounts of overtime but did not receive any overtime pay.

243. Defendant is further to maintain a register of wages and the register subject to the inspection of labor inspectors. Defendant failed to maintain a register of wages as proscribed by Iraqi law. Iraqi law provides the register is subject to control by Iraqi labor inspectors. To the extent Titan's register or similar records exist, Titan does not make them available or subject them to control by

Iraqi labor inspectors. As a result of defendant's failure to make documents available to labor inspectors, wages paid to plaintiff and class members have been incorrect.

244. Defendant required some class members to sign a release or similar documents in order to receive their pay or severance. Iraqi law provides any release or waiver signed by employees is invalid unless the employee also signs the wage register. Where the employee does not sign the register, the claims are not discharged. Neither plaintiff nor any of the class members signed the register. To the extent some of the claims at issue may be challengeable based upon satisfaction and accord, Iraqi law explicitly prohibits such a defense, because the employees or former employees did not sign the register or because no register existed.

245. Employees subjected to a cessation of work must be paid 30 additional days of pay beyond those already due. Although defendant did cease in certain locations without providing employees alternative employment, defendant failed to pay the class members subjected to work stoppages the 30 additional days required by Iraqi law.

## Count XX (Redacted)

Wherefore plaintiff prays the court to provide the following relief against the government defendants in their official capacities:

Count I and Count II

   A. Declaratory Judgment seeking rescission of contract

   B. Declaratory Judgment holding plaintiff's detention was illegal

    C.  Declaratory Judgment seeking classification as a disabled veteran

    D.  Declaratory Judgment seeking entitlement to combat medals

    E.  Explanatory notice relief

    F.  Future combat related medical expenses through Department of Veterans Affairs

    G.  Rescission of employment contract

    H.  Attorneys' fees

    I.  Appointment of a court monitor

    J.  Appointment of special counsel immune to conflict of interest

## Count III

    A.  Preliminary and Permanent injunction prohibiting impressments, draft, or detention of citizens to serve in combat in Iraq

    B.  Declaratory Judgment seeking rescission of contract

    C.  Declaratory Judgment holding plaintiff's detention was illegal

    D.  Declaratory Judgment seeking classification as a disabled veteran

    E.  Declaratory Judgment seeking entitlement to combat medals

    F.  Explanatory notice relief

    G.  Future combat related medical expenses through Department of Veterans Affairs

    H.  Rescission of employment contract

    I.  Attorneys' fees

    J.  Such other and further relief as the court may deem just and appropriate

    K.  Writ quo warranto

## Count IV and V

A.    Permanent and temporary injunction

B.    Declaratory Judgment

C.    Nominal Damages

D.    Compensatory damages

E.    Lost wages

F.    Notice relief

G.    Public posting of court decision and notice of legal rights

H.    Punitive damages

I.    A favorable reference

J.    Reinstatement

K.    Trial by jury

L.    Re-imposition of the writ of habeas corpus

M.    Such other and further relief as the court may deem just and appropriate

Count VI and VII (Individual Capacity and Official Capacities)

A.  Permanent and temporary injunction

B.  Declaratory Judgment

C.  Nominal damages

D.  Compensatory damages

E.  Lost wages

F.  Notice relief

G.  Public posting of court decision and notice of legal rights

H.  Punitive damages

I. A favorable reference

J. Reinstatement

K. Trial by jury

L. Such other and further relief as the court may deem just and appropriate.

Counts IX through XVI:

A. Permanent and temporary injunction

B. Declaratory Judgment

C. Nominal damages

D. Compensatory damages

E. Lost wages

F. Front pay

G. Notice relief

H. Public posting of court decision and notice of legal rights

I. Punitive damages

J. A favorable reference

K. Reinstatement

L. Trial by jury

M. Such other and further relief as the court may deem just and appropriate.

Count XVII through XIX

A. Reinstatement of plaintiff and all class members

B. Back pay

C.  Front pay

D.  Compensatory and punitive damages

E.  Medical and other expenses

F.  Medical monitoring

G.  Trial by jury

H.  Attorney fees

I.  Fines of 300 Dinars per violation paid to the Iraqi government

J.  Public posting

K.  Declaratory judgment

L.  Temporary, Preliminary, and Permanent injunctions

M.  Notice relief

N.  Accounting

O.  Favorable reference

Count XX deleted under seal

A.    (Redated)

Respectfully submitted,

Michael Beattie    Bar # 450873

9502B Lee Highway

Fairfax, VA 22031

(703) 267-5783