**IN THE UNITED STATES DISTRICT COURT FOR THE**

**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ABDULWAHAB NATTAH, et al., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-00700 RCL |
| | ) | |
| GEORGE W. BUSH, et al., | ) | |
| | ) | |
| Defendant | ) | |

_____

# Plaintiff's Opposition in Response to Defendant L-3 Communications

# Titan Corporation's Motion to Dismiss

## Section I. Introduction

This brief responds to defendant Titan's motion to dismiss.   Prior to this motion, the government defendants except for those unknown government defendants covered by a Bivens tort claim moved to dismiss, and the court granted their motion.    Plaintiff submits a first amended complaint to clarify and refine the original complaint.   Mark Shallal, another former Titan employee seeks to join as a plaintiff, and Shallal and Nattah seek to join additional defendants.   Plaintiff asks the court to rule on the motion to amend and join new parties before ruling on the motion to dismiss.   Should the court grant a motion to amend, many if not all of the issues contained in the government's motions to dismiss could become moot.   Plaintiff argues the best course of action would be to grant the motion to amend, deny the motion to dismiss without prejudice, then require the government and Titan to file a responsive pleading to the amended complaint.

## Section II.   Statement of Facts

The case against Titan must not be dismissed.  The complaint alleges claims under international law, the right to travel, slavery, the Rehabilitation Act, Iraqi law, and German law.  Titan sold Nattah into slavery thereby sending him into combat with Army Intelligence.  Working as an Arabic translator, Nattah became disabled for life fighting for his country in Iraq.   While lying in a hospital bed recovering from brain surgery, Titan terminated his employment attempted to physically remove him from the hospital and ship him home to the United States.   Because a military doctor had previously ruled air travel could cause death, the hospital had to use military police to physically prevent Titan employees from removing Nattah from the hospital.   The facts of this case are so egregious that a precedent in favor of Titan would mean no employee of a government contractor working abroad could ever sue the employer, because it is difficult to imagine a more heinous factual scenario.

## III.  Introduction to Argument

Defendant Titan moved to dismiss based upon (1) failure to exhaust administrative remedies on ADA, Rehabilitation Act, and Title VII claims; (2) 42 U.S.C. 1981 does not provide for extraterritorial application; (3) False Claims Act case is redacted; (4) Rule 44.1 requires dismissal due to failure to provide notice of foreign law claims; (5) forum non-convenience warrants dismissal of Iraqi law claims; (6) doctrine of forum non-convenience requires dismissal of Kuwaiti and German law claims; (7) the Geneva Convention and U.N. Charter do not apply to corporations; (8) U.N. Charter is not self-executing; (9) failure to plead slavery and fraud claims with particularity; (10)

2

breach of contract claim governed by Virginia law's at-will employment doctrine; (11) Bowman wrongful termination claim under Virginia law does not permit recovery on the facts alleged; and (12) Fair Labor Standards Act does not apply exterritorialy.

The brief will now provide a numbered response to each of defendant's 11 reasons for dismissal.   Regarding issue (1) plaintiff requests dismissal of Title VII and A.D.A. claims because plaintiff did not receive a right to sue letter however, plaintiff maintains the Rehabilitation Act claim may not be dismissed, because the Rehabilitation Act does not require a plaintiff to obtain a right to sue letter; (2) and (3) plaintiff consents to dismissal of 42 U.S.C. 1981 and redacted False Claims Act claim; (4) Rule 44.1 does not require dismissal prior to suit but rather only notice prior to trial to prevent unfair surprise and the lawsuit itself constitutes sufficient notice; (5) forum non-convenience doctrine does not apply to claims under Iraqi law because the Iraqi civil war leaves plaintiff has no alternative forum to litigate them;  (6) forum non-convenience rule does not allow dismissal of Iraqi or Kuwaiti law claims because (a) plaintiff chose home forum, (b) more than half of documents and witnesses are most likely in the United States, (c) public policy gives the United States a stronger interest to resolve a claim by a U.S. resident and a U.S. corporation working on a U.S. government contract especially where the underlying facts occurred inside U.S. military bases; (7) the Geneva Convention is a self-executing treaty but even assuming it is not a self-executing treaty under the Alien Tort Claims Act and the War Crimes Act Congress passed implementing legislation that explicitly permits suits against corporations and individual respectively; (8) plaintiff consents to dismissal of U.N. charter claim, (9) facts relevant to the slavery and fraud claims can be found in the statement of facts and the complaint is sufficient to

put the defendant on notice of the claims asserted; however, assuming the complaint may

not be sufficiently specific plaintiff asks to file a First Amended Complaint further

explaining these claims; (10) plaintiff consents to dismissal of wrongful termination

claims ; (11) the parties formed a verbal contract governed by Kuwaiti law rather than

Virginia law, and the written confirmation letter does not purport to change the terms of

the verbal agreement; however, assuming the contract is governed by Virginia law, the

employment was not a voluntary at will contract but rather an involuntary master-servant

whereby defendant dropped plaintiff in the middle of the desert with no means to

transportation back to society and approved the Army's abduction of plaintiff  ; (12) the

complaint does not assert a claim under the Fair Labor Standards Act, but rather asserts a

claim under Iraqi wage and hour law.    The proposed First Amended Complaint does not

include the claims which plaintiff consents to dismiss.


## Section III. (a) Rights Must Give a Remedy

American, British, and Roman court have always followed the rule of *ubi jus, ibi*

*remedium*.    This Latin term translates as, "where there is a right there must be a remedy".

As Justice Marshall in *Marbury v. Madison* wrote, "If he has a right, and that right has

been violated, do the laws of his country afford him a remedy?," *Marbury v. Madison*, 1

Cranch 137, 162 (1803), the question was rhetorical, and he answered his own question

in the affirmative.  Blackstone commented, "A general and indisputable rule, that where

there is a legal right, there is also a legal remedy, by suit or action at law, whenever that

right is invaded."

The complaint states Titan made numerous false promises to induce him into traveling to Kuwait.   Although Titan promised plaintiff he would be staying in a well appointed apartment complex, Titan arranged to have Nattah dumped at an Army tent in the middle of desert without any means of returning to civilization.   Subsequently, Titan sold the African-American plaintiff into slavery.   Tricking someone into traveling abroad for the purpose of selling someone into slavery falls under the definition of trafficking in persons.   Defendant does not say plaintiff should lose on the merit.   Instead, defendant says these facts give him no legal remedy against Titan to prove his claims.   Considering the court already dismissed the case against the government based upon sovereign immunity, granting the Titan's motion to dismiss would violate the sacred principal of *ubi jus, ibi remedium*   Indeed, given the egregiousness of the fact, the precedent set would prohibit any plaintiff from bringing international or foreign law claims any corporation in Washington D.C.

## Section III.  (b) Slavery and Right to Travel Provide Sufficient Notice of Claim

The question presented in a Rule 12 (b) motion is whether the complaint has pled sufficient facts to place the defendant on notice of the claim.   Because many of the causes pertain the same set of facts, plaintiff simply incorporated the above paragraphs by reference, because the lawsuit had already pled all the necessary facts.   Rule 8 requires a "short plain statement of the claim".   The complaint alleges that the Titan and Nattah agreed plaintiff would only be assigned to work in Kuwait and would not be asked to work in Iraq.   Upon arrival in Kuwait, Nattah informed the Army about this agreement.

Titan lacked sufficient staff to assign an additional translator to the military unit to which Nattah had been attached.   Titan and the Army solved this problem by agreeing to sell Nattah into slavery.   Titan and the Army agreed that Nattah could be taken into Iraq by use or display of force and that as a result, Titan did not need to provide an additional translator.   The complaint further states from the time Nattah was abducted and taken into Iraq, the government did not need to pay Nattah.

## Section III. (c) International Law Applies to Corporations

American courts have always held that international law is the law of land, and yet Titan says corporations and individuals are exempt from American law.   This court previously ruled the government has sovereign immunity from international law claims. Therefore, a ruling stating that corporations are exempt from international law would result in policy that acknowledges international law as the law of land but does not apply in any case.

The court should not dismiss claims against Titan premised on a violation of international law.   Under a Rule 12 (b) (6) motion, the question presented is whether there is any set of facts and inferences drawn there from under which plaintiff could prove a cause of action.

Titan violated the Geneva Convention by approving the Army's request to take Nattah into custody without providing any mechanism to challenge his detention and without registering his name with the International the Red Cross.   Titan assisted the government by telling Nattah's wife that Nattah was doing fine in Kuwait.   While serving in Iraq, Titan required him to translate interrogation questions Iraqi prisoners of

war.   Nattah had to explain to prisoners of war that they would not get food, water, or medical attention without providing intelligence about the composition and location of Iraqi forces.   Nattah experienced extreme emotional anguish, because Titan forced him to be a party to Geneva Convention violations.   He also premises a Geneva Convention on a theory of by-stander liability.

Titan argues it cannot be held liable for Geneva Convention violations, because the Convention only applies to governments, and the Convention does not create a judicially enforceable private right of action.   Defendant says violations are the subject of negotiations between the signatory governments.

The Geneva Convention claim should not be dismissed, because the Convention is self-executing, but even if the court finds it is not self-executing Congress has passed implementing legislation giving rise to a private right of action.   International law is gradually incorporated into United States domestic law.   Treaties and customary international law fall under two categories self-executing and non-self-executing.   A self-executing treaty is one containing specific obligations.   A self-executing treaty either expressly or impliedly create a private right of action and implied right of action can be found by examining the treaty as a whole.   See: *In re Guantanamo Detainee Cases* 355 F.2d 443 (D.C. Cir. 2005).   Whereas a non-self-executing treaty is one containing lacking delineated duties and prohibitions and instead setting aspirational goals.   Non-self-executing treaties also require implementing legislation.

First, United States domestic law holds that international law is the law of the land.   From Roman law to British law to American law, courts have consistently recognized the maxim *pacta sunt servanda*—"pacts must be respected."   Since the

federal courts are an arm of the United States government, a decision by district court dismissing a Geneva Convention claim would contradict the *pacta sunt servanda* principal and damage United States standing in the international community. Further, there are currently hundreds of non-governmental organization acting with the acquiance of foreign governments. A holding that non-governmental organizations need not comply with the Geneva Convention notwithstanding the fact that the nation within which they operate has signed the convention would give a green light to terrorists to torture or abduct United States citizens.

The Supreme Court in *Hamdan v. Rumsfeld* 126 S.Ct. 2749 (2006) held the entire Geneva Convention was judicially enforceable. The decision did not limit enforceability to habeas corpus actions. A second portion of the decision concluded that although the entire treaty might not apply to situations where the detainee was not fighting upon behalf of a government, Article V certainly applied to alleged terrorists as well as uniformed soldiers.

Although this author would vehemently reject the interpretation, one could argue the Geneva Convention was only enforceable, because the court had jurisdiction to adjudicate habeas corpus claims. This narrow reading would mean that although the Geneva Convention is non-self-executing implementing legislation (habeas statute) made it enforceable. Although plaintiff contends Congressional action was not required to bring a Geneva Convention claim, Congress enacted the Alien Tort Claims Act at 28 U.S.C. 1350, the War Crimes Act, and the Torture Victims Protection Act specifically to stop violations of The Hague and Geneva Conventions.

In *Sosa v. Alvarez-Machian* 124 S.Ct. 2739 (2004), the Supreme Court held that the ATCA does not itself create a cause of action it provides a vehicle by which a plaintiff could enforce established treaties and customary international law.    The Supreme Court decided federal courts could develop a common law interpreting international and could examine foreign legal precedents as persuasive authority.

Defendant argues the Geneva Convention does not create a private right of action and the treaty does not create judicially enforceable rights.    Cases indicate these are two separate issues.    In summary, the Geneva and Hague Conventions and customary international law create a private right of action.    Under Hamdan, the Geneva Convention is enforceable even without implementing legislation.    The Hague Convention is not itself judicially enforceable, but the War Crimes Act makes the Hague Convention judicially enforceable.    Absent implementing legislation, customary international law no judicially enforceable, but the Alien Tort Claims Act makes rights created under customary international judicially enforceable.

Corporate Liability

Titan contends a corporation cannot be liable for a violation of international law.In *Bao Ge v. Li Pang* 201 F.2d. 14 (2000), Judge Hogan held a private corporation can be liable for international law violations where the corporation cooperates with a government, (2) operates under a "joint venture" with a government, or (3) acts under color of law.

The *Bao Ge* decision came four years prior to the Supreme Court's *Sosa* decision. Judge Hogan in Bao Ge stated that an Alien Tort Claims Act defendant could not be

liable for gross international law violations such as slavery or piracy, which would have been illegal at the time of the passage of the Alien Tort Claims Act.   In Sosa, the Supreme Court specifically overruled the notion that an Alien Tort Claims Act violations can only be those which would have been illegal at the time of passage.   Rather than require a plaintiff to prove "gross" international law violations the Supreme Court authorized district to examine established international law as of the date of future opinions.   However, even Judge Hogan held a corporation could be liable for "slavery".

Judge Hogan wrote cooperation between a corporation and a government could be found where the corporation took some action directly impacted the plaintiff or the corporation and the government cooperated together under some specific written "formal agreement".   The court cited with approval *Doe v. Unicol* 963 F.Supp. 2d 880 (C.D. CA 1997) where a corporation with authority over "assignment of personnel" was held liable under the Alien Tort Claims Act.   Judge Hogan noted that prior to the hearing on the motion to dismiss he had permitted the plaintiff to engage in discovery to determine the existence of a "formal agreement" between the corporation and the government, and he pointed out that discovery did not identify any "formal agreement".

Unlike Bao Ge, the government entered a contract with Titan to provide translators.   This contract qualifies as a "formal agreement" as the term is defined under Bao Ge.   For purposes of a 12 (b) motion, the plaintiff either does not have to produce the agreement or must be given discovery to get a copy of the contract.   The complaint alleges that Titan did have authority over "assignment of personnel" within the meaning of Bao Ge and Unicol.   Titan is also liable because by approving the army's detention of

plaintiff the company had a "direct role in either plaintiff's the incarceration or treatment".   In the plaintiff in *Iwonowa v. Ford* 67 F.Supp. 2d 424 (N.J.D.C. 1999) cited with approval in Bao Ge, the German government solicited bids for government contracts, and after winning the contracts, Ford increased profits by using forced labor. Likewise, Titan had to pay a dramatically higher rate of pay to employees who volunteered for hazardous duty.   Because Nattah was involuntarily taken into Iraq, the company made a higher profit on his labor.

For the above stated reasons, plaintiff has a judicially enforceable private right of action, and plaintiff can bring the action against a corporation.

## Section III. (d) Rehabilitation Act of 1973 Claim

The court should not dismiss plaintiff's Rehabilitation Act claim. Rehabilitation Act compliance is a term and condition of every federal government contract and grant.   Nattah worked on a government contract for Titan, and Titan's contract with the government required the company to comply with the Rehabilitation Act.   Titan now seeks to avoid liability from a claim under the Rehabilitation Act.

Defendant urges that a Rehabilitation Act plaintiff must first obtain a right to sue letter from the Equal Employment Opportunity Commission prior to filing a civil action, and Nattah's case should be dismissed, because he failed to obtain a right to sue letter.   However, unlike the Americans with Disabilities Act that uses the rights and remedies provided under the Title VII Civil Rights Act, Rehabilitation Act claims are governed by the rights and remedies found in Title VI of the Civil Rights Act. Therefore, an Americans with Disabilities Act plaintiff must receive a right to sue letter

from the Equal Employment Opportunity Commission, while a Rehabilitation Act

plaintiff need not go through the E.E.O.C.  To clarify the lawsuit, the amended complaint

includes a Rehabilitation Act claim but omits an A.D.A. claim.

Every court of appeals to address this question held that plaintiffs suing private

recipients of federal funds under section 504 do not need to exhaust Title VI

administrative remedies. See, e.g., *Brennan v. King*, 139 F.3d 258, 268 n.12 (1st Cir.

1998); *Tuck v. HCA Health Serv. of Tennessee, Inc*., 7 F.3d 465, 470-71 (6th Cir. 1993);

*Smith v. Barton*, 914 F.2d 1330, 1338 (9th Cir. 1990); *Miener v. State of Missouri*, 673

F.2d 969, 978 (8th Cir. 1982); *Pushkin v. Regents of the Univ. of Colo.*, 658 F.2d 1372,

1382 (10th Cir. 1981); *Lloyd v. Regional Transp. Auth*., 548 F.2d 1277, 1287 (7th Cir.

1977). These holdings reflect the fact that "the applicable remedies [under Title VI]

provide no individual relief, including no damage orders against an employer." Tuck, 7

F.3d at 471. The Title VI administrative remedy, which provides for the termination of

federal financial assistance to programs that violate Title VI, 42 U.S.C. S 2000d-1, does

not "include or encompass equitable relief for the affected individual."  *Pushkin*, 658 F.2d

at 1381; *Freed v. Consolidated Rail Corporation* (3rd Cir. 1999); *Kaplan v. Consolidated

Edison* 482 F.Supp. 1165 (S.D. NY 1980*); California Paralyzed Veterans v. FCC* 721

F.2d 677 (9th Cir 1980); *Davis v. Modine* 526 F.Supp 943 (D.C.KAN 1981).

## Section III. (e) Rule 44.1 Does Not Warrant Dismissal

Defendant urges dismissal of the foreign law claims, because plaintiff failed to

provide the notice required by Rule 44.1, but because the lawsuit itself constitutes notice

the foreign law claims should not be dismissed.

Section VI of the Federal Rules of Civil Procedure solely covers issues related to trials, and Rule 44.1 falls within the section governing trials.   Therefore, the rule has no applicability in the context of a Rule 12 (b) motion.   The rule reads:

> Rule 44.1. Determination of Foreign Law
>
> A party who intends to raise an issue concerning the law of a foreign country shall give notice by pleadings or other reasonable written notice. The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law.

The purpose of the rule seems to be to prevent unfair surprise at a trial.   The Rule itself states, "Notice shall be given in the pleadings or other reasonable written notice". Pleadings include documents filed with the court and would encompassed the civil complaint otherwise known as this lawsuit.   Therefore, assuming Rule 44.1 has any applicably in the context of a 12 (b) motion, it has been satisfied, because the lawsuit itself constitutes notice.   Plaintiff cannot find any case law indicating the notice must be more specific than that already found in the lawsuit, and defendant must not specifically say how or why the notice already given is defective, insufficient, or ineffective. Therefore, the foreign law claims should stand.

## Section III. (f) Breach of Contract

Plaintiff formed a verbal employment contract with Titan.   Titan offered him a job, and Nattah accepted after a face to face interview in Virginia.   Defendant agrees to this set of facts, but it points out that Titan subsequently sent a confirmation letter and asked Nattah to sign the confirmation letter.   However, the confirmation letter does not

purport to be a contract, because the parties already had an agreement.   The confirmation letter did not claim to supersede the prior verbal agreement.

Defendant makes several arguments that would have merit if the parties had not already formed a contract.   First, the defendant claims the contract should be governed by Virginia law.    The confirmation letter does not include a choice of forum or choice of law clause.   Assuming both Nattah and Titan's version of the facts is correct, the parties formed the contract in Virginia, but the contract was to be performed in Kuwait.   *Lex loci* solutionis is a fundamental choice of law principal.   The Latin translation for the is term "law of the place where relevant performance occurs".   Since the contract called for performance in Kuwait, Kuwati law should apply.

If the contract is governed based upon the place of acceptance of the offer Virginia law would apply.   However, if the contract were formed in Virginia the notification letter would become irrelevant.   If the notification letter constitutes the contract and the plaintiff signed the letter in California law would apply.   Defendant is trying to have it both ways by saying the notification letter controls and simaltaneoulsy saying Virginia law should apply.

The verbal understandings between the parties may also be relevant to the choice of law.   The complaint could be fairly read to allege facts which could be governed by either California law or Kuwaiti law.   Discovery is necessary to establish verbal understandings between the parties.   Therefore, the case should not be disposed of on a 12 (b) (6) motion.

Incorrectly assuming Virginia law applies, the case should still not be dismissed. The notification letter which again does not claim to supersede the oral agreement says plaintiff is entitled to fringe benefits, but it does not include an exhaustive list of plaintiff's benefits.   If the court incorrectly finds the notification letter is a contract, then evidence about the verbal understanding is highly relevant to interpreting this vague provision.

The complaint alleges that defendant told plaintiff he would have several benefits which subsequently were not provided including an air condition apartment, pool, and fitness center.   Not only did the Plaintiff not receive accomodations with these amnenities, but his accomodations were abandoned warehouses and tents.  These terms induced plaintiff to accept employment.   The notification letter states Titan reserves the right to change some terms within the notification letter, the letter does not claim Titan can or will change any of the terms previously included in the verbal agreement. Defendant cites *White v. Federal Express* 729 F.Supp 1536 (E.D.VA 1990) *and Lewis v. NVT* 118 F.Supp.2d 51 (D.D.C. 2001) for the proposition that an at-will contract's right to terminate at will necessarily includes the right to change the terms and conditions. First, these precedents merely strengthen plaintiff's claim.   *White* holds that the right to cancel benefits does not give the employer the right to cancel benefits already earned. Plaintiff earned the housing benefit by attending a week of training and briefing in Georgia and by flying to Kuwait.   He earned the right to get an apartment at his time of arrival.   Second, defendant's version of the fact explicitly contradict the facts alleged and in Rule 12 (b) motion, the court must assume the facts alleges and inferences there from are true.   No where in the complaint does plaintiff imply that Titan ever cancel his free

housing benefits.   Instead, plaintiff claims that the defendant showed plaintiff photos of an apartment building and promised if he accepted employment he would be residing in the apartment free of charge.    Titan claim it had rented the entire building.   However, the complaint says Titan had never rented the building and never procured a room for plaintiff.    Defendant tricked plaintiff with a desert mirage.  Therefore, the housing benefit was not cancelled; it never existed.   Third, Titan never provided plaintiff notice of any terms in the contract.

Defendant makes another factual assertion without any evidence which directly contradicts the complaint by stating plaintiff's employment was at will and thus he could quit and simply go home.    The complaint alleges when Nattah was taken to his lush apartment, he arrived at an army camp in the middle of the desert and shown to a tent with a dozen soldiers.  The temperatures in the camp regularly exceeded 100 degrees and the area was frequently hit by severe sand storms.   Nattah had no transportation.   Nattah would have died if he had attempted to walk back to Kuwait City.    At the time of his arrival, Iraq and United States were at the brink of war.   In 1990, Iraq invaded Kuwait. Nattah could not be certain whether and when hostilities might commence.   Upon leaving the camp on the Iraqi border, plaintiff could have been confused for an Iraqi and arrested.   Therefore, traveling alone in the desert and enduring temperatures in excess of 100 degrees and sandstorms would be hazaardous to say the least.

The lawsuit makes clear the employment contract was not "at will".   The employer-employee relationship was involuntary, because he could not quit.   Titan further asserts the above cited cases give the employer the right to re-assign the plaintiff

to a different project, and as a result, the promise that plaintiff would only work in Kuwait and would not have to work in Iraq is not enforceable, because employment was at will.   Unlike other translators who contracted to go into Iraq, Nattah did not receive hazardous duty pay.   Titan states that when the Army ordered Nattah accompany them into Kuwait, he was free to ignore the military order and walk back to Kuwait City.   The defendant's factual assertion unaccompanied by any evidence directly contradicts the complaint.   The complaint includes a count for slavery.   Titan and the Army knew Nattah's contract provided he could not and would not be sent into Iraq, and they also knew Titan lacked sufficient employees to provide a translator for the Army Intelligence unit to which Nattah was attached.   The complaint says that Titan sold Nattah into slavery.   Titan agreed the Army could take him into custody and force with to work without any payment.   Rather than pay Nattah, the Army agreed to pay Titan for Nattah's services.   No one told Nattah of this arrangement until the moment of the commencement of hostilities in March 2003.   Army intelligence officers pointed loaded weapons at Nattah and ordered with to travel into Iraq and work as a translator.  Instead of submitting, Titan argues Nattah should have quit started to walk away and been shot in the back as a deserter, because the contract was "at will".   Therefore, defendant's motion to dismiss should not only be denied, the court should condemn the outrageous, ludicrous, and insulting assertions put forward without the slightest evidence.

## Section III.  (g) Forum Non Convenience

Defendant argues it would be more convenient to litigate this case in four separate proceedings with most argued in the United States, some in Kuwait, some in Iraq, and one in Germany.   The defendant's forum non-convenience motion is actually three

motions.   The court could dismiss counts under German, Kuwaiti, and Iraqi law (b) could dismiss counts involving two of the three, (c) could dismiss only one of the three, (d) or the court could dismiss.   Just because it might be inconvenient to litigate one claim in the United States does not mean it would be inconvenient for litigating all three of the foreign law claims.

*Piper Aircraft v. Reyno* 454 U.S. 235 (1981) controls adjudication of forum non-convenience motions.   The forum non-convenience prevents plaintiffs from foreign shopping for the best possible place to bring a lawsuit and avoid opening the U.S. courts to a flood of cases from foreign litigants.   Under *Piper*, courts must consider both private and public interest factors.  The Supreme Court did not give much weight to the plaintiff's choice of forum, because all the plaintiffs were either English or Scottish citizens.   Where the plaintiff resides in the United States, the plaintiff choice of a U.S. forum is entitled to substantial deference.   Since Mr. Nattah has resided in the United States prior to his departure to Iraq and returned immediately after his recuperation in Germany, Mr. Nattah's choice of a U.S. forum should receive great deference.

Second, the court indicated a change of substantive law between the foreign country and the United States should not be given much weight.   This factor is not applicable to Nattah's claim.    Unlike the plaintiff in Piper who sought to proceed on a strict liability theory even though strict liability was not available in Scotland, Nattah is not asking a U.S. court to change the standards of liability applicable in the foreign country.   Instead, he is simply asking a U.S. court to faithfully apply foreign law.

Third, courts should compare evidentiary problems between the U.S. forum and the foreign forum.  At this preliminary stage, no one knows whether a trial in Iraq or the

United States would present less evidentiary problems. Few of the witnesses have been

identified. Witnesses will include employees of Titan and the Army. Army employees

rotate in and out of Iraq. After a rotation, the solider may be sent to another U.S. facility

such as Korea. Most Titan employees have probably returned to the United States,

because effective March 9, Titan lost the government contract to provide translators.

(See: Exhibit A) Some of the employees may even have retired. It appears all the

Titan and Army employees are U.S. citizens. Therefore, it is likely they would retire in

the United States. The civil action involves the fraudlent method of hiring Nattah and

method by which the company terminated him. Unless they have moved, management

and human resources staff is in the United States. The many foreign claims involving

wage and hour, overtime, and hazardous duty pay involve work performed in Iraq, but

staff responsible for underpayment are probably in the United States. Plaintiff believes

that Titan issues paychecks and performs accounting in the United States, and Mr.

Nattah's bank account was in the United States. Therefore, Titan employees with

knowledge of pay are probably in the United States. Another foreign law claim involves

employers to give the Iraqi Ministry of Labor and Employment notice whenever the

employer terminates an employee. The employee then has the right to challenge the

grounds for termination. Nattah argues he should get back pay from the date Titan was

required to provide notice. There is no reason whatsoever to try this case in Iraq. Titan

either sent notice or it did not. If the company sent notice, the notice would most likely

have come from the headquarters in the United States, and the notice is probably a one to

two page document. Testimony might not be necessary to authenticate it if the notice

fell under the business records exception. If defendant produces a copy of the notice,

plaintiff will dismiss the claim voluntarily.   If the defendant answers an admission

stating it did not provide notice, plaintiff will move for summary judgment.   The

notification issue is purely a legal issue.    In Piper, the court found evidentiary problem

made an American forum inconvenient, because the airplane wreckage was located in

Scotland.   In contrast, plaintiff is not aware of any large objects or massive amounts of

documents that can only be found in Iraq, Kuwait, or Germany.  To the extent some

documents can be found abroad, these documents will need to be scanned for electronic

filing.   It would not be more expensive to scan documents located in Iraq then it would

to scan documents located in the United States.   Since many of the claims involve

multiple claims or theories to recover the same damages, most if not all of the documents

located in Iraq would have to be scanned anyway even if the court dismissed the foreign

law claims.   For these reasons, evidentiary issues will be less of a problem if the entire

case is handled in the United States.

        Court should also consider public policy by comparing which nation has a greater

stake in the controversy.   Nattah holds dual United States and Libyan citizenship.   He

attempts to bring this case as a class action of all United States citizens who worked as

translators for Titan in Iraq.   Iraqi citizens are not involved in the case.   Therefore, the

United States has a greater interest in seeing U.S. contractors fully pay U.S. citizens.   In

contrast, the Piper case the Scottish government had a greater interest in regulating

airplane safety over Scottish skies with Scottish and English pilots and passengers.

Because the contract has been canceled, the Iraqi government will not have any need to

require future compliance by Titan.   The extensive research conducted by plaintiff

indicates Titan had over 4,000 employees in Iraq for four years, and Iraq never made any

moves to require Titan to come into compliance.   Iraq's failure to act on this issue

indicates Iraq does not particularly care about whether Titan underpays U.S. employees,

who most likely will be exempt from pay Iraqi income taxes.

        The Supreme Court wrote in *Piper*, "At the outset of any forum non-convenience

inquiry, the court must determine whether there is an alternative forum."   Other than

U.S. district court, there is no alternative forum to litigate Iraqi law claims, and thus the

court need not even delve into the other factors governing forum non-convenience.   Of

the three foreign law issues (Iraqi, Kuwaiti, and German) dismissing the Iraqi law would

be by far the most unjust, and there can be little doubt that dismissing the Iraqi law claims

would definitely violate the *Piper* decision.   The court wrote, "If the remedy provided by

the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all,

the unfavorable change of law may be given substantial weight.   The district court may

conclude that dismissal would be not in the interests of justice."   The court cannot help

but take judicial notice of the fact that a civil war currently rages throughout Iraq.

Americans traveling the street without security are frequently murdered, tortured, or

kidnapped.   Counsel for plaintiff would need to proceed in Iraqi court with local counsel;

however, there are numerous instances where attorneys and judges have been killed for

taking on unpopular cases.   Iraqi politics is such that any group may find any case has

the risk of being unpopular in some quarters.   Given the threat of death at any given

moment, no American attorney could be expected to mentally function and present

coherent arguments.   Dismissing the case and telling American attorneys to take their

case to court would be tantamount to a death sentence and would be completely unjust.

The plaintiff would need to testify in an Iraqi court, and Nattah suffers from severe post-

traumatic stress disorder and thus would be physically and mentally unable to return to Iraq given the civil war.   Press reports too numerous to mention irrefutably establish that corruption runs rampant through the Iraqi legal and political system.   The Iraq civil war has intensified over the past twelve months, and there is indication of when if ever the situation may improve.   There is a significant risk though that Iraq may descend into anarchy, and a functioning judicial system may completely disappear.   The availability of compulsory process in a foreign country is one factor to be considered in determining whether an alternative forum exists.   Nattah worked for Army intelligence 20 hours per day seven days per week.   The parties may need to substantiate or refute this claim by subpoenaing Army soldiers who served with him.   However, the Status of Forces Agreement (SOFA) specifies that American military personnel are immune from service of process by the Iraqi courts and attorneys.   The United States military would not have to provide documents giving the names of soldiers and last known addresses with whom Nattah served, and even if he could get their names, the witnesses could not be compelled to testify.   Finally, the defendant mostly does not want a trial in Iraq, because a trial in Iraq would subject witnesses and counsel to injury and death.    Plaintiff believes the forum non-convenience argument regarding Iraq is made in bad faith.   Litigating the Iraqi law claims in Iraq would require plaintiff to retain foreign counsel, pay for numerous witnesses, the plaintiff, and at least one U.S. licensed attorney to pay for travel and lodging in Iraq.   Plaintiff would also need to hire private security.   While the current counsel for plaintiff is not charging plaintiff, an Iraqi attorney would almost certainly request a retainer which Nattah could not afford.   Defendant want the case sent to Iraq, because defendant is confident plaintiff will not be able to litigate the case in Iraq.

An "inadequate" or "unsatisfactory" remedy under these circumstances is almost certain.

The claims under U.S. law are inextricably linked with those involving foreign law.   Therefore, severing the foreign law claims would force the plaintiff to introduce almost the exact same evidence in multiple forums.   The outrageous conduct and assault claims deal with Titan's agreement with the Army to abduct plaintiff and take him from Kuwait into Iraq.   Since plaintiff was taken from Kuwait and transported into Iraq, it is unclear whether Kuwaiti or Iraqi law would apply.   One of the United States law claims charges Titan with selling plaintiff into slavery.   Since the claims involve the same facts, witnesses would have to testify three times about the same facts.    Three trials would necessitate counsel and witnesses to incur substantial travel expenses.   The defendant nevertheless contends it would be more convenient for the employer and its witnesses to appear four times.

The German law claim deals with procedure Titan used to terminate plaintiff. Due to combat wounds suffered in Iraq, the Army sent plaintiff to an Army hospital in Germany.   After multiple brain surgeries stemming from combat wounds, Nattah teetered on the brink of death.   At the worst possible time, Titan sent goons to plaintiff's hospital room and told him the company was terminating him, and therefore he had to the United States.   Nattah explained that he had not been discharged and a flight back to the United States could cause death.   As Titan staff attempted to wheel Nattah out of the hospital, a doctor summoned military police officers who physically prevented Titan employees from transporting Nattah to the airport.   The United States Rehabilitation Act claims states Titan failed to reasonably accommodate him.   Nattah became deaf due to

battlefield noise.   After his war wounds, Nattah could no longer perform oral translation, but he could still make written translations.   Titan should have accommodated his disability by providing unpaid leave and transfer him into a job translating documents rather than oral conversations.   The complaint alleges the war induced post-traumatic stress disorder.   To accommodate, the mental injuries Titan needed to transfer him into a job outside a combat zone.   The Rehabilitation Act claim not only charges that the company failed to reasonably accommodate his disability but also that the company fired him because of his disability.   The procedure Titan used to terminate him itself indicates bigotry toward people with disabilities and statements made at the time of the termination could be critical as to whether the defendant's proffered reason for terminating him is a pretext for discrimination.   Furthermore, many of the claims deal generally with Titan's mistreatment of Nattah.   Although evidence of facts surrounding the termination might not be an element of all the causes of action against Titan, facts surrounding the terminating could be quite important in the calculation of damages including the availability and propriety of awarding punitive damages.   Therefore, severing the outrageous conduct and assault German law claims would cause the witnesses to testify one in Germany and once in the United States about the same fact pattern.  Defendant contention that it would be more convenient to testify twice about the facts occurring in Germany is without merit.

The Plaintiff also includes claims related Iraqi law.   Iraqi law provides that employees must be paid overtime regardless of whether they are salaried or hourly employees.   Further, employers with employees in Iraq must pay a bonus for hazardous duty.   Finally, an employer firing an employee who worked in Iraq must provide notice

to the Ministry of Labor and Employment.   The terminated employee can then initiate

legal proceedings to challenge the termination.   Plaintiff cannot find any legal authority

indicating these provisions only apply to Iraqi citizens.   However, when a law such as

certain provisions of the Iraqi constitution is meant to apply solely Iraqis or solely Arabs

the texts seem to always include this limiting language.   Absent specific legal authority

to the contrary the Latin maxim of *Jus soli* applies meaning the law of the physical

location applies.   Defendant correctly argues that American law does not apply, because

the Fair Labor Standards Act is not extraterritorially applicable.   Finally, plaintiff's case

involves a complex fact sequence where plaintiff last worked in Iraq, but he was

terminated in Germany.   Plaintiff believes the Iraqi government should have received

notice of the termination even though Nattah had already gone to Germany.   If the court

finds to the contrary though, it is unclear what remedies Nattah would have under

German labor law.   If the court dismissed the labor law issues due to forum non

convenience, plaintiff might re-file the case in Germany only to be bounced into Iraq.

At this stage in the case, we cannot know whether access to witnesses and

documents will not be any more difficult or easy in the United States than in Iraq,

Germany, or the United States.   Many of Titan employees and Army soldiers may have

moved to the United States or been posted somewhere else.

## Section III. (h) Slavery and Fraud

Defendant urges dismissal of the fraud and slavery claims, because they fail to

meet the requirements of Rule 8 of the Federal Rules of Civil Procedure.   Rule 8 of the

Federal Rules of Civil Procedure requires, "A short and plain statement of the claim

showing that the pleader is entitled to relief".   Because the same facts pertain multiple causes of action, the plaintiff placed facts relevant to all claims in a statement of facts. Facts supporting the fraud and slavery claims are the same as those in the statement of facts section and so reiterating them would be duplicative.

The test for a Rule 12 (b) motion is not whether the complaint is a model of clarity or whether defendant might need more information to make an excellent response. Instead, a case can only be dismissed if the facts alleged and inferences drawn there from demonstrate there is no set of facts under which the plaintiff could prevail.   One method of understanding Rule 12 (b) is to compare and contrast the motion with other types of motions.   Rule 12 (e) provides:

> If a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading. The motion shall point out the defects complained of and the details desired.

Based upon the wording of defendant's motion, defendant should have filed a Rule 12 (e) motion rather than a 12 (b) motion.   The pleading standard for the fraud claim and the slavery claim are different.   Although federal procedure does not require fact pleading, fraud must be pled with particularity.    Although the plaintiff does not believe either count should be dismissed, a court could dismiss the fraud claim and deny the motion to dismiss the slavery claim.

The fraud claim should not be dismiss, because the statement of facts alleges all the elements of a fraud cause of action.   Those elements include:

(1) Misrepresentation by the defendant

(2) Scienter

(3) Intent to induce

(4) Causation

The Plaintiff alleges that the parties formed an oral contract whereby Titan would only provide translation services in Kuwait, and the parties set the compensation based upon the agreement Nattah would not be going to Iraq, the pay did not include a hazardous duty supplement.   The parties further agreed plaintiff would be residing in an air-conditioned apartment building, and Titan showed plaintiff pictures of the building where he would be staying.   These facts amount to elements (1) above, because the complaint alleges Titan knew Nattah would be sent into Iraq and Titan knew Nattah would be residing in a tent, because the apartment building referenced by defendant had not been and never would be rented or owned by Titan.

Scienter is established, because defendant knew its promises with respect to geographic limitations and accommodations would not be honored.

The lawsuit further satisfies the inducement element above, because the intent of its misrepresentations was to trick Nattah into traveling to Kuwait.

The lawsuit alleges causation.   Plaintiffs prove causation by showing the plaintiff actually relied on defendants promises.   Nattah can prove actual reliance, because the complaint says he traveled to Kuwait based upon the promises made to him by the defendant.   Therefore, the complaint alleges all the elements of a fraud claim.

## Section III. (i) Slavery

The complaint also contains all the elements of a case for slavery.   Unlike other constitutional provisions, the Thirteenth Amendment applies to private as well as governmental action, and the Amendment is self-executing and does not require implementing legislation.  See:  *Oliver v. Donovan* 293 F.Supp. 598 (E.D. NY 1968). The 13th Amendment bars not only slavery but also other forms of involuntary servitude.   The Trafficking in Persons Protection Act 78 U.S.C. 7102 defines involuntary servitude as:

> "(**A**) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint".    The act further defines "severe human trafficking" as, "**T**he recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."

Plaintiff alleges all the elements of cause of action for slavery.   The complaint alleges that Titan tricked Nattah into traveling to Kuwait, and the above paragraphs explain the rationale for arguing defendant's conduct amounts to "fraud" within the meaning of the Trafficking in Persons Protection Act.   Second, plaintiff must prove the fraud was perpetrated for the purpose of subjugation, and the complaint meets this criterion, because Titan knew plaintiff would not voluntarily enter Kuwait and further knew it would place him into a job requiring him to travel into Iraq.   The only logical inference that can be drawn from these facts is that Titan knew plaintiff would

be "subjugated".  Finally, a plaintiff must the situation amounts to "involuntary servitude", and one establishes involuntary servitude by showing they feared "serious harm" or "physical restraint" if they did not continue to work.   The complaint alleges that Titan and the Army agreed that Nattah could be taken into custody and forced to work in Kuwait.   The Army then used loaded weapons to force Nattah to accompany an Army Intelligence Unit into Iraq.   Therefore, Nattah's original complaint alleges all the elements of a cause of action for slavery.

## Section IV.  Conclusion

For the reasons stated above, the defendant's motion to dismiss should be denied.

Respectfully Submitted,

/s/_____
Michael J. Beattie, Bar # 450873
Employee Rights Law Group
9502 B Lee Highway
Fairfax, Virginia 22031
703-273-2235
703-273-3440
mjbeattie@verizon.net
*Counsel for Plaintiff*

Certificate of Service

This document was sent via electronic filing.