## IN THE UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| United States ex rel Titan Class, | ) | |
| ABDULWAHAB NATTAH, | ) | |
| ABDULWAHAB NATTAH as | ) | |
| lead plaintiff in a class of Titan employees | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-CV-00700 RCL |
| | ) | |
| GEORGE W. PRESIDENT BUSH, | ) | |
| in his individual capacity | ) | |
| DICK CHENEY, | ) | |
| in his individual capacity | ) | |
| ROBERT GATES, | ) | |
| in his official capacity as United States | ) | |
| Secretary of Defense | ) | |
| FRANCIS HARVEY, | ) | |
| In his official capacity as United States | ) | |
| Secretary of the Army | ) | |
| Six Unknown United States Government | ) | |
| employees, | ) | |
| | ) | |
| L-3 Communications Titan Group | ) | |
| | ) | |
| Curveball | ) | |
| | ) | |
| Dr. Ahmad Chalabi | ) | |
| | ) | |
| Iraqi National Congress Assembly Fund | ) | |
| | ) | |
| Iraqi National Congress Support Foundation | ) | |
| | ) | |
| Iraqi National Congress Defense Foundation, LLC | ) | |
| | ) | |
| Iraqi National Congress Action Foundation | ) | |
| Defendants | ) | |

# FIRST AMENDED COMPLAINT

## Causes of Action

1.     Six unknown United States Government employees are sued in their individual capacity. These officials either directly or indirectly formulated and implemented the Administration policy authorizing detention and suspension of the writ of habeas corpus for anyone found on the battlefield in Iraq and Afghanistan.    Some of the unknown government employees include U.S. Army intelligence officers and non-commissioned officers who kidnapped, enslaved, and drafted Abdul Wahab Nattah into the United States Army serving in Iraq.

2.     Plaintiff Abdul Wahab Nattah (hereinafter "Nattah" or "Plaintiff") brings Count III and Count IV War Crimes against defendant Cheney in his individual capacity.

3.     Plaintiff Nattah brings Count III Geneva Convention, and Count IV against defendant President Bush in his individual capacity.

4.     Plaintiff Nattah brings Count I Due Process, Count II First, Third, and Fourth Amendment; Count III Geneva Convention, Count V Slavery; Count VI Right to Travel against defendant Gates in his individual capacity.

5.     Plaintiff Nattah brings Count III Geneva Convention, Count V Slavery, Count VI Right to Travel against all defendants.

6.     Plaintiff brings Counts IX through XIX solely against Titan who engaged Nattah initially.

7.     Plaintiff brings Count XVI, XVII, and XVIII for himself and as a representative of a class of similarly situated Titan employees and former employees.

8.     Plaintiff Titan Class brings Count XIX solely against Titan.

9.     Plaintiff United States ex rel. Titan Class (hereinafter referred to simply as United States ex rel.) sues in the name of the United States government.  United States ex rel consists of thousands of former Titan employees working as translators and interpreters in Iraq who have personal knowledge about documents and objects related to weapons of mass destruction (WMD) in Iraq.


Parties

10.     Defendant President Bush is the President of the United States, resides in Washington, D.C. and has his principal place of business in Washington, D.C.


11.     Defendant Cheney is the Vice-President of the United States and resides in Washington, D.C. and has a principal place of business in Washington, D.C.


12.     Defendant L-3 Communications Titan Group is a successor corporation to Titan and inherited Titan's liabilities.  L-3 Communications acquired Titan, and the Titan Group is now a division of L-3 Communications.  Titan purchased plaintiff and later sold him.  L-3 Communications is hereinafter referred to as simply Titan.

13.     Plaintiff Nattah holds dual citizenship from Libya and United States.  His racial group

can be characterized as African and/or Arabic.  He was born and raised in Libya.  Plaintiff

was exploited as a slave for defendant Titan and later defendant Gates.  Plaintiff currently

resides in California.  Plaintiff's higher education in Libya and the United States included

studies in Arabic language, chemical engineering, economics, and business administration.

Plaintiff's education enabled Mr. Nattah to be a highly skilled Arabic and English-speaking

interpreter.     **Presently and throughout his entire life, Plaintiff Nattah retained his**

**Libyan citizenship.**


14.     Defendant Ahmed Chalabi served as the leader of the Iraqi National Congress (INC)

from 1995 to 1999.  After 1999, he served as an officer and director of INC.  Chalabi is a

citizen of the United Kingdom and Iraq.  He was President of the Petra Bank located in

Jordan until the bank collapsed.  As a result of the scandal caused by the bank's demise, a

Jordanian court found and convicted Chalabi guilty of felony and bank fraud.   He

orchestrated an unsuccessful coup against Saddam Hussein in 1995.  Escaping Iraq and a

prison term in Jordan, he came to the United States and founded the Iraqi National Congress.


15.     From 1995 through 2003, the Iraqi National Congress (INC) worked in conjunction with

the United States government to overthrow the regime of Saddam Hussein.   Although

chartered as a 501c3 organization, the organization's primary function was actually to lobby

Congress and the Executive Branch seeking support for military action against Saddam

Hussein.

16.    The INC also attempted to be an organization analogous to a government-in-exile representing the true aspirations of the Iraqi people and sought to take power following the overthrow of Saddam Hussein.  Publicly Chalabi expressed support for a democracy, but Chalabi and his cronies within the INC actually sought to institute a kleptocracy whereby Chalabi and other INC officers would use government authority to siphon off governmental oil revenues for personal gain.  Chalabi and the INC unsuccessfully attempted to take power following the fall of Baghdad in March and April 2003.  The plot failed after the United States accused Chalabi and the INC of taking classified intelligence data provided by the United States and selling it to Iran.

17.    Curveball is an Iraqi citizen living in Germany.  His precise name, address, and phone number are classified, but they will be declassified through the process of discovery.  In exchange for his silence about fraud committed by U.S. governmental officials, the United States government worked with other parties to place Curveball into the functional equivalent of a witness protection program, immunized him from prosecution, provided a stipend, and provided him an assumed name.  These actions prevented the commission on intelligence failures created by Congress and Congressional committee from contacting Curveball.

**18.**    The Iraqi National Congress Support Foundation was incorporated in Delaware in 1999. The Iraqi National Congress Action Fund and the Iraqi National Congress Defense Foundation, LLC each were incorporated in Delaware in 2001.  In 2004, the INC merged with another political party and re-named itself Iraqi National Congress and National Assembly.  In 2004, INC members and officers formed a successor Delaware Corporation

called the Iraqi National Congress Assembly Fund. Each of these organizations currently transacts business within the United States, purchasing substantial goods and services domestically and abroad, thereby having a significant impact on inter-state and international commerce. The INC transacted business primarily in Washington D.C. and Virginia.[1]

**Facts Specific to Nattah**

19.    Plaintiff contacted Titan after learning of a translator employment opportunity. During this phone call Titan determined that Plaintiff would make a good candidate to interview and sent Plaintiff a plane ticket to Virginia for a job interview with Titan for the position.

20.     The US Army performed medical exams in Georgia just prior to flying Nattah to Kuwait.

21.    An unknown entity performed background checks on all candidates including Nattah.

22.    Titan determined that Plaintiff was well suited for the translator position and offered a position. The parties agreed Nattah could only be fired for misconduct, lack of work due to termination contract between Titan and the United States government, or dereliction of duty. The terms of employment stated that Plaintiff would receive three (3) meals, apartment accommodations, employment in Kuwait, and would not be sent to work in a war zone, this included Iraq.

23.    Defendant asked Plaintiff to sign a document containing some terms normally found in a contract. The document states that it is not to be construed as a contract.

24.    Plaintiff arrived in Kuwait under Titan supervision and was taken to various campsites in Kuwait for the first two weeks of his stay. For the remainder of his stay in Kuwait he resided

---

[1] When this complaint seeks to discuss all of the four organizations listed above, this complaint will refer to them as the Iraqi companies. When talking about the Iraqi companies and Chalabi, this complaint will refer to them collectively as the Iraqi defendants.

at Camp Virginia in a tent with no running water, no general plumbing, and did not receive three meals per day. Some days he did not receive any food at all.

25.    After two months in Kuwait, the United States Military took Plaintiff with Titan's knowledge and approval, to Iraq. Titan did not prevent the US Military from taking Plaintiff against Plaintiff's will.

26.    Plaintiff traveled with US Military soldiers for four days in a Humvee through active war zones.

27.    During this four-day journey, a mortar shell exploded near the Humvee causing Plaintiff nerve damage resulting in hearing loss.

28.    Plaintiff contacted Titan management several times regarding this event as well as other incidents; however, no one returned his phone calls.

29.    For the next several months, the United States Military forced Plaintiff to travel with them and translate various Arabic documents, teach soldiers Arabic language, and communicate with local intelligence.

30.    Since the US Army asked Plaintiff to translate interrogations forcing him had to witness the violence of war.

31.    Plaintiff is a civilian and has no military training.

32.    The US military ordered Plaintiff to be the first person to enter into one of Saddam's Palaces, to make certain that no danger lied within the gates. This placed Plaintiff directly in harms way.

33.    Plaintiff received an award for his work.

34.     Plaintiff began throwing up and fainting.  He immediately saw the base physician who informed him that he had extensive nerve damage in his ear and he needed to be operated on immediately.

35.     Plaintiff was then sent to Germany to be operated on.  Plaintiff's doctors state clearly that the nerve damage occurred during Plaintiff's travels through various war zones.

**United States Preparations for Iraq War**

36.     During the winter of 2003-2004, the United States Department of Defense initiated a massive mobilization of troops and resources to Kuwait in preparation for an armed invasion of Iraq.  At that time, Iraqi compliance with previous United Nations Security Council resolutions was pending before the Security Council.  In an effort to secure U.N. approval of the operation, United States Secretary of State, Colin Powell, gave false testimony before the Security Council regarding the Iraqi efforts to acquire weapons of mass destruction.  The United States government had prior knowledge of many of the statements made by Powell were false.  The United States utilized the fear of Iraqi possession of weapons of mass destruction issue as a pretext to obtain a legal caucus bellum.

37.     Negotiations at the United Nations between Iraq and U.N. officials secured Iraqi compliance with an inspection regime.  Progress in implementing the inspection regime gave the appearance that the United States would not invade Iraq.  U.S. officials, including President George W. President Bush, repeatedly assured the plaintiff, the American public, and neutral nations that war was not inevitable and resolution of the WMD inspection issue would eliminate the need for war.

38.     Subsequently, top-secret memos leaked by British officials stated that the United States had made a final decision to invade Iraq in the summer of 2002.  Other British documents also revealed a manipulation of intelligence findings to support a pre-determined strategy to invade Iraq.

39.     British government officials subsequently revealed that coalition intelligence reports on Iraq's WEAPONS OF MASS DESTRUCTION capabilities were "sexed up," exaggerated to fit pre-determined policy conclusions.   Specifically, the Downing Street Memo states that in August 2002 Untied States Department of State told Britain the U.S. would be attacking Iraq in 2003 regardless of Iraqi compliance efforts.   At the precise time of the meeting between the U.S. diplomatic core and British government, the Department of State, President, Vice-President, and Department of Defense publicly stated the United States had not made a decision about war, and war would only be initiated if Iraqi did not comply with United Nations resolutions.

**Army Orders Nattah to Search for Documents Identified by INC**

40.     Defendant Cheney, the National Security Agency, the Department of Defense, and other members of the President Bush Administration worked with and funded the Iraqi National Congress and informed the US Congress of information needed to build the case for war. These officials specifically requested intelligence that U.N. Inspectors would not be able to verify.  The Department of Defense paid the INC $340,000 per month over the course of several years, totaling about $20,000,000 in exchange for intelligence on fictitious Iraqi

programs related to weapons of mass destruction. Following the fall of Baghdad, INC officers and directors returned to Iraq to take power. The Department of Defense continued to fund the Iraqi defendants and provided them security forces for their personal protection.

41.     Cheney, the CIA, and others knew of Chalabi's questionable reputation, as he had been convicted of fraud in Jordan. Therefore, they knew Chalabi would provide dubious information at best.

42.     The INC, made up of Iraqi dissident defectors, saw the organization as a form of a government in exile. The organization's mission was to take power in Iraq by overthrowing Saddam Hussein through the utilization of the United States' armed forces. After obtaining control of the Iraqi government, the INC and Chalabi sought to form a kleptocracy for the benefit of INC members. Therefore, the U.S. government knew that the INC had a motive to manufacture evidence.

43.     Nattah was one of thousands of translators dispatched to find and translate documents identified by the INC. Nattah searched sites which the INC told the U.S. government housed WMD documents. Nattah translated and reviewed thousands of documents identified by the INC, but he personally discovered the INC's claims were a hoax.

**Curveball Provides Indispensable Justification**

44.     In consideration for these payments, a senior aide to Ahmed Chalabi as well as a high-ranking official within the INC contacted the aide's brother and solicited him to make false

statements to a German foreign intelligence agency. German intelligence services aptly gave the informant the code name of "Curveball". Curveball was a Baghdad taxi driver prior to relocating to Germany, but the INC suggested Curveball lie to German intelligence and state that he had been a senior engineer working within the Iraqi biological weapons program. German intelligence operatives and intelligence analysts interviewed him and found he was mentally unstable.

45.    As mentioned above, Cheney, the INC, and others needed and requested information that could not be verifiable by the U.N. inspectors. Therefore, Chalabi and others fabricated the story that Iraq had constructed trucks and trains to be used as mobile biological weapons labs. The INC instructed Curveball to convey this information to German intelligence. Curveball and others drew graphic illustrations describing the vehicle's appearance and technical features. The INC then hyped Curveball's statements independent of German intelligence to lobby the government to declare war upon Iraq. Routing Curveball's statements through German intelligence enabled Curveball to have more credibility than if his statement had come directly from the INC.

46.    Curveball was the singular source of intelligence related to the mobile labs. Based upon Curveball's lack of scientific and technical knowledge, German intelligence concluded Curveball was not even an engineer and none of his claims could be substantiated. German intelligence passed along Curveball's statements to the Central Intelligence Agency and Defense Intelligence Agency. German intelligence conveyed the information along with the

caveat that (1) Curveball was mentally unstable, (2) he claimed to be but probably was not an engineer, and (3) none of his claims could be substantiated.

47.     Central Intelligence Agency specialists in the Iraqi weapons of mass destruction program concluded Curveball's statements were inaccurate.     These specialists insisted that Curveball's story should not be used as a policy justification, should not be used in any public statements, and especially should not be used in any presentation to the United Nations.  After Iraqi specialists deleted references to mobile labs from a speech to be given by Collin Powell to the Security Council, the partisan political appointees lacking expertise or knowledge of Iraqi programs edited the U.N. document, covertly inserting deleted sections back into the speech.     Administration officials further lied to Powell about intelligence reports, deliberately misled him, and did not convey the views of career intelligence analysts and officers.  These administrators knew that without Powell's knowledge, a decision to go to war had been pre-determined by Cheney and others.  In furtherance of the conspiracy, Administration officials issued false public statements, withheld key documents from Congress, and lied to Congress about the mobile labs.  The Administration did not inform Congress about the CIA analysis of mobile labs.   In 2006, Senator Pat Roberts, Republican co-chair of the Senate Intelligence Committee stated unknown to the Committee in 2003 "98% of United States intelligence on Iraq's biological and chemical weapons program came from Curveball".     1% of the information indicating Iraq still had WMD derived from statistics about Iraq amount of chemical and biological agents usable in weapons prior to the Iraq war and the number of agents which United Nation inspectors witnessed being destroyed after the 1991 armistice.     No nation had any evidence that Iraq still possessed any of the

pre-cursor agents, but pro-war factions concluded that Iraq must still have chemical or biological weapons, because Iraq could not prove they had been destroyed.   An additional 1% of information to the chemical and biological weapons program came from reports that Iraq had acquired machinery or parts which could be used for such weapons.   Career civil service intelligence officers concluded that the type of machinery purchased was most likely not intended or well-suited for production of chemical or biological weapons.   Once again analysis-debunking myths about dual use technologies were deleted by political appointees from public pronouncements, the National Intelligence Estimate, and submissions to Congress.

48.     The sole rationale given to the United Nations by the United States was Iraqi's failure to disarm according to the Security Council Resolution 687, promulgated on 4/13/1991, at the conclusion of the Iraq war, which mandated the dismantling of chemical, biological, and nuclear weapons and production facilities.  The Security Council based the approval of the use of force solely on Iraq's alleged weapons of mass destruction program and only approval of the use of force in the event of non-compliance with inspection regime.   Unknown to the U.N. and Congress, regime change was the true primary motivating factor for invading Iraq.

49.     Inspectors found certain rockets arguably beyond the range limit imposed by the cease-fire agreement.  Prior to the war, Iraq destroyed all materials and parts challenged by the inspectors.

50.     Following the Security Council resolutions, the United States did not claim Iraq was not destroying material found by the inspectors.  Rather, the U.S. argued Iraq was frustrating the

work of the inspectors by moving banned weapons prior to the arrival of the inspectors. Therefore, information supplied solely by Curveball became the key justification for authorization of the war by the Congress and the United Nations.

51.    Although German intelligence made Curveball available for questioning, U.S. government officials never contacted Curveball directly until fourteen months after the war. Instead, they relied upon second hand accounts from German intelligence and the Iraqi National Congress.  Neither government ever placed Curveball under oath, subjected him to a lie detector test, asked him to make a statement under the penalties of perjury, or independently verified any of his claims.     To the contrary, expert career civil servants within the Central Intelligence Agency went to great length harping on the fact none of Curveball's assertion had been or could be verified.    Political appointees then copiously deleted all such caveats from the National Intelligence Estimate and reports to Congress.

52.    Curveball indirectly provided the CIA with drawings and locations for documents discussing mobile biological weapons labs programs.  A comprehensive search by the Iraq survey team and David Key who was heading the Iraq Survey Group and acted as a weapons inspector in Iraq after the 2003 invasion of Iraq. revealed no relevant documents at any of the locations specified by Curveball or the Iraqi defendants.

53.    Following the fall of Baghdad in 2003, U.S. officials reviewed Curveball's employment and personal records and learned Curveball had never worked on any biological or chemical weapons.  Curveball had finished last in his graduating class and got a job as an engineering

trainee working on a civilian project. Due to poor performance and lack of aptitude, Curveball left the trainee position and became a cab driver in Baghdad. When interviewing Iraqi scientists and engineers familiar with Curveball's work as a trainee, American agents divulged Curveball's identity and named him as the source of intelligence relating to biological labs. Even if a banned weapons program had existed, interviewees described Curveball as inept and incapable of grasping the complexities of a biological weapons program.

54.    Plaintiff Nattah personally searched for documents related to the programs at the locations specified by Curveball, but found no such documents. Therefore, Nattah knew Curveball's statements to be false, and he further knew that INC intentionally circulated false statements made by Curveball to the Department of Defense.

55. Although the CIA and Department of State criticized the reports by the INC and Curveball, the Defense Intelligence Agency (DIA) including the contracting officer and contracting officer's technical representative (COTR) very much believed Curveball and the INC's claims, and the DIA paid INC invoices premised upon their belief the INC had provided accurate intelligence assessments.

56.    US Government officials concocted a story about the discovery of a mobile biological and/or chemical weapons lab in Iraq. Within days, the Central Intelligence Officials located at Langley, Virginia and inspectors working for David Kay found the report about mobile laboratory to be a hoax. Experts conveyed their conclusions to senior policy makers.

However for more than a year, senior Administration officials continued to deceive the public and Congress, insisting the existence of a mobile lab.

**INC Uses Tax Payer Dollars to Pay for Forgery of Yellow Cake Documents**

57.    The Iraqi defendants collaborated and coordinated with White House Counsel, Stephen Hadley, Dick Cheney, and other officials within the President Bush-Cheney Administration to determine the type of proof the President Bush-Cheney Administration would need to establish that Iraq was actively engaged in developing nuclear weapons.

58.    Based on the type of information requested by the Bush-Cheney Administration, the Iraqi defendant conspired with each other to forge documents showing Iraq had purchased "yellow cake" from Niger.   "Yellow cake" is jargon for weapons-grade uranium.   The Iraqi defendants paid former agents of the Central Intelligence Agency to forge the documents.

59.    The Iraqi defendants correctly realized that any documents coming directly from them would be viewed as suspicious due to their personal self-interest in overthrowing Saddam Hussein.  Just as the Iraqi defendants used the German intelligence service as a conduit for information from Curveball, the Iraqi defendants secretly passed the information to Carlo Rossella and Giovanni Castellaneta, who in turn passed the information to the Italian intelligence service.

60.    Carlo Rossella and Giovanni Castellaneta then shared the information with Italian Prime

Minister Silvio Berlusconi.  Mr. Castellaneta served at the same time as the deputy chair of

Finmeccanica, an Italian defense conglomerate, and national security advisor to Prime

Minister Berlusconi.  Castellaneta negotiated a deal with the White House providing that

Castellaneta would provide evidence of Iraq's nuclear arms program in exchange for

awarding Finmeccanica a U.S. government contract to manufacture Marine 1 helicopters for

the White House.  The White House uses Marine 1 to transport the President and other

government officials.


61.    Normal diplomatic protocol would be for the Italian Intelligence Service, SISMI, to

forward all intelligence documents to the CIA.  However, Castellaneta correctly realized the

Central Intelligence Agency would recognize the Niger documents related to Iraqi weapons

of mass destruction as forgeries because former CIA agents had forged the documents.  As a

result, Castellaneta sent the Niger documents directly to the White House.  Stephen Hadley

and others within the National Security Agency performed their own analysis of the

documents without the CIA.  Castellaneta informed the White House and others he had

received the documents from a woman working for Niger's Italian Embassy and provided

woman's name.  Subsequently, the woman named by Castellaneta learned she had been

named as the source and strenuously denied having anything to do with the documents.


62.    Subsequently, the Central Intelligence Agency requested the White House provide a copy

of the Niger documents and found them to be potentially false.  When asked about the

authenticity of the Niger documents, Nicola Pollari, the head of SISMI, tried to dispel the CIA's misgivings about the authenticity of the yellow cake papers.

63.     The Central Intelligence Agency and/or Vice President Cheney dispatched Joseph Wilson to Niger to determine whether Iraq was purchasing "yellow cake."  Mr. Wilson reported to the appropriate Administration officials that Iraq was not attempting to purchase "yellow cake" from Niger, and further reported that the alleged purchases were completely false. Despite the fact that the Administration knew the "yellow cake" allegation was completely fabricated, President Bush drafted a State of Union speech seeking support for possible war against Iraq utilizing the "yellow cake" allegation.  Career civil servants and the Central Intelligence deleted the reference to "yellow cake" from the speech, however the allegation was reinserted into the speech at a later date.  President Bush and Cheney employed the unfounded "yellow cake" claim to mislead the American people into believing that Iraq was presently working to construct and deploy atomic weapons for use against the United States. Cheney used to the "yellow cake" documents to assert Iraq was "assembling nuclear weapons".  President Bush and Cheney falsely portrayed the purchase of "yellow cake" as a confirmed fact.

**Activity at the United Nations**

64.     The President Bush Administration delaying action at the United Nations was merely an effort to enable the U.S. time to build up sufficient forces and obtain the assent and cooperation of various foreign governments such as Turkey.

65.    In the Security Council, the President Bush Administration bribed various foreign governments to vote for authorization of military operations in Iraq.

66.    Because Security Council members and the Congress would not authorize hostilities to depose the Iraqi government, the President Bush Administration used the weapons of mass destruction as an excuse to mask the Administration's true motivations.

67.    Without false intelligence assessment and testimony of U.S. officials to the United Nations and Congress, the Congress and the U.N. would not have authorized any action against Iraq.

68.    Congress and the U.N. would have authorized military intervention in Iraq only if Iraq failed to comply with United Nations resolutions dealing with weapons of mass destruction. Military action was not authorized to overthrow the Iraqi regime.

69.    Subsequently, the United States launched a pre-mediated war of aggression against Iraq to depose Saddam Hussein and thereby advance U.S. security interests, access to oil, privatization, and economic interests in the region.

70.    The President and other Administration officials knowingly and falsely claimed that intelligence suggested Iraq was presently planning an attack against U.S. interests, would send weapons of mass destruction to terrorists, and was actively working to expand production and deployment of nuclear, chemical, and biological weapons.    The

Administration knowingly and falsely claimed that an attack against U.S. interests was imminent and the invasion was necessary for self-defense. Through these efforts, the President Bush Administration succeeded in defrauding the American people, including Plaintiff.

71.    Vice-President Cheney and other Administration officials knowingly and falsely stated that Iraq cooperated and assisted in the September 11, 2001 attacks against the Pentagon and World Trade Center. The purpose of Cheney's statements was to mislead the American people into supporting future military intervention. Despite proof that Iraq played no role in these attacks, about fifty percent of all Americans continue to believe Cheney's statement that the former Iraqi regime participated in the attacks of September 11, 2001.

72.    United Nations-appointed arms inspector, Hans Blix stated that the United States' invasion of Iraq violated international law because the war was allegedly premised by Iraqi violation of U.N. weapon inspection regime and Iraq was actually in compliance with United Nations resolutions.

73.    United States troops occupying Iraq found no weapons of mass destruction. Following the war, the President Bush Administration sought to deter and silence critics. Due to Joseph Wilson's criticism of the Administration and his failure to falsify evidence of nuclear components in Niger, Vice-President Dick Cheney began an investigation to find incriminating information against Wilson. Cheney and requested Vice President Chief of Staff Lewis "Scooter" Libbey to spearhead the effort to against Wilson. Subsequently,

Libbey and White House Deputy Chief of Staff Carl Rove retaliated by leaking the identity of Wilson's wife, CIA operative Valerie Plane.

74.    Defendant and other war profiteers gave large campaign donations to the Republican candidates to assist in the election of pro-war candidates and encourage U.S. intervention in Iraq.

75.    Defendant President Bush stated in 2003 and early 2004 that his Administration had not determined if war in Iraq was necessary.  Agents of President Bush notified the government of the United Kingdom in the summer of 2002 that the decision to go to war in Iraq was a foregone conclusion.

76.    Defendant President Bush further stated Iraq was currently producing and deploying weapons of mass destruction. In fact Iraq was not producing or deploying any such weapons. The infrastructure previously used for weapons productions had been destroyed, converted for civilian use, or was dormant under U.N. supervision.

77.    Defendant President Bush also stated Iraq was in the process of reconstituting its nuclear weapons program and purchasing component parts for bombs.  In the 2003 State of the Union address, President Bush called Saddam Hussein, "The dictator who is assembling the world's most dangerous weapons."  The word 'assembling' places the phrase in the present tense.  At the time of the address however, Iraq was not assembling weapons of mass destruction or other banned weapons.  Iraq had not taken any steps to resume nuclear

weapons productions, would not have been able to build nuclear weapons had the U.S. not intervened, and was not purchasing components for nuclear weapons.

78.    The President and other Administration officials pointed to Iraqi involvement in the attacks of September 11, 2001.  President Bush stated:

a    "This Congress and the American people must recognize another threat. Evidence from intelligence sources, secret communications, and statements by people now in custody reveal that Saddam Hussein aids and protects terrorists, including members of al Qaeda.  Secretly, and without fingerprints, he could provide one of his hidden weapons to terrorists, or help them develop their own. Before September the 11th, many in the world believed that Saddam Hussein could be contained.  But chemical agents, lethal viruses and shadowy terrorist networks are not easily contained.  Imagine those 19 hijackers with other weapons and other plans -- this time armed by Saddam Hussein.  It would take one vial, one canister, one crate slipped into this country to bring a day of horror like none we have ever known.  We will do everything in our power to make sure that day never comes."

79.    In fact, Iraq played no role in the attacks of September 11, 2001 and was not aiding, protecting, or harboring al Qaeda or its members.

80.    The Administration claimed Iraq violated United Nations resolutions by retaining weapons of mass destruction.

81.     President Bush falsely asserted that Iraq had a stockpile of weapons of mass destruction. Although he stated repeatedly that the stockpile was a fact and said he knew this fact based upon classified intelligence. In fact, no such intelligence actually existed. The Administration assumed that any unaccounted for chemical agents and munitions had not been destroyed.

82.     The President Bush stated that violation of Security Council resolution 687 was the casus belli of the war and the motivating factor behind efforts to win approval for the war. However, President Bush failed to disclose that campaign contributions from supporters of the war (including but not limited to defendant Titan) motivated the Administration to invade Iraq, thereby necessitating awarding of contracts to Titan and others.

83.     Defendant President Bush claimed throughout 2003 and early 2004 that he hoped the United Nations would find a method to resolve the weapons of mass destruction dispute without resorting to war. Furthermore, he claimed the United States would not go to war if Iraq complied with a U.N. Resolution. Although Iraq complied with U.N. resolutions regarding inspections and disarmament, the United States launched a war of aggression against Iraq.

84.     Defendant President Bush claimed Iraq posed a direct and imminent threat to the United States and Iraq would shortly attack the United States itself or would transfer weapons of mass destruction to terrorist groups. The White House claimed, without attribution, that Iraq "could launch a biological or chemical attack 45 minutes after the order is given." The White House claimed it had classified information to support this claim. In fact, no such intelligence or other data existed. The White House made the statement without any factual basis, and President Bush issued the statement purely to persuade the American people to

support an invasion of Iraq. Upon occupying Iraq, inspectors learned that Iraq had no ability to launch a nuclear, chemical, or biological attack on the United States and at the time of the invasion Iraq posed no imminent threat. Further, Iraq had no intention of transferring weapons of mass destruction to a terrorist organization.

85.     Prior to war, President Bush stated that if the United States attacked Iraq, the campaign would not involve a long, complicated occupation effort and would minimize the risks and costs. British officials and the United States State Department warned about inadequate preparation for occupation and criticized unrealistic Administration projections. The war led to a prolonged occupation and insurgency.

86.     President Bush insisted war with Iraq was necessary to cleanse Iraq of terrorist groups. However, Iraq was not a haven for terrorist groups prior to the war and played little role in supporting international terrorism. The extent of Iraq's financial support of terrorism was encouraging suicide bombers in Israel. Contrary to the Administration's stated intentions, the war has inflamed, inspired, increased, and rallied terrorist recruitment efforts. As a direct result of the American invasion, the number of terrorists residing in Iraq has increased significantly.

87.     Shortly after the capture of Saddam Hussein, President Bush gave a speech under the banner "Mission Accomplished." However, to date the mission has not been accomplished. Although defendant Cheney asserted that based on secret intelligence the insurgency was nearing completion, no such intelligence existed, and the insurgency has continued with no foreseeable conclusion.

88.    Based upon the statements made by President Bush and his surrogates, plaintiff Nattah believed a war between Iraq and the United States was unlikely.  Mr. Nattah believed that the issue of inspections could be resolved by the United Nations.

89.    The new Iraqi government is not engaged in the production, deployment, or research into weapons of mass destruction.

90.    The issue of weapons of mass destruction provided the original justification for the war, however the rationale for the occupation has changed.  President Bush now asserts the rationale for attacking Iraq was to change the regime and promote democracy in the Middle East.

91.    Prior to the invasion of Iraq, defendant Titan knew the invasion was a foregone conclusion; however, the defendants misled plaintiff and others about U.S. intentions. Plaintiff further relied upon statements made by President Bush and other U.S. officials that war with Iraq was avoidable.  Plaintiff consistently informed defendant that due to moral, philosophical, religious, and personal safety concerns he would not accept employment with defendant if he might be sent into Iraq.  Plaintiff correctly saw that Kuwait was a relatively safe venue in comparison to Iraq.  Also, plaintiff drew a distinction between interpreting between U.S. military officials and Kuwait government officials, and he believed the type of interpreting envisioned by defendant would not involve participating in a war and therefore would not violate his religious and other convictions.

92.    Prior to agreeing to work for defendant, plaintiff attended an orientation workshop for applicants.  The speakers at the orientation claimed either actually to have the authority to contract on behalf of defendant or held themselves out as able to contract on behalf of defendant.  In order to secure a contract with the United States Government, defendant Titan

falsely informed the Department of Defense that they had employed a sufficient number of Arabic language interpreters. However, the defendant had not recruited enough personnel to fulfill its contract with Department of Defense due to an extremely high demand for Arabic language interpreters. In order to meet its contractual obligations with the Department of Defense, defendant Titan resorted to deceptiveness to lure a sufficient number of interpreters to travel to Kuwait and later Iraq.

93.     Agents of defendant Titan stated that their contract with the Department of Defense indicated that interpreters would only work in Kuwait. Furthermore, the contract stated that under no circumstances would the interpreters be sent to Iraq.

94.     Agents of defendant Titan further stated that each of the Arabic language interpreters would immediately be placed in a luxury air-conditioned apartment building, including a fitness center and a pool. Defendant Titan assured each applicant that they would receive their own bedroom and bathroom, running water, electricity, mail service, and phone service. Defendant assured the plaintiff and all other applicants' access to restaurants and stores where he could purchase food, beverages, and other necessities. Defendant stated that the corporation had already obtained all of these accommodations and that the facilities were fully constructed, operational, and available in sufficient numbers for immediate occupancy by plaintiff and other applicants. In reality, the defendant was aware that no housing facility or any other structure had been or would be constructed. The defendant's sole purpose of intentionally lying to plaintiff and others was to persuade them to travel to Kuwait, in close proximity to Iraq.

95.     At the orientation, the defendant offered the plaintiff and other applicants the opportunity to work for the company under the terms described in the orientation workshop including but

not limited to the agreement that translators could only be fired for cause or termination or diminution of Titan's contract with the government.

96.    After careful consideration and believing the statements made by defendant Titan and President Bush, plaintiff accepted defendant's offer of employment.

97.    On January 17, 2003, Abdul Wahab Nattah signed an employment contract with Titan Systems Corporation.  Titan Systems Corporation employed Mr. Nattah as a CAT II Arabic Linguist assigned solely to Kuwait.  Although the contract mandated that the defendant could only call upon plaintiff to serve in Kuwait, defendant intended before and after formation of the contract to send plaintiff to Iraq shortly after his arrival in Kuwait.  Even though defendant knew plaintiff would be sent into combat, defendant did not provide for combat pay.   The contract called for a starting annual base salary of $70,000 ($2,692.31 biweekly), plus a $3,250 completion bonus at six and 12 months.  Mr. Nattah was scheduled to report to Kevin Hopkins in the Operational Analysis and Training Group on the start date of January 19, 2003.

98.    Plaintiff traveled to Kuwait based on the defendants' promises enumerated above.

99.    Upon arriving in Kuwait, defendant sequestered plaintiff in a military encampment located in the desert without any access to the outside world.  Defendant and the United States troops guarding him required him to live in a tent with 40 soldiers.  This tent did not include phone, mail, air-conditioning, running water, or electricity.  Defendant required plaintiff to consistently eat distasteful food and live under substandard conditions.  Upon arrival, a military officer responsible for supervising plaintiff promised plaintiff he would not be asked to leave Kuwait, would not be assigned to any combat operations, and reassured

plaintiff that he would not travel to Iraq. The military officer further informed plaintiff his only duties would consist of interpreting and translating within Kuwait.

100.   During the two months preceding the American invasion of Iraq, the military forces guarding plaintiff progressed to the frontier with Iraq. Plaintiff consistently informed the appropriated military and civilian supervisors for Titan that he would not go into Iraq.

101.   Prior to the invasion of Iraq, defendant Titan was aware that plaintiff would not voluntarily go into Iraq and that military officials wanted to impress and draft plaintiff into military service. Defendant could have prevented plaintiff from serving in Iraq by withdrawing him from Kuwait. Instead, defendant sold plaintiff as a slave to the military. Defendant sent the military invoices to consummate the sale. The military purchased the plaintiff as a slave and paid invoices for his slave labor.

102.   After the military purchased plaintiff from the defendant Titan, the U.S. military made plaintiff one of the first prisoner of war. Mr. Nattah informed the military that he did not sign a contract with Titan to work in Iraq or to enter a war zone. Military officials did not believe Mr. Nattah and did not take his statements as truth. Military officials told Mr. Nattah that he did not have a choice and that he had to go wherever they went. With the defendant Titan's permission, the military forced plaintiff into Iraq against his will.

103.   On March 20, 2003, Mr. Nattah was deployed to Iraq as an Arabic-English interpreter for the military. At this time the military was engaged in operations in Iraq. Plaintiff served in the vanguard of the coalition's invasion force and was among the first military units entering Iraq. Plaintiff's placement on the battlefield made him particularly susceptible to injury. Defendants required plaintiff to ride in a humvee without protection against small arms or explosives. On several occasions plaintiff and company rode on the front lines of

war in the unprotected humvee.  During his tenure as an interpreter, Mr. Nattah was stationed on the front line in Iraq.  In fact, Mr. Nattah even served time in a tank.  Plaintiff endured days of driving up and down mountains and through the desert in intolerable conditions.  Due to the defendants' refusal to provide proper winterized gear, plaintiff's jaw froze shut in the night, while daylight unleashed unbearable heat and sandstorms.  Plaintiff objected to his confinement, but neither the military nor Titan would agree to release him from bondage.

104.     The humvee crew drove for four days continuously, except for ten-minute breaks to refill the fuel tank.  Plaintiff could not sleep due to the extreme cold and rough terrain.  Plaintiff did not receive any sort of overtime, combat, or hazardous duty pay to compensate for the risks or conditions.

105.     Plaintiff witnessed mistreatment of prisoners of war including the needless infliction of pain, broken legs and ribs, refusal of medical care, deprivation of food and water, and a physical dispute injuring numerous prisoners.  As prisoners died due to lack of medical care, plaintiff counseled and held the hand of dying victims.  Plaintiff witnessed horrific scenes of violence and gore.   Defendants subjected plaintiff to the horrors of war including impalement, dismemberment, and disembodied and exposed protruding body organs and bones.

106.     A rocket-propelled grenade nearly hit plaintiff, and he spent the night in a bunker under constant shelling.  Operating far behind enemy lines, plaintiff's unit reached one of Saddam Hussein's palaces, and the commander ordered plaintiff to translate documents for clues about weapons of mass destruction.

107.     Plaintiff's unit experienced periodic exposure to toxic black dust and fumes.  During his tenure, Mr. Nattah was exposed to loud noises as a result of excessive shelling and

explosions, especially of mortar shells.  During the campaign, plaintiff worked under highly dangerous conditions.  His outfit became involved in a full-fledged artillery battle.

108.    Defendants next conscripted plaintiff to ride in a Bradley tank without providing training in operating such a vehicle.  Iraqi forces attacked the tank using a variety of weapons.

109.    Comrades working with plaintiff described him as a war hero.  One soldier noted plaintiff's indispensable role in the unit contributed to the mission success.  Plaintiff later received one medal or award.

110.    Although plaintiff served as an E-4 (Corporal) in the United States Army and the government classifies him as an E-4, the government declined to issue the ribbons and other similar honors normally bestowed upon individuals serving as an E-4.  Government officials have correctly stated that plaintiff became disabled solely and directly because of combat related injuries suffered while serving as an E-4 in Iraq.  Plaintiff asked the government to update its records and grant him veteran's benefits.  However, the government declined to issue a decision on whether plaintiff qualified as a veteran and whether he was entitled to benefits as a disabled veteran.  This suit seeks a declaratory judgment holding Nattah is a disabled veteran and thus entitled to all the benefits and honors normally accorded to such persons.

111.    Plaintiff later served in Mosul and Baghdad.  Due to the suspension of the writ of habeas corpus and unavailability of U.S. or Iraqi courts, plaintiff could not seek his freedom.

112.    During this time period, Mr. Nattah experienced loss of hearing and ringing sounds in his ears, difficulty sleeping, and recurring nightmares.  Mr. Nattah was examined at the American Clinic in Iraq.  His physician recommended Mr. Nattah travel to Germany for a

more detailed medical examination.  While en route to Germany, two doctors examined Mr. Nattah in Qatar.

113.    On May 16, 2003, Dr. Curry Morton examined Mr. Nattah at the American Army Hospital in Landstuhl, Germany.  Dr. Morton discovered Mr. Nattah had experienced tremendous loss of hearing.  Dr. Morton also discovered Mr. Nattah had a severe head injury. Dr. Morton recommended immediate surgery and attempted to make arrangements at the American Army Hospital.  However, the hospital was not equipped for the type of brain surgery Mr. Nattah required, so Dr. Morton advised Mr. Nattah to transfer to the University of Hamburg Hospital for surgery.

114.    On June 17, 2003, Rob Hansen, Deputy Directory for Operations, visited the barracks Mr. Nattah shared with other recovering soldiers.  Mr. Hansen began raising his voice and asking one of the soldiers if he was Mr. Nattah.  The soldier responded he was not Mr. Nattah, but told him that Mr. Nattah had just left for the hospital in Landstuhl.  Mr. Hansen responded by disclosing to the soldier Mr. Nattah's personal information, stating Mr. Nattah "did not belong there anymore."  Mr. Hansen said Mr. Nattah needed to go back to the United States, as he was on leave without pay as of May 12, 2003.  Mr. Hansen then wrote a small memo and put it in clear view on Mr. Nattah's bed.

115.    The following day, Mr. Nattah placed calls to Mr. Hansen and tried to set up an appointment to discuss the situation, however Mr. Hansen refused because he was leaving for Afghanistan the upcoming Friday.   Mr. Nattah requested leave as a reasonable accommodation of disability as well as leave under the Family and Medical Leave Act.  Mr. Nattah stated that he needed to stay in Germany, because turbulence associated with a flight

31

back to the United States would result in his death.  Hansen stated he would not care less whether Nattah lived or died and that his services were terminated.

116.    On June 21, 2003, one day before Mr. Nattah entered the hospital, two men employed by Titan entered the barracks without announcing their presence.  These men approached Mr. Nattah, assaulted him, and told him to gather his belongings so they could take him to a doctor.  The hoodlums used very callous, cold, and tough language.  They attempted to abduct Mr. Nattah by any means necessary in an effort to return him to the United States before the surgery, with no consideration or regard for his health.  The MPs intervened and told the two men to leave, advising Mr. Nattah to call the MPs again if the men returned.

117.    Mr. Nattah arrived at the University of Hamburg Hospital on June 22, 2003, and his surgery took place the next day, on June 23.  Unfortunately, there were complications from the surgery, and the doctors had to perform a second surgery on July 8.  Mr. Nattah was subsequently discharged from the hospital on July 23.  He traveled back to the United States on July 24, 2003.

118.    Despite the surgeries, Mr. Nattah has lost all hearing in his left ear and partial hearing in his right ear.  Mr. Nattah also has head, neck, and back pain, as well as symptoms of post-traumatic stress syndrome.

119.    When Mr. Nattah returned home from the hospital on July 22, 2003 he received a memo from Adam (Titan's driver) dated June 25, 2003.  Mr. Nattah asked the driver to change the date to July 22, 2003.  He refused.  On July 25, 2003, Mr. Nattah contacted Ben Adams, Senior Vice President of Titan, about a memorandum he sent to him.

120.    Mr. Nattah informed Mr. Adams that the military personnel in Landstuhl Hospital had never directed him to go back to the United States.

121.    Mrs. Nattah attempted to contact Mr. Hansen to inquire about her husband's condition and Titan refused to cooperate; they replied that Mr. Hansen was not available.    She contacted Congressman Dough Ose for assistance.

122.    In August 2003, Dough Ose answered Mrs. Nattah's letter.    He said Mr. Nattah's case had been assigned to Michelle Smira in the Sacramento District Office and that in accordance with the Federal Privacy Act of 1974; she needed a written authorization on record before she could proceed.    Mr. Nattah signed the authorization form and gave authority to Dough Ose to resolve the case.    That same month, Mr. Nattah received a letter from Titan dated in July, which informed him of his termination.    No reason was stated.

123.    On October 15, 2003, Kimberly L. Clausen, Congressional Coordinator of the Inquiry Division of the Department of the Army, sent a letter to Mr. Ose regarding Mr. Nattah's predicament.    Ms. Clausen informed Mr. Nattah that the U.S. Army does not have jurisdiction over relationships between contractors and their employees.    Therefore, she was unable to offer any assistance in the matter.    Ms. Clausen also said if Mr. Nattah believes he was treated unfairly, he should contact his Human Resource Office at Titan.    The Army refused to make a decision about whether Nattah was entitled to status as a veteran or investigate the Army's torture and enslavement.

124.    On October 31, 2003, the law firm of Laughlin Falbo Levy & Moresi LLP sent a letter to Dr. William F. Boyle, MD requesting an examination of Mr. Nattah to determine the cause of his loss of hearing was and to respond by December.

125.    On November 28, 2003, Dr. Boyle sent his medical report to Roger A. Levy, Titan's attorney.    Dr. Boyle's diagnosis was as follows: (1) total deafness, left ear; (2) sensorineural hearing loss, right ear; (3) chronic tinnitus.

126.    On December 13, 2003, Mr. Nattah requested Dr. Boyle correct his report.  Mr. Nattah

stated the audiogram was never an issue and was not requested by Titan.  Mr. Nattah insisted

the audiogram showed an equal amount of hearing loss in both ears prior to surgery.  Dr.

Boyle informed Mr. Nattah that his hearing could not be restored.

127.    On January 7, 2004, Dr. Boyle replied to Mr. Levy's letter, correcting his report and

stating Mr. Nattah must be aware there is no medical or surgical treatment available at this

time to restore his hearing.

128.                                  Prior to plaintiff's departure to Kuwait, President

Bush assured plaintiff and others the United States would not initiate a draft to conscript

Americans to serve in Iraq.  Subsequently, the United States military drafted plaintiff by

purchasing him from defendant Titan.


**President Bush/Cheney Deception of Nattah, American People,**

**Congress, and the United Nations**

129.    The statements of President Bush and other Administration officials described above

were statements of fact and were not statements of opinion.

130.    Numerous statements made above were later found to be inaccurate and untrue at the

time they were claimed.

131.    President Bush made several predictions about the success, safety, timing, and outcome

of operations in Iraq.  He transmitted these optimistic forecasts to the American people,

including plaintiff and military personnel.  American military engaged in operations in Iraq

were not prepared for the insurgency, and President Bush's predictions have not come to

fruition.

132.    Prior to the Iraq war, President Bush and Cheney stated that the United States forces

would be greeted as liberators, U.S. military efforts would be financed by Iraqi oil revenue,

the United States would never undertake "nation building", and U.S. troops would rapidly

leave Iraq during 2003.   President Bush continued the deception by falsely announcing that

navy sailors on an aircraft carrier had spontaneously placed a "Mission Accomplished"

banner.   In fact, the banner was placed at the behest of the Republican Party, and President

Bush and Cheney knew the mission had not been and would not be accomplished for many

years.

133.    President Bush and Cheney feigned surprise at the insurgency.   In fact prior to the Iraq

war of 2003, the Central Intelligence Agency widely circulated within the President Bush

Administration their analysis that an invasion of Iraq would one:  (1) fuel the growth of

Islamic extremism, (2) build support for al-Queda, (3) strengthen Iranian influence

throughout the region, (4) cause sectarian violence, (5) unleash "chaos", (6) lead to partition

of Iraq, (7) force the U.S. to reduce troops in Afghanistan and thereby enhance the power and

strength of al-Qaeda in Afghanistan, and (8) severely damage the United States reputation

throughout the world.   The State Department concurred in much of this analysis.   President

Bush decided to keep this information from Congress in order to get authorization for the

Iraq war.   Although President Bush and Cheney knew from these intelligence supports that

an invasion of Iraq would strengthen al-Qaeda and other terrorist groups in Afghanistan and

throughout the Middle East, both pretended a war against Iraq would reduce a terrorist threat,

because Iraq would transfer arms to terrorists and had supported the attacks of 9/11.    Both

hinted gravely that they relied on sensitive intelligence reports and thus could not publicly

specify Iraq's terrorist links.    Contrary to President Bush and Cheney's statements, the

intelligence reports cited by them stated Iraq had no ties to al-Qaeda and no role in 9/11. Because al-Qaeda was a fundamentalist religious organization, and Saddam Hussein led a Baathist highly secular regime, they were at odds with and either hostile or indifferent to each other. Further, intelligence reports gave no hint to any Iraqi plans or intentions of transferring weapons of mass destruction or any other many especially considering the intelligence community found little credible evidence Iraq actually possessed WMD.

134.    Although President Bush stated a rapid and complete exit would be completed in 2003, the United States formed a secret plan to build airbases and other long-term infrastructure and planned to permanently place U.S. forces in Iraq. Four years later, the White House acknowledged the secret plan by saying that U.S. forces would remain present in the region for decades.

135.    President Bush knew his relative optimism regarding the invasion of Iraq would persuade a reasonable person to enter into contracts with the United States government directly or indirectly, through corporate contractors. At the time of the State of Union address in 2003 the Administration was issuing contracts to defense firms such as Titan, and President Bush knew these companies would need to recruit new employees to fulfill their contracts.

136.    President Bush also knew that individuals considering working on government contracts would rely on his statements.

137.    Plaintiff traveled to Kuwait based on each of the statements made by President Bush and his Administration.

138.    Specifically, Plaintiff traveled to Kuwait and accepted a job there on President Bush's assurance that he would not and could not be drafted.

139.  Plaintiff traveled to Kuwait based on President Bush's statement that the war in Iraq would be swift and would not entail battling an insurgency.  Based on the President's statements, plaintiff reasonably believed he would not and could not be called upon to go into battle and participate in urban warfare.  Had he known of this risk, plaintiff would not have traveled to Kuwait.  Prior to the war, the United States State Department and the British government strongly cautioned about the chaos and insurgency that an invasion would entail.  However, the President Bush Administration concealed these risks from the American people, including the plaintiff.

140.  Encouraged by President Bush, plaintiff traveled to Kuwait to serve his country under the false impression that the United States was at risk of imminent attack.  Had plaintiff known that (1) national security was not at risk, (2) Iraq was not supporting al Qaeda and was not involved in the attacks of September 11, 2001, (3) did not possess weapons of mass destruction, and (4) Iraq was in compliance with U.N. resolutions, plaintiff would not have been moved to serve his country.

141.  President Bush intentionally misled the plaintiff, stating the purpose of the war was to disarm Iraq.  Disarming the Iraqi military, capturing those associated with weapons of mass destruction production and use, and then leaving the country could have accomplished this very limited objective.  The United States would have suffered significantly fewer casualties had the military executed the mission originally assigned to it.  The true motivation for the war required a more arduous mission and placed plaintiff at far greater risk.  Had plaintiff known that the goal of the war would become the broader mission of promoting democracy in the Middle East, he would not have volunteered.

142.    Plaintiff's reliance on President Bush's statements, promises, and predictions was reasonable. Defendant Titan employed 4,000 interpreters to perform its contract.  The sheer number of qualified applicants applying for work with defendant establishes that plaintiff was not unique in his faith in the President's word, and therefore plaintiff reasonably relied on President Bush's statements.

143.    The United States Congress approved military operations in Iraq based upon the President's statements regarding weapons of mass destruction.  Congressional approval indicates the President's claims were capable of convincing a reasonable individual.

144.    The plaintiff was given no reason to question President Bush's statements, nor could he independently investigate the President's claims.  The President purported to summarize classified top-secret intelligence reports. Plaintiff did not have access to this data.

145.    Due to his reliance on President Bush's misstatements, plaintiff found himself in an urban combat situation.  President Bush's placement of plaintiff on the battlefield made it foreseeable that plaintiff would be injured in combat.  Numerous press reports have described interpreters in Iraq as having the "world's most dangerous job."  During combat, plaintiff sustained considerable injury.

**Gates Dismisses Nattah's Administrative Complaint**

**and Supports Titan Torturers**

146.    After plaintiff's war injury, the agents of defendant Gates continued to mislead plaintiff. Plaintiff and his Congressman wrote agents of Gates to complain of Titan's mistreatment of plaintiff.  The Department of Defense stated it had no jurisdiction over defense contractors and could not take any action whatsoever against Titan.  Indeed, the Department would not claim any responsibility for conduct of U.S. military personnel.  The Department would not

investigate, apologize for, acknowledge, or settle plaintiff's claims.    The failure of investigation plaintiff's claim indicates that Gates condones or is apathetic about mistreatment of Arab civilian working on behalf of the Department.

147.    In response to queries from Congress and Nattah, the Department of Defense falsely stated it had no jurisdiction over the relationship between employees and government contractors.    In fact, DOD regulations prohibit human trafficking.    Plaintiff alleged Titan trafficked in persons by selling him to the Department of Defense.    The agency has legal authority to monetarily sanction the contractor for this regulation.    The agency further had the authority to terminate defendant's contract or simply not renew it.    Legally allegations that a contractor engaged in human trafficking must be investigated and forwarded to the contracting officer.    However, Nattah's claims were neither investigated nor forwarded to the contracting officer.    Because Nattah had no way of knowing the identity of the contracting officer, the contracting officer had a way of knowing of the slavery and taking it into account in contracting decisions.    After plaintiff informed the government about slavery perpetrated by Titan and after prisoners at Abu Grave prison detailed torture and rape of prisoners by Titan employees, the government still opted to renew the contract.

148.    Plaintiff further alleged to the government defendant did not compensate him with combat pay during the conflict and placed him on leave without pay while plaintiff was still working for defendant.    The failure to pay no less than the rate of pay determined by the Department of Labor constituted a violation of the contract.    The Department of Defense had the option of either contacting the contractor and seeking contract compliance or terminating the contract due to the violation of the wage determination.    Department took no action to investigate the allegation.

149.    The Defense Base Act applies workers compensation abroad to all foreign military operations and facilities.  Within 10 days of any injury, the Defense Base Act required Titan to file a form notifying the government of the plaintiff's injury.  This notification is intended to ensure Americans injured while serving their country have work related claims processed accurately.

150.    In correspondence to the Department of Defense, plaintiff alleged facts constituting a violation of the Defense Base Act.  The federal government responded to plaintiff's letter indicating it had no power to enforce the Defense Base Act.

151.    Agents of Gates demeaned plaintiff's sacrifice to his country by falsely telling him that could not require Titan's compliance with the contract between Titan and the government.

152.    The Department of Defense's attitude toward Arabs and Muslims transcends plaintiff's case and extends to a wide-range of activities.  Agents of Gates hired Titan to translate between intelligence operatives and detainees at the Abu Grave prison.  With the support and concurrence of military and intelligence officials, employees of Titan tortured Abu Grave detainees.

153.    Permission for some forms of torture at the Abu Grave prison and other facilities was first discussed within the White House Counsel's office and the Department of Justice. Gates aided in the policy by refusing to report prisoners to international inspection agencies and by ignoring reports from those agencies.  When victims tortured by Titan complained to federal officials, federal officials gave them the same response given to plaintiff.  The government told the prisoners that neither the Unite States government nor the Iraqi government had jurisdiction to prosecute rapes and torture occurring within federal prisons

and no authority over Department of Defense contractors. A Department of Defense investigation named Titan and another defense contractor as participants in the torture.

154.    Prior to the renewal of the Titan contract, the government learned that Titan employees working at Abu Grave lacked the proper clearance to interpret in a highly classified environment. Department of Defense declined to take any action against the defense contractors or the individuals. Therefore, federal taxpayers actually paid for time spent raping and torturing detainees.

155.    Although aware of plaintiff's enslavement, contract violations, and torture of Muslim prisoners by defendant, the Department of Defense renewed Titan's contract. The Department of Defense took no action against soldiers it knew had purchased plaintiff from Titan and made him a slave of the U.S. military.

156.    At the same time Gates took no action against torturers working for Titan, Cheney was vigorously lobbying to allow Titan interrogators and others to torture prisoners and to immunize himself, and other Administration officials and military personnel, and Titan and other contractors from civil or criminal prosecution.

157.    Plaintiff has exhausted all administrative remedies. Although he notified defendants of the illegal and tortuous conduct, and was issued a final notice denying his claim.

158.    False statements made by Gates and his agents stating they had no method of policing Department of Defense contractors amplify and build upon previous inaccurate false statements made by President Bush prior to the war.


**Titan Assaults Nattah in Germany**

159.    The men retained by Titan entered plaintiff's hospital room without consent.  Their

words, mannerisms, and body language were intended to cause fear and thereby coerce and

intimidate plaintiff into leaving with them.

160.    These threats placed plaintiff in actual apprehension and fear of immediate and harmful

bodily contact.

161.    Plaintiff summoned military police, which intervened and prevented the battery.  The

assailants only left the premises upon threat of arrest by military police.


**Count I.  Due Process**

162.    Plaintiff incorporates paragraphs 1-152 by reference.

163.    Military officials drafted and inducted him into the military as an E-4.

164.    Plaintiff received no notice of his arrest prior to or after being drafted.  Military personnel

repeatedly assured plaintiff that he would not be required to go into Iraq.  Prior to and after

his draft, plaintiff received no opportunity to be heard and no opportunity to challenge or

redress his illegal detention.   Even after his draft, the military declined to take any action.

165.    Plaintiff had a liberty interest in his own safety, employment, security, and freedom to

travel.

166.    "The very essence of civil liberty certainly consists in the right of every individual to

claim the protection of the laws, whenever he receives an injury."  Marbury v. Madison, 1

Cranch 137, 163 (1803).

167.    The Fifth Amendment states, "nor be deprived of life, liberty, or property, without due

process of law".

168.    President Bush stated he would never permit a draft, but after Gates learned Nattah had been drafted he took no action.

169.    Furthermore, the Administrative Procedure Act, 5 U.S.C § 551 specifies that agencies be required to give notice regarding various actions.  Failure of the US military to give Plaintiff notice when depriving him of his liberty interests violates this Act.

170.    Defendant former Secretary Rumsfeld deprived plaintiff of his liberty.

171.    Due process required former Secretary Rumsfeld to accord plaintiff, inform him of the charges against him and a hearing to obtain his release.

172.    Neither prior to, during, nor after plaintiff's detention, defendant Former Secretary Rumsfeld gave plaintiff any notice of his impending detention, did not provide any method of contesting his detention, and did not give plaintiff any opportunity to be heard.

173.    Furthermore, without prior Congressional authorization, United States law specifically precluded the military from impressing any American citizen into military service, and Congress has not given any such authorization.

174.    The United States military breached its duty to respect plaintiff's liberty by detaining him for an indefinite period without means of escape or redress.

175.    As a direct and proximate result of plaintiff's illegal detention, plaintiff became deaf as a result of shelling, has sustained great mental distress, and is unable to pursue his career and earn wages due to loss of hearing.

176.    Taken as a whole, the facts demonstrate a violation of substantive due process, because the facts described "shock the conscience" of the nation.

177.    As a matter of substantive due process, plaintiff could not travel where he pleased or pursue the vocation of his choice.  Further, substantive and due process require that the

draftee be within the age group subject to selective service, and plaintiff's old age rendered him exempt from selective service.

178.    Prior to being drafted plaintiff was entitled to the due process contained within the United States Code including but not limited to provisions (1) the right to a pre-draft hearing before the draft board, (2) right to a pre-draft appeal of the draft board's decision, (3) contest the Army's determination of his age and applicability of the draft to him, (4) right to petition for status as a conscientious objector, (4) right to receive training prior to service, and (5) right to receive military gear such as ear plugs prior to service

**Count II. First, Third, and Fourth Amendments of the United States Constitution**

179.    The Fourth Amendment of the United States Constitution provides that persons shall be secure in their persons absent probable cause and warrant for their arrest.

180.    The First Amendment includes a freedom of association as well as the corollary right to abstain from association, and defendants' violated plaintiff's rights by requiring him to associate with the military despite his status as a conscientious objector.

181.    The United States military did not charge plaintiff with any crime and had no evidence nor suspicion that plaintiff had committed any crime.

182.    The military lacked any warrant or any other claim of authority to detain plaintiff.

183.    The military acted under an Administration policy where warrants are not necessary.  The military lacked authority to detain plaintiff, because the invasion of Iraq was a war of aggression violating international law and prohibited by the United Nations Charter.

184.    The military breached its duty to respect plaintiff's physical privacy and integrity and seized him, and plaintiff's imprisonment into the military amounts to a search and seizure as defined by the 4th Amendment.

185.   The Third Amendment provides, "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law."

186.   A penumbra or conjuncture between the First, Third, Fourth, and Fifth Amendments prohibits utilization of a draft in an arbitrary or capricious manner.

187.   These three Amendments in combination with the First Amendment preclude drafting conscientious objectors.

188.   Plaintiff's moral and religious convictions preclude him from participating in military operations. The contract plaintiff originally signed called for plaintiff to interpret behind the scenes without direct participation in combat operations.

189.   Defendant former Secretary Rumsfeld's purchase of plaintiff and deployment of him into Iraq violated plaintiff's constitutional rights by drafting him notwithstanding his status as a conscientious objector.

190.   As a direct and proximate result of plaintiff's illegal detention, plaintiff rendered deaf by shelling, has sustained great mental distress, and is unable to pursue his career and earn wages due to loss of hearing.

### Count III.  Geneva Convention/War Crimes Act Customary International Law

191.   At the direction of defendant President Bush, White House Counsel and the Department of Justice bypassed and violated the procedures and law governing the treatment of prisoners of war.  The purpose of the new policy was to aid American forces achieve military success in Iraq and Afghanistan.

192.   The Geneva Convention relative to the Treatment of Prisoners of War was adopted on August 12, 1949 by the Diplomatic Conference for the Establishment of International

Conventions for the Protection of Victims of War, held in Geneva from 21 April to 12 August, 1949 and went into force 21 October 1950.

193.   Under the President Bush policy, United States law enforcement, intelligence, and military officials received authorization to apprehend anyone found on the battlefield, in addition to deprive prisoners of war notice of charges against them and a fair hearing. President Bush authorized this policy to be applied to United States citizens as well as international prisoners of war.

194.   President Bush authorized Rumsfeld, law enforcement, and intelligence services to hold prisoners of war without declaring them, making them available for outsiders to inspect them, or acknowledgement of their health and safety.  Also, at President Bush's direction, White House Counsel dictated methods of torturing prisoners.

195.   Pursuant to a much broader policy regarding detention, agents of Former Secretary Rumsfeld purchased and captured plaintiff while on the battlefield and made him a prisoner of war.

196.   Article 3 of the Geneva Convention states:

a.   In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each party to the conflict shall be bound to apply, as a minimum, the following provisions:

b.   Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness,

wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, color, religion or faith, sex, birth or wealth, or any other similar criteria.

c. To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:

  i.  Violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;

 ii.  Taking of hostages;

iii.  Outrages upon personal dignity, in particular, humiliating and degrading treatment;

 iv.  The passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

197.    Article III precedes the portion of the treaty dealing with prisoners of war. Unlike Article IV, Article III applies not only to persons in the hands of an "enemy" but also to all "persons taking no part in hostilities."  Individuals falling into the category outlined in Article III include a broader range of persons, but persons falling only under Article III are entitled to less protection than those also protected by Article IV.

198.    Article III precedes the portion of the treaty dealing with prisoners of war. Unlike Article IV, Article III applies not only to persons in the hands of an "enemy" but also to all "persons taking no part in hostilities."  Individuals falling into the category outlined in Article III include a broader range of persons, but persons falling only under Article III are entitled to less protection than those also protected by Article IV.

199.    Plaintiff falls under the category defined by Article III as well a prisoner of war as defined Article IV.

200.    Agents of former Secretary Rumsfeld implementing the policies of former Secretary Rumsfeld and President Bush subjected plaintiff to "violence to life and person" within the context of the Convention by knowing and intentionally placing him on the battlefield. Agents of former Secretary Rumsfeld knew the assignments given to plaintiff subjected him to intense and highly dangerous enemy fire.  Press accounts described interpreters as having the "most dangerous job in Iraq."

201.    Although plaintiff was subjected to the same risks encountered by American troops, Former Secretary Rumsfeld's agents did not issue body armor to plaintiff.  The failure to provide body armor evidences a lack of concern for plaintiff safety.

202.    The Convention further obligated former Secretary Rumsfeld to abstain from "outrages to personal dignity."

203.    The Merriam Webster online dictionary defines outrages as "a: INJURY, INSULT, and b: an act that violates accepted standards of behavior or taste."

204.    The Merriam-Webster online dictionary defines "dignity" as "the quality or state of being worthy, honored, or esteemed."

205.    Agents of former Secretary Rumsfeld treated plaintiff as a sub-human slave.    By
impressing him into service through threat and brandishing weapons, agents of defendant
severely violated plaintiff's personal dignity.

206.    Agents of former Secretary Rumsfeld purchased plaintiff as a slave, impressed him into
the military, and required him to participate in combat.    These activities constitute outrage,
because they do not conform to "acceptable standards of behavior."    International and
domestic norms and values dating back to the 19th deem the sale of human life immoral.
Furthermore, United States norms treat the arbitrary and capricious drafting of persons as
unacceptable behavior.

207.    Article III of the Convention further condemns adverse treatment based upon race,
religion, and national origin.    Agents of defendants believed that because plaintiff was an
African of Libyan national origin and Islamic faith, plaintiff was an "enemy" as is defined in
the Convention and could be purchased and sent into combat.    Caucasian, non-Arab, and
Christian interprets did not receive the adverse treatment experienced by plaintiff.

208.    Like numerous other Arabs, former Secretary Rumsfeld did not declare and permit
inspection of plaintiff by international organizations as required by the Geneva Convention.

209.    Article V provides:

> Should any doubt arise as to whether persons, having committed a belligerent act and
> having fallen into the hands of the enemy, belong to any of the categories enumerated
> in Article IV, such persons shall enjoy the protection of the present Convention until
> such time as their status has been determined by a competent tribunal.

210.    Defendant President Bush and former Secretary Rumsfeld implemented an official policy
violating Article V.    Their policy held that in the event there is doubt over whether a person

falls into one of the categories listed in Article IV, the person is NOT treated as though they fall into one of the categories listed in Article IV. This policy did not provide for review of status by a competent tribunal, and in legal proceedings they have consistently fought against permitting review by a competent tribunal of whether detainees falls within the scope of Article IV. President Bush Administration policy mandated the secret detention of dozens of individuals, including plaintiff. The Administration withheld notification and inspection of the Red Cross and other organizations to enable their detention and facilitate torture of detainees.

211.    Even assuming plaintiff actually did not fall under the provisions of Article IV; defendant violated the treaty by failing to provide the protections guaranteed to prisoners until such time as their status could be determined.

212.    Under international law, no nation may seize a person found on the battlefield or force them to work for the occupying power unless the person has been adjudicated to have committed some offense.

213.    Plaintiff has been permanently traumatized by atrocities and violations of the Geneva Convention he witnessed in Iraq. Due to extreme mental anguish, plaintiff has suffered and will continue to suffer damages for the rest of his life.

214.    As a translator, plaintiff assisted in interrogating prisoners. He witnessed human mutilation, decapitation, carnage, and dismemberment and experienced near death incidents.

215.    Defendants compelled plaintiff to assist in violations of the Geneva Convention. Plaintiff translated conversations in which U.S. troops withheld water from prisoners of war and refused to provide medical treatment to prisoners of war until such time as the Iraqi soldier confessed and/or provided intelligence information. On other occasions, plaintiff witnessed a

strict rationing of medical care and water attributable to negligence. Due to rationing, he observed injured Iraqi's left to die without medical care, while other prisoners endured needless suffering and inhuman conditions due to lack of water and medical care.

216.                              Defendant Titan knew of and participated in the violations of the Geneva Convention alleged above.

217.                              Nattah is a citizen of Libya and is an "alien" within the definition of the term "alien" contained with the "Alien Tort Claims Act".

218.    The Geneva Convention is enforceable through the "Alien Tort Claims Act" and the "War Crimes Act".


## Count IV.  International Law Launching a War of Aggression

219.    The United Nations Charter forbids the initiation of a "war of aggression."

220.    Prior to and at the time of the U.S. invasion of Iraq, the United States was in no danger of an attack by Iraq, Iraq planned no offensive operations against the United States, and Iraq had no means of manufacturing, possessing, deploying or distributing weapons of mass destruction.

221.    The Security Council's permission to use force only applied if Iraq failed to comply with Security Council resolution.  Although Iraq had complied with those resolutions, the United States launched an unprovoked attack upon Iraq.

222.    The Merriam Webster dictionary defines aggression as, "the act of initiating hostilities or invasion."

223.    Customary and international law based upon the Nuremberg principles holds that governmental officials are personally liable for war crimes, including the initiation of a war

of aggression.    The United States Supreme Court's Chief Justice played a critical role in the development of the Nuremburg principles.    Since 1943, the United States Department of State has always firmly argued that high government officials including the head of state are personally liable for crimes against humanity, the Hague Convention, the Geneva Convention, and launching a war of aggression.    Strongly supported by the United States, the United Nations codified customary international law defining a war of aggression as a war which is not mandated by an immediate, probable, and imminent threat of attack and which has the purpose or affect of causing economic or political change in a foreign country. Further, the term "war" is defined broadly to include not only invasions but also support for insurgents, air strikes, blockades, and other acts of war launched without a formal declaration of war.    The customary international law definition of a war of aggression codified by the United Nations at the behest and support of the United States further requires that any military measures constituting an act of war must be proportional to the imminent threats.

224.    Prior to commencement of hostilities intelligence and diplomatic agencies consistently held there was no imminent, immediate, or probable threat of an attack by Iraq on the United States or any of its allies.    During the months leading up to March 2003, George Tenant, former Director of the Central Intelligence Agency explicitly, consistently, clearly, but privately told President Bush, Cheney, the National Security Council that no one within the intelligence believed there was any threat at all of an immediate nature by Iraq upon the United States.

225.    Within just days of each such briefing, defendant Cheney would go on television shows such as "Meet the Press" and state that the intelligence community believed the United States and its allies were in imminent danger of attack by Iraq. He further claimed to possess

intelligence that Saddam Hussein would transfer chemical, biological, and nuclear weapons to al-Qaeda even though no such intelligence ever existed.    In fact, President Bush and Cheney were well aware that Iraq had antipathy toward and no connection with al-Qaeda or other similar terrorist groups.

226.    Defendant Cheney formulated a plan to launch a war of aggression against Iraq and defendant President Bush approved his plans.    Cheney and President Bush planned and executed the war in order to achieve political change within the meaning of the relevant United Nations resolutions, because the war's goal was to depose Saddam Hussein.

227.    Assuming incorrectly that Iraq actually posed an imminent threat to the United States, initiation of hostilities still violated international law.    The U.S. government claimed to know the sites where Iraq stored documents, and weapons related to the WMD program and claimed the goal of the war was to eliminate Iraq's WMD program.    Assuming U.S. intelligence was correct, the United States could have destroyed suspected Iraqi WMD sites from the air.    President Bush and Cheney had a legal obligation to only use proportional force necessary to achieve self-defense.    Assuming incorrectly that the destruction of WMD facilities would actually be an act of self-defense, the invasion itself violated international law, because it was not proportionate to the threat posed.

228.    After the capture of Baghdad, the central justification for the war shifted to become an effort to democratize Iraq and depose Saddam Hussein.    However, the post-hoc rationalization itself violates the traditional stance of the United States towards international law.    The codified definition of a war of aggression explicitly forbids a war to promote political change however laudable the proposed change may be.    The United States sought the language specifically because the U.S. wanted to prevent a war launched for a self-

proclaimed noble purpose, because a noble purpose is in the eye of the beholder. For example, the war of aggression definition was written to set a norm which would make any future Soviet invasion of Hungary or Poland illegal. The United States correctly believed allowing a noble purpose exception would enable the Soviet Union to invade a neighbor for failing to support the noble goal of socialism.

229.    Following the invasion, the United States trumpeted the need to bring Saddam Hussein to trial for launching a war of aggression against Kuwait. The interpretation of both United States and international regulating wars of aggression is just another example of the U.S. government's support for the legal rule that a head of state is personally liable for war crimes. The United States government insisted however that under its interpretation of U.S. and international law the accused head of state might not be subjected to a trial before a foreign court of law or the International Criminal Court. Instead, the United States maintains that high ranking officials and the head of state may only be tried by a court in their nation.

230.    Under the interpretation of United States and international law expounded by the United States government itself, a United States federal court would have jurisdiction to criminally try a President and other high ranking officials for war crimes such a initiation of a war of aggression.

231.    Since the earliest formulation of the Nuremburg principles, the United States Chief Justice and other legal authorities have always maintained that a head of state and other government officials do not possess any immunity from prosecution based upon the fact that they acted in good faith. In fact, the Chief Justice explicitly rejected the argument by the defendants at Nuremburg.

232.   The heart of this lawsuit is that the legal rules which the United States applies to foreign heads of state are applicable to United States leaders.   Second, a domestic and international cause of action for war crimes violations includes both civil and criminal remedies. International law and the War Crimes Act are the "law of the land" within the United States. If the law of war crimes can only be applied in the criminal law sphere, then a case against a government leader can only be brought by an attorney general serving at the pleasure of the United States.   Since the attorney general at the time, has previously acted as White House counsel and advised the President on methods to skirt the Geneva Convention and other international law obligation, any possibility of criminal prosecution is not merely remote but also ridiculous.   Therefore, a civil remedy is the only effective tool to prevent war crimes.

233.   At the time of initiation of the war of aggression against Iraq, the military took plaintiff into custody.   Had President Bush and Cheney not launched a war of aggression, plaintiff would never have been taken into custody, would not have experienced the horrors of war, would never have suffered a combat injury, and would never have experienced reduced wages and earning potential.   The war of aggression was the sole, actual, proximate, and direct cause of all these indignities and injuries.

234.   A damages remedy is essential to deter future egregious violations of international law.

## Count V.  Slavery

235.   Plaintiff incorporates paragraphs 1-95 above by reference.

236.   John Doe 1-6 and Titan forced Plaintiff to perform work as a translator in Iraq.  Plaintiff did not receive any compensation from the military based on the work he performed.

237.   Titan management and Army Intelligence officers were well aware that Nattah would not voluntarily go into Iraq.

238.    Titan could not find a sufficient amount of voluntary labor.    Titan needed Nattah to go into Iraq, otherwise Titan would not be able to meet its contractual obligations to the government, and in theory Titan's future contract awards and bonuses depended upon good performance.

239.    Army intelligence and Titan formed a slave labor contract.    Titan agreed to sell plaintiff as an E-4 slave for Army Intelligence, and in exchange Army Intelligence agreed to compensate Titan at an hourly rate.    Titan and the government agreed upon an hourly rate reserved for hazardous duty.    Titan benefited greatly from this deal, because Titan's contract with Nattah did not include hazardous duty pay, because he was never supposed to go into Iraq.    Thereby, Titan pocketed the extra funds that should have in part accrued to Nattah.

240.    With Titan's full support and approval, six unknown Army Intelligence soldiers pointed loaded weapons at Nattah and told him he was being drafted in the U.S. military.    When Nattah again stated he would not go into Iraq, the soldiers told Nattah he would be shot for desertion if he failed to report for duty.    To avoid being shot, Nattah then followed the unit into battle.

241.    Defendants forced plaintiff to perform various translating duties in highly hazardous and emotionally traumatizing environments.    These environments included being forced to aid torturous interrogation method and traveling through active war zones.

242.    Plaintiff did not receive any compensation for the work he performed and was not permitted to leave US Military service until being honorably discharged in Germany.

243.    The Thirteenth Amendment to the United States Constitution prohibits government and non-government entities from purchasing or selling people into slavery, indentured servitude, forced labor, or other similar forms of bondage.

244.  .42 U.S.C. 1981 (a) prohibits racial discrimination in contractual relations.  Nattah was born in Libya and can be classified as African.  Nattah and Titan had an employment agreement under which Nattah could only be fired for cause or diminution or termination of the government contract.  Titan subjected Nattah to differential treatment by forcing him into servitude while not subjecting similarly situated white translators into servitude.  This differential treatment raises an inference of discrimination.

245.  42 U.S.C. 1985 prohibits people from conspiring to violate an individual's civil rights. The Titan office responsible for human resources is located in Virginia, and this office plays a role in all personnel actions such as that befalling plaintiff.  Some or all of Titan translation management and contract implementation team are probably located in Virginia.  Likewise, some or all of government's contracting officer and officials overseeing contract implementation also probably work in Virginia.  There is a causal nexus between actions or failure to act within Virginia and plaintiff's captivity in Iraq.

246.  Congress passed 42 U.S.C. 1981 (a) and 42 U.S.C. 1985 pursuant to powers given to it by the Thirteenth Amendment. Congress passed the Defense Bases Act and the Department of Defense enacted regulations prohibiting human trafficking pursuant in to the DBA based upon the powers given to the Thirteenth Amendment and the Emancipation Proclamation. According to the United States State Department DOD regulations prohibiting human trafficking spring from the United Nations Convention on the Elimination of All Forms of Slavery and the Trafficking Victims Protection Act (TVPA).    Department of Defense regulations on human trafficking, TVPA, and the United Nations Convention on Elimination of all Forms of Slavery each create a private right of action to enforce the 13th Amendment.

247.  A number of provisions in the U.S. Code target trafficking in persons, also known as involuntary servitude/slavery or forced labor. These provisions are contained in Chapter 77

of Title 18 and are sometimes referred to generally as Chapter 77 offenses. The Trafficking Victims Protection Act (TVPA) of 2000 supplemented existing laws, primarily 18 U.S.C. § 1584 (Involuntary Servitude), and also provided new tools to combat trafficking. Key statutes are excerpted below.

248.     Section 1581 of Title 18 makes it unlawful to hold a person in "debt servitude," or peonage, which is closely related to involuntary servitude. Section 1581 prohibits using force, the threat of force, or the threat of legal coercion to compel a person to work against his/her will. In addition, the victim's involuntary servitude must be tied to the payment of a debt.

## 18 U.S.C. § 1581

*(a) Whoever holds or returns any person to a condition of peonage, or arrests any person with the intent of placing him in or returning him to a condition of peonage, shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.*

*(b) Whoever obstructs, or attempts to obstruct, or in any way interferes with or prevents the enforcement of this section, shall be liable to the penalties prescribed in subsection (a).*

---

249.     Section 1584 of Title 18 makes it unlawful to hold a person in a condition of slavery, that is, a condition of compulsory service or labor against his/her will. A Section 1584 conviction requires that the victim be held against his/her will by actual force, threats of force, or threats of legal coercion. Section 1584 also prohibits compelling a person to work against his/her will by creating a "climate of fear" through the use of force, the threat of force, or the threat of legal coercion [i.e., If you don't work, I'll call the immigration officials.] which is sufficient to compel service against a person's will.

## 18 U.S.C. § 1584

*Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.*

---

250.    Section 1589 of Title 18, which was passed as part of the TVPA, makes it unlawful to provide or obtain the labor or services of a person through one of three prohibited means. Congress enacted § 1589 in response to the Supreme Court's decision in United States v. Kozminski, 487 U.S. 931 (1988), which interpreted § 1584 to require the use or threatened use of physical or legal coercion. Section 1589 broadens the definition of the kinds of coercion that might result in forced labor.

### 18 U.S.C. § 1589

*Whoever knowingly provides or obtains the labor or services of a person--*

*(1) by threats of serious harm to, or physical restraint against, that person or another person;*

*(2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or*

*(3) by means of the abuse or threatened abuse of law or the legal process,*

*shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.*

251.    *18 U.S.C. 1581, 1584, 1589 each create a private right of action on their own right as well as a vehicle to enforce the 13th Amendment.*

252.    *Plaintiff had contractual employment obligations to Titan, and he could not resign without giving prior notice.  As noted above, the contract was NOT at will.*

253.    *Nattah further had a contract with the United States Army whereby he had to serve for a fixed time period, became disabled, or was no longer needed by Army Intelligence.*

254.    *As a condition of discharging Nattah's contractual obligation to the Army and Titan, Titan and the Army forced him to work for the Army.*

**255.    42. U.S.C. 1994 prohibits:**

*The holding of any person to service or labor under the system known as peonage is abolished and forever prohibited in any Territory or State of the United States; and all acts, laws, resolutions, orders, regulations, or usages of any Territory or State, which have heretofore established, maintained, or enforced, or by virtue of which any attempt shall hereafter be made to establish, maintain, or enforce, directly or indirectly, the voluntary or involuntary service or labor of any persons as peons, in liquidation of any debt or obligation, or otherwise, are declared null and void.*

256.    *The Army violated 42 U.S.C. 1994 by directly "enforce" and "order" Nattah be placed in voluntary servitude in "liquidation" of his contractual "obligation".*

257.    *Titan violated 42 U.S.C. 1994 by  indirectly "enforce" and "order" Nattah be placed in voluntary servitude in "liquidation" of his contractual "obligation".*

258.    *The Army and Titan further violated the 1994 by placing him in "involuntary service" "or otherwise".  The "or otherwise" clause modifies the words "involuntary service" and thus the statute does not require that the forced labor be used to satisfy a monetary debt.*

259.    *The United States invasion of Iraq in 2003 overthrew and completely replaced the Iraqi government such that Iraq had no government of its own.   During some or all of the period of Nattah's captivity, United States government ran all governmental functions, directly governed Iraq, and treated and acted as though Iraq were a protectorate and/or colony.   Therefore, during the time period of some or all of Nattah's forced labor, Iraq was a United States "territory…of the United States" within the meaning of 42 U.S.C. 1981 (a), 42 U.S.C. 1985, and 42 U.S.C. 1994.*

*260.    18 U.S.C. 1590 provides:*

*Whoever knowingly recruits, harbors, transports,  provides, or obtains by any means, any person for labor  or services in violation of this chapter shall be fined  under this title or imprisoned not more than 20 years, or both.  If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to  commit aggravated sexual abuse, or an attempt to kill,  the defendant shall be fined under this title or imprisoned for any term of years or life, or both.*

*261.    Six unknown Army soldiers, Harvey, and Gates violated violated 18 U.S.C. 1590 by "recruiting" and "transporting" Nattah as a slave from Kuwait and through Iraq.*

*1. Titan violated 18 U.S.C. 1590 by "recruiting" Nattah to work as a slave and by "transporting" him from the United States to Kuwait.*

*2.  U.S.C. 1583 provides:*

*Whoever kidnaps or carries away any other person, with the intent that such other person be sold into involuntary servitude, or held as a slave; or*
*Whoever entices, persuades, or induces any other  person to go on board any vessel or to any other  place with the intent that he may be made or held as  a slave, or sent out of the country to be so made or held -  Shall be fined under this title or  imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.*

262.     Titan violated 18 U.S.C. 1853, because it "enticed", "persuaded", and "induced" plaintiff to board a "vessel" flying from the United States to Kuwait where he was to be made a slave.

263.   Congress enacted 18 U.S.C. 1851 through 1895 pursuant to powers conferred by the 13th Amendment.   Section 1581 through 1595 provide a private right of action to enforce rights guaranteed by the 13th Amendment.

264.   In addition to creating a vehicle to enforce the 13th Amendment, Section 1595 provides a statutory right of action to enforce Sections 1589, 1590, and 1591.   Plaintiff brings this case pursuant the 13th constitutional guarantees implemented by 1581 through 1595 and the statutory guarantees contained in 1589, 1590, and 1595.

265.   18 U.S.C. 1595 provides:

(a) An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

266.   Plaintiff further brings a claim as a private attorney general pursuant to enforce the provisions of 18 U.S.C. 1594 seeking fines and forfeitures to the United States government. An implied or judicially created private attorney general action can be inferred or found where the United States Attorney General has a conflict of interest.   The Attorney General has a conflict of interest, because plaintiff's detention sprang from an official White House legal opinion written by Alberto Gonzales approving and authorizing (a) the arbitrary detention of persons found on the battlefield and (b) the use of spurious or fictitious loopholes in the Geneva Convention.   The Attorney General also has a conflict of interest, because the Attorney General has an ethical obligation to both represent government employees accused or violating the statute but also to seek civil forfeiture from those same individuals.   Further, the Attorney General has an obligation to defend claims brought against the United States Army, but a simultaneous obligation to seek forfeiture of Army property used in the furtherance of slavery such as the Humvee and Bradley Armored Fight Vehicle used to transport plaintiff.   These conflicts of interests necessitate a court approved private attorney general action pursuant to 18 U.S.C. 1594 against Titan, Harvey, and the individual soldiers.

267.    Section 1590 makes it unlawful to recruit, harbor, transport, or broker persons for labor or services under conditions which violate any of the offenses contained in Chapter 77 of Title 18.

### 18 U.S.C. § 1590

*Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both. If death results from the violation of this section, or if the violation includes kidnapping or an attempt to kidnap, aggravated sexual abuse, or the attempt to commit aggravated sexual abuse, or an attempt to kill, the defendant shall be fined under this title or imprisoned for any term of years or life, or both.*

### Count VI.  Constitutional Right to Travel

268.    Plaintiff incorporates paragraphs 1-100 above by reference.

269.    The United States Military denied Plaintiff's right to travel by forcing him to accompany them into Iraq.  The US Military denied the Plaintiff the right to return home.

270.    Titan violated plaintiff's constitutional right to travel by making forced labor a term and condition of plaintiff's employment and by agreeing that the Army could (1) force plaintiff to go where the Army pleased and (2) prevent Nattah from leaving the military encampment and returning to a Kuwait City.

271.    While recuperating in hospital from numerous brain and ear surgeries, thugs hired by Titan came to plaintiff's room and told him they were removing him from the hospital without being discharged and would be transporting Nattah back to the United States. Nattah told them that flight could cause death, because turbulent would jostle and rupture brain and ear wounds.   Titan staff indicated they cared little about whether he lived or died and moved to take him out of the building.    Whereupon, military police arrived and

physically restrained Titan hooligans from taking Nattah and then escorted the Titan ruffians out of the building.

## Count VII.  Outrageous Conduct under Kuwaiti and Iraq Law

272.                                    Plaintiff incorporates paragraphs 1-95 above by reference.

273.    The Articles of Confederation and Constitution create a right to travel.-

274.    The totality of the facts alleged above demonstrate defendants' conduct was beyond all standards and bounds of decency shared by civilized nations.

275.    The defendants' actions intentionally and recklessly caused shock, anxiety, stress, and great emotional trauma.  A reasonable person in plaintiff's position would find defendants' conduct to be outrageous.

276.    Based upon information given to Titan as well as plaintiff's personal appearance and presence in an emergency recovery room, defendant Titan was well aware of plaintiff's particular susceptibility to coercion and inability to resist mentally or physically to an assault and battery.

277.    Titan's actions succeeded in causing plaintiff debilitating mental anguish, anxiety, stress, confusion, consternation, and upset.  Wherefore, plaintiff suffered damages.

## Count VIII.  Intentional Infliction of Emotional Distress Kuwaiti and Iraqi Law

278.    Plaintiff incorporates paragraphs 1-95 above by reference.

## Count IX.  Fraud

279.    Plaintiff incorporates paragraphs 1-100 above by reference.

280.    Defendant, Titan enticed Plaintiff to work as an Arabic translator by promising various benefits to working with the company.

281.    Defendant made those promises at a career fair in the United States.

282.    Plaintiff and Defendant agreed to terms and entered into an employment contract.

283.    Defendant later sent a letter to Plaintiff requesting his signature and providing further detail regarding his employment, but that letter did not serve as the employment contract.

284.    Both parties relied on the initial offer of employment, occurring during the career fair to serve as the employment contract.

285.    Defendant did not fulfill the terms of the contract.

286.    Defendant knew or should have known that the company could not possibly fulfill the terms of employment Nattah relied upon.

287.    Defendant fraudulently enticed Plaintiff to fly to the Middle East.

## Count X.  Breach of Contract

288.    Plaintiff incorporates paragraphs 1-95 above herein by reference.

289.    Titan offered plaintiff employment in Kuwait.

290.    Plaintiff accepted Titan's offer.

291.    Subsequently, defendant breached the contract by selling him to Defendant Former Secretary Rumsfeld for service in Iraq.

292.    Defendant did not provide the fringe benefits promised to plaintiff under the contract such as an apartment, food and recreational facilities.

293.    Contrary to Iraqi and Kuwaiti law, the contract of employment was not written in Arabic.

294.    To the extent Titan asserts defenses under the contract, Iraqi and Kuwaiti law provides the employer may not enforce any contractual provision or defense against the employee unless the employment contract is in Arabic.

## Count XI.  Iraqi Labor and Social Affairs Notification (Class Action)

295.   Plaintiff and class members re-allege paragraphs 1-95 above.

296.   Plaintiff Nattah brings Count XVII against defendant Titan upon behalf of himself and a class of all Titan employees of Arab national origin who have ever worked in Iraq.

297.   Plaintiff is of Arabic national origin.

298.   Iraqi law provides non-Iraqi Arabs shall legally be treated the same as Iraqi nationals.

299.   Plaintiff and the class he represents are employees for purposes of Iraqi labor and employment law, because they labored in Iraq for a wage.

300.   Defendant Titan is an employer, because (1) it employed one or more employees within Iraq and (2) it is a private or mixed employer.

301.   Defendant Titan had a clear obligation under Iraqi law to inform the Ministry of Labor and Social Affairs and the President of the General Federation of Employees' Trade Unions any time it terminates an employee.

302.   Titan terminated thousands of employees working in Iraq, including plaintiff.

303.   Titan never informed and to this day still does not inform the Iraqi Ministry of Labor and Social Affairs or the President of the General Federation of Employees' Trade Unions of any of these terminations.

304.   Titan willfully refused and continues to refuse to comply with the said notification provision of Iraqi law.

305.   Plaintiff and the class he represents have been prejudiced by the failure to notify, as their termination resulted from Titan's failure to notify the Ministry and Union.  None of the terminations are legally valid and must be vacated as null and void.  Class members are therefore entitled to lost wages and damages, and Titan must pay the Ministry and Union fines.

## Count XII.   Wrongful Termination

306.    Plaintiff and class members re-allege paragraphs 1-100 above.

307.    When an employer terminates or suspends an employee, the employer must make an accusation against the employee and provide a specific reason for the termination or suspension.

308.    The termination is wrongful where either (1) the accusation is false, (2) the employer is mistaken, or (3) vexatious.   Any one of these three is a reason for the termination to be wrongful and illegal.   Wrongfully terminated employees are entitled to lost wages, damages, and reinstatement.

309.    Titan's stated reasons for terminating plaintiff and hundreds of class members were false, mistaken, and vexatious.

## Count XIII.   Hours of Work and Overtime

310.    Plaintiff and class members re-allege paragraphs 1-95 above.

311.    No employer may require an employee to work more than one shift per pay.   The maximum night shift shall be seven hours per night, the maximum shift including some day and some nighttime shall be seven and one-half, and the maximum day shift shall be eight hours per day.

312.    Titan required plaintiff and thousands of others to work more than one shift per day. Titan also required plaintiff and thousands of other employees to work more than seven hours at night, to work more than a seven and one-half hours of a mixed day and night shift, and to work more than and an day hour day shift.   Plaintiff, for example, was required to work 20 hours per day.

313.    Employers may not require employees to work on their day of rest.

314.    Titan required plaintiff and thousands of other class members to work on their day of rest without the employee's consent or approval.

315.    Where an employee voluntarily agrees to work more than the above specified number of hours, work more than one shift, or work on their day of rest, the employer must pay both salaried and hourly employees overtime.  The employee must be paid double the rate of normal pay for night work or dangerous work.  The employee must be 1.5 times the normal rate of pay for non-dangerous daytime work.

316.    Titan has and continues to willfully refuse to compensate any employee for overtime.

317.    Plaintiff and the class members he represents worked significant amounts of overtime but did not receive any overtime pay.

318.    Defendant is further required to maintain a register of wages and the register is subject to inspection by labor inspectors.  Defendant failed to maintain a register of wages as proscribed by Iraqi law.  Iraqi law provides the register is subject to control by Iraqi labor inspectors.  To the extent of Titan's register or similar records, Titan does not make them available or subject them to control by Iraqi labor inspectors.  As a result of defendant's failure to make documents available to labor inspectors, wages paid to plaintiff and class members have been incorrect.

319.    Defendant required some class members to sign a release or similar documents in order to receive their pay or severance.  Iraqi law provides any release or waiver signed by employees is invalid unless the employee also signs the wage register.  Where the employee does not sign the register, the claims are not discharged.  Neither plaintiff nor any of the class members signed the register.  To the extent some of the claims at issue may be challengeable

based upon satisfaction and accord, Iraqi law explicitly prohibits such a defense, because the employees or former employees did not sign the register because no register existed.

320.                                    Employees subjected to a cessation of work must be paid 30 additional days of pay beyond those already due.  Although defendant did cease in certain locations without providing employees alternative employment, defendant failed to pay the class members subjected to work stoppages the 30 additional days required by Iraqi law.

**Count XIV. False Claims Act (Iraqi Defendants)**

321.   At the behest of defendant Cheney, the United States Department of Defense paid Iraqi defendants over $20,000,000 to provide reliable intelligence.

322.   The United States Department of Defense fully believed it was receiving good intelligence from the Iraqi defendants about the Iraqi political system, program to build and deploy weapons of mass destruction, and connections between the Iraqi government and terrorist organization such as al-Qaeda.  The Department Intelligence Agency thought the Iraqi defendant's information was so reliable that it used the information to brief other executive and legislative branch leader, foreign nations, and international organizations. Defendant Cheney vouched for the INC and further strengthened the INC's credibility.

323.   In consideration for $20,000,000, the Iraqi defendants knowingly and intentionally provided the Department of Defense with completely false information about Iraq's weapons of mass destruction programs and Iraqi contacts with terrorist groups.  None or virtually none of the information supplied by the INC was correct.  As a direct and proximate cause of deliberately deceptive information supplied to the Department of Defense by the Iraqi defendants, the United States has spent over $300,000,000,000, experienced over 2,500

combat deaths, and thousands of disabling combat injuries including the injuries sustained by plaintiff Nattah.

324.                              The INC detailed hundreds of sites containing weapons of mass destruction, WMD precursors or components, and/or documents related to the weapons of mass destruction program.  Plaintiff Nattah followed up on leads supplied by the Iraqi defendants and found none of the documents, machinery, components, weapons, or chemicals, which the Iraqi defendants claimed would be found at the site visited by Nattah.

325.    Nattah personally translated documents described by the Iraqi defendants and found the documents did not remotely contain the purported content.  Based upon his own personal knowledge, plaintiff knows for a fact the information given to him and supplied by the INC was totally false.

326.    Thousands of class members had experiences strikingly similar to Nattah.   Class members searched fruitless for weapons of mass destruction and related information translating perhaps 1,000,000 pages or more from Arabic to English, but they found none of the documents identified by the Iraqi defendants beyond those already provided to the United Nations by Iraq.  Class members also translated markings and lettering on physical objects such as machinery, boxes, and barrels.  However, translators did not find any of the objects listed by INC, because not only had the objects not existed since Iraqi disarmament in the early 1990s, the Iraqi defendants in fact well knew none of the objects described by them would be found in Iraq.

## COUNT XV.  Slavery, Human Trafficking, and Fraud

327.    Article 3 (a) of the Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and Children states: Trafficking in persons" shall mean the recruitment,

transportation, transfer, harboring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation or the prostitution of others or other forms of sexual exploitation, forced labor or services, slavery or practices similar to slavery, servitude or the removal of organs.

328.    The United States and Kuwait have both signed and ratified the Protocol.

329.    According to the Convention, consent is not a defense to a claim of human trafficking.

330.    The Convention bans "transportation" of persons through means of "deception", "giving or receiving of payments", "coercion", and "fraud".

331.    According to answers.com, the term "exploitation" in the Protocol is defined as: Utilization of another person or group for selfish purposes.

## Count XVI.  Denial of Substantive and Procedural Due Process

332.    The United States Department of Defense has an official policy of forcing employees of government contractors into involuntary servitude and refusing to accord employees of government contractors any due process rights whatsoever.

333.    Using campaign contributions, defendant Titan collaborated to form this illegal policy and abuses it to keep its employees from leaving the company.    Employees of government contractors must obtain a clearance.   The clearance process starts when the contractor asks for an interim clearance until final and permanent clearance decision can be made.

334.    Titan and other contractors blame the government for the failure to provide plaintiff any notice or opportunity to be heard.

335.    Applicants may not submit the paperwork on their own, and instead they must rely on a
contractor to submit the information on their behalf, and an applicant has no ability to request
a hearing or appeal.    Assuming DOD's factual assertions are correct, the DOD policy
violates due process rights of plaintiff and his class by delegating plaintiff's procedural due
process rights to a third party.    DOD policy mandates that plaintiff and his class will never
receive any notice or any opportunity to be heard.

336.    Once a translator obtains a long-term clearance, the translator can transfer his clearance
to another company and/or request a substantial raise from their current employer.    Interim
clearance holders cannot transfer their clearance to another company though.

337.    The Iraqi language translation contract between Titan and the United States government
requires Titan to submit accurate clearance application forms and forward long-term and
permanent security applications in a timely manner.    This contractual provision is crucial to
the American effort to fight the war in Iraq and the war against terrorism.    Insurgents,
militia, and terrorist rings are currently attempting to infiltrate American jobs in Iraq to gain
intelligence on American war plans and convey misinformation.    Interim clearance checks
are extremely brief and only reveal the most blatantly obvious security risks.

338.    The forwarding of a long-term or permanent security clearance application from the
contractor to the federal government is a simple clerical task.    Despite the public policy and
contractual imperatives, Titan made a conscious decision to withhold, obstruct, and delay
long-term and permanent clearance applications from the relevant U.S. government agencies.
The sole purpose of stopping the processing of clearance applications was to prevent its
employees from having the ability to quit and go work for a different contractor.

339.    The government's policy of sending notice of the security clearance denial to the contractor rather than the applicant helps the contractor keep applicants in involuntary servitude.    If a security clearance is approved, the contractor does not need to inform the employee, and the employee will then remain obligate to work for sub-standard wages.    If an employee complains of unsafe working conditions, the contractor can fire the applicant and falsely tell the applicant his clearance has been denied.    Alternatively, a contractor can withdraw a clearance application without the applicant's consent.    The purpose and affect of the contractor's powers is to keep employees meek and servile.

340.    The Thirteenth Amendment forbids "involuntary servitude".

341.    The purpose and affect of failing to transmit security clearance paperwork is to keep language translators beholden to Titan, prevent them from exercising their rights, and placing them in a bond of involuntary servitude to the company.

## Count XVII.  Breach of Contract (Security Clearances)

342.    Plaintiff re-alleges paragraphs 1-100 above.

343.    The United States government and Titan contracted for professional services.

344.    Titan promised to timely submit security clearance applications.    At the time Titan signed the contract, it had no intention of transmitting clearance applications in a timely manner.

345.    Titan woefully and intentionally failed to transmit clearance application as required by the contract.

346.    In addition to suing on the government's contract with Titan as a third party beneficiary, plaintiff also sues upon his own contract with Titan.

347.    Titan breached its contract with both the employees and the contract with the government by demanding employees make up or guess at unknown information.   Titan refused to allow employees sufficient time to complete clearance applications.     Due to the speed demanded, applicants also inadvertently wrote incorrect answers.    Titan was not worried about the false information supplied on applications, because the company did not plan on transmitting most of the completed applications and instead sought to use them primarily to get interim clearances.

348.    Placing false information on the application form is one of the most common reasons for being denied a clearance.     The defendant's refusal to allow applicants to have sufficient time to complete the applications resulted in numerous class members having their clearance application denied.

349.    Intentionally inflating the number of errors on the applications prejudiced both the applicants and the government by increasing the amount of time required by the government to process clearance applications.

**Count XVIII. False Claims Act and Whistle Blower**

350.    Titan's contracts with the government require the company to submit clearance applications in a timely manner.     Titan had a policy, pattern, and practice of delaying or withholding clearance applications.

351.    Titan instructed class members to make up unknown information.   As employees handed in their applications, many of them candidly told Titan that much of the on the applications was wrong or the product of guesswork.   Titan did not flag applications from persons submitting incorrect data.     Titan submitted some of the clearance applications to the

government, and at the time of transmittal, the company knew many if not most of the applications contained some false information.

352.    Titan had to pay translators for the time spent on filling out applications.    Titan invoiced the government for translators whom the contractor knew had submitted false or misleading information.    Invoices from Titan to the government certified Titan was in compliance with the contract even though Titan well knew the company was not in compliance.    Had the government known the clearance applications were incorrect, the government would not have approved payment of many of the invoices.

353.                                As a direct result of defendant's failure to expeditiously transmit, unreliable individuals worked on the contract.

### Count XIX. Violations of International Law

354.    Plaintiff incorporates paragraphs 1-100 above by reference.

355.    Defendants Former Secretary Rumsfeld, Harvey, President Bush, Cheney, and Titan violated plaintiff's rights requiring him to violate international law and terminated him for refusing to participate in violations of international law.

356.    The United States has signed and ratified the Geneva Convention, the Hague Convention, the United Nations charter, and publicly adopted similar and related norms of customary international law.    This international law has been incorporated into United States law and made enforceable through a variety of means including but not limited to the 18 U.S.C. 2441 War Crimes Act and the Alien Tort Claims Act.

357.    The Hague Convention requires not only armies but also militias, private sector military related entities, and other similar entities to wear a uniform and insignia and to carry weapons openly.

358.    As a term and condition of employment, defendants prohibited plaintiff from wearing a uniform, displaying an insignia, or openly carrying a weapon.    Defendant fired plaintiff, because he would not violate international law.

359.    Article 39 of the Geneva Convention provides:

> a.    Protected persons, who as a result of the war have lost their gainful employment, shall be granted the opportunity to find paid employment. That opportunity shall, subject to security considerations and to the provisions of Article 40, be equal to that enjoyed by the nationals of the Power in whose territory they are….Where a Party to the conflict applies to a protected person methods of control which result in his being unable to support himself, and especially if such a person is prevented for reasons of security from finding paid employment on reasonable conditions, the said Party shall ensure his support and that of his dependents.

360.    Plaintiff Nattah is also a protected person under Article 39.

361.    As a direct result of the war, plaintiff Nattah lost their employment.

362.    Defendants did not allow plaintiff any opportunity to find paid alternative employment. Nattah was not given the same employment opportunities as those residing in Iraq.

363.    Nattah is married and has children.    Defendants failed to support plaintiff and their dependants.

364.    Article 40 of the Geneva Convention states:

> b.    Protected persons may be compelled to work only to the same extent as nationals of the Party to the conflict in whose territory they are…If protected persons are of enemy nationality, they may only be compelled to do work

which is normally necessary to ensure the feeding, sheltering, clothing, transport and health of human beings and which is not directly related to the conduct of military operations.

c. Article 23 of the Hague Convention of 1907 states: A belligerent is likewise forbidden to compel the nationals of the hostile party to take part in the operations of war directed against their own country, even if they were in the belligerent's service before the commencement of the war.

365. Agents acting under instructions from Defendants Titan, President Bush, Cheney, Former Secretary Rumsfeld, and Harvey and acting under supposed color of law ordered plaintiff to work as a secret agent. They placed him on team with orders to infiltrate the Iraqi military lines prior to the Iraq war and make contact with Shite leaders advocating the overthrow of Saddam Hussein. Defendants planned the covert operation to take place well before the actual invasion of Iraq.

366. Congress further incorporated the Hague Convention into United States law through passage of War Crime Act. The Act abrogates qualified and absolute immunity

367. Section III Article I of the Hague Convention provides:

d. The Contracting Powers recognize that hostilities between themselves must not commence without previous and explicit warning, in the form either of a reasoned declaration of war or of an ultimatum with conditional declaration of war.

368. At 8:00 on March 17, President Bush issued an ultimatum threatening to declare war on Iraq if terms unlined by President Bush were not met within 48 hours.

369.    Under The Hague Convention, the United States was not authorized to commence hostilities until March 19 at 8:00 PM EST.    However, defendants Titan, Former Secretary Rumsfeld, Harvey, Cheney, and President Bush ordered the invasion and commencement of hostilities to begin well before March 17.    President Bush falsely stated the invasion would not begin until 8:00 PM on March 19 even though he knew at the time he made the speech the invasion had already begun and United States military forces had already crossed the Iraq-Kuwait border.    The invasion of Iraq prior to expiration of the ultimatum deadline set by President Bush violated the Section III Article 1.

370.    Section 1 Chapter 5 Article 36 provides:

> e.    An armistice suspends military operations by mutual agreement between the belligerent parties. If its duration is not defined, the belligerent parties may resume operations at any time, provided always that the enemy is warned within the time agreed upon, in accordance with the terms of the armistice.

371.    The United States and Iraq signed an armistice ending the 1991 war.

372.    Article 36 required United States to warn Iraq prior to the renewal of hostilities.    The United States violated Article 36 by resuming hostilities prior to giving the warning.

373.    The above named defendant violated international law by terminated plaintiff based upon his refusal to collaborate in the violation of Section 1 Article 36.    The violation of international law led directly and proximately to Nattah's disability.

374.    Article 25 of the Hague Convention states:

> f.    To make improper use of a flag of truce, of the national flag or of the military insignia and uniform of the enemy, as well as the distinctive badges of the Geneva Convention;

375.    Defendants terminated plaintiff because he would not participate in this plot.

**Count XX.     U.S. Common Law and Federal Tort Claims Act Violate**

**Hague Convention and Due Process**

376.    Plaintiff is not bringing this action pursuant to the Federal Tort Claims Act. Nevertheless, plaintiff's complaint was dismissed, because it was incorrectly claimed that plaintiff brought a cause of action under the Federal Tort Claims Act.

377.    The dismissal of Nattah's lawsuit violated international and United States law.

378.    Plaintiff Nattah seek a declaratory judgment to invalidate provision of United States federal common law, Department of Defense regulations, the Federal Tort Claims Act which violate of the Hague Convention.

379.    Article 23 of the Hague Convention states:

> g.   In addition to the prohibitions provided by special Conventions, it is especially forbidden…to declare abolished, suspended, or inadmissible in a court of law the rights and actions of the nationals of the hostile party.

380.    The United States, Kuwait, and Iraq are all parties to the Hague Convention.

381.    Department of Defense issued regulations establishing a system for compensating Iraqi citizens for monetary losses inflicted by United States troops.   Those regulations explicitly prohibit Iraqi citizens from bringing an action against United States governmental agencies, employees, soldiers, and other military personnel.   Then by force of arms and a condition of regaining sovereignty, the Department of Defense coerced and compelled the Iraqi government to sign a status of forces agreement prohibiting Iraqi citizens from suing U.S.

military or governmental employees or the United States government and its agencies and instrumentalities either a Iraqi or a United States court. DOD regulations also prohibit Iraqi victims from testifying, presenting evidence, obtaining an oral hearing, or cross-examining witnesses. Department of Defense regulations dealing specifically with Iraqi citizens do not provide for any type of discovery process. Regulations dealing with Iraqis prevent them from getting the military to provide them with names and contact information of U.S. military personnel who witnessed the harm suffered by the victim. The absence of a discovery process precludes victims from reviewing, copying, or inspecting evidence in the possession of the United States government. Even in cases of premeditated murder or torture of Iraqi citizens, the regulations limit compensation to Iraqi victims to $2,500. However, the Department of Defense has no such cap on damages for non-Iraqi's. Individuals processing claims on behalf of the military are themselves military personnel. Policy specifically precludes claims adjudicators from being fair, impartial, neutral, independent, or objective. Claimants do not get any notice about the adjudications, and claimants have no appeal rights.

382. United States governmental policy violates substantive process, because it explicitly discriminates against victims based upon their national origin and procedural due process because victims deprived of life and liberty do not get any notice or any opportunity to be heard.

383. At the time the injuries were sustained, Nattah (Libya) was a citizen of a hostile nation. He suffered economic losses due to United States military's demand that they accompany American forces during the invasion of Iraq. The purpose and affect of both the Department of Defense regulations and the SOFA is to prevent Iraqi claimants from having access to U.S.

Courts.    The Status of Forces Agreement is invalid on its face, because it explicitly violates the Hague Convention, and plaintiffs bring this action seeking a declaratory judgment to finding provisions of the SOFA are illegal.

384.    The United States Supreme Court and lesser inferior courts are now currently violating the Hague Convention.

385.    United States law prohibits federal courts from promulgating a common law.

386.    Nevertheless, United States courts used British common law to develop a common law of sovereign immunity, qualified, immunity, and absolute immunity.    The United States constitution does not mention or require sovereign, qualified, or absolute immunity.

387.    The theory of sovereign immunity holds the United States government cannot be held liable for wrongs committed by the government.  Absent some exception, adherence to the theory means citizens of hostile nations such as Nattah has no right to sue the United States government.

388.    Where a treaty or statute contradicts common law, the common law subordinates and is abrogated.

389.    The Hague Convention contradicts sovereign immunity by requiring a nation to give citizens of hostile nations access to its court system.   During wartime, governments cause almost all the damage done to citizens of a hostile foreign country.   All the provisions of the Hague Convention regulate the conduct of wars by governments.     Article 23 of the convention prohibits seizure of persons and property for wartime proposes.   Provision of the Convention immediately following the one barring confiscation of property mandates that a belligerent open its courts to victims of hostile nations.    Read in this context the access to court provision is really only applicable to claims by foreigners against a hostile government.

If a court held that the doctrine of sovereign immunity overrode the access to court provision, it would render key portions of the treaty meaningless, because there would be no enforcement mechanism.

390.    Unlike the Iraq situation, some treaty obligations can be resolved through arms length bargaining between nations, and a citizen of a foreign nation can look to their government to press their claims on their behalf.    In sharp contrast, Iraq has not achieved the status of a sovereign nation much less a functioning legal and diplomatic structure.    To date, the United States does not even have a consulate in Iraq, and instead all consular affairs dealing with Iraq must be performed in Jordan.    The United States created the Coalition Provisional Authority which in turn developed constitutional and election procedures, and until recently Iraqi military units operated under the control of United States commanders.  To date, the Iraqi government is not sovereign entity with control over its own territory.    Non-governmental militias and insurgents exercise control over most Iraqi territory.    American and Iraqi forces enter a town, take control, and then depart thus returning the area to a state of anarchy.    The Iraqi government is totally dependent on United States military forces and operates as an American protectorate.    To the extent effective government exists, it is controlled by Shiite religious fundamentalists.

391.    Although sovereign immunity does not prohibits foreigners from hostile nations from ever testifying in court to describe their ordeal, American civil procedure makes a court first consider immunity.  The judicial rule of civil procedural looking first to immunity violates the Convention, because the Hague Convention prohibits any effort to make their testimony inadmissible.    In the context of domestic human rights law, many countries such as South Africa have agreed to grant the government and former government officials' immunity from

prosecution and damages as long as they provide truthful testimony.    These officials however are not immunized from civil proceedings.    Victims have the right to testify, and government officials can be forced to testify.    Testimony of both victims and perpetrators is profoundly important for victims, because it give them a cathartic forum to describe their unfair treatment.    Testimony by perpetrators, victims, and witnesses also serves to create an accurate historical record.    Similarly, in this case, Nattah still does not know the rationale for kidnapping him and taking him into Iraq.  The American people still do not understand how or why the United States went to war against Iraq considering Iraq had no weapons of mass destruction.    Nattah became permanently disabled as a result of his war injury, and refusing to let him call witnesses would send him to the grave still grasping for an explanation for the causes and persons responsible for his disability.  Even assuming the Hague Convention does not forbid sovereign immunity, dismissing a case based upon sovereign immunity without first giving a victim the chance to testify would still violate the treaty.

392.    Signature and ratification of The Hague and Geneva Conventions repealed the common law of sovereign immunity.

393.    The United States promulgation, adoption of the Nuremburg principals, and the implementation and affirmation by the Chief Justice waived sovereign, absolute, and qualified immunity for cases involving war crimes.

394.    The Federal Tort Claims Act prohibits any claims arising abroad or claims involving military combat.    However, the Federal Tort Claims Act can be interpreted in a manner consistent with the Hague Convention, because the Hague Convention creates an exception for combat related claims by citizens of hostile nations.    Under this interpretation, the Act would preclude claims by citizens of every country except a few hostile countries such as

Iraq, Iran, Libya, and North Korea.   Congress passed the War Crimes Act 18 USC 2441 to implement the Hague Convention.   Second assuming the Hague Convention does not create an exception to the Federal Tort Claims Act, the Hague Convention supersedes the Federal Tort Claims Act, because Congress passed the Hague Convention implementing statute after passage of the Federal Tort Claims Act, and a statute later in time supersedes any prior inconsistent laws.

395.    The plaintiff seeks a declaratory judgment holding the government violated plaintiffs' rights under the Hague Convention.   If the court finds, the Federal Tort Claims Act does not impinge on rights guaranteed by the Hague Convention, then the court should go forward and make factual findings.   Should the court rule the Federal Tort Claims Act extinguishes a claim for damages that would otherwise be available, plaintiff asks for a declaratory judgment holding the statute itself violates the treaty and thus the U.S. is not in compliance with the treaty.

**RELIEF**

Wherefore plaintiff prays the court to provide the following relief against the government defendants in their official capacities:

Count I and Count II

A.        Declaratory Judgment seeking rescission of contract

B.        Declaratory Judgment holding plaintiff's detention was illegal

C.        Declaratory Judgment seeking classification as a disabled veteran

D.        Declaratory Judgment seeking entitlement to combat medals

E.        Explanatory notice relief

F.        Future combat related medical expenses through Department of Veterans Affairs

G.          Rescission of employment contract

H.          Attorneys' fees

I.          Appointment of a court monitor

J.          Appointment of special counsel immune to conflict of interest

Count III

A.          Preliminary and Permanent injunction prohibiting imprisonment, draft, or detention of

            citizens to serve in combat in Iraq

B.          Declaratory Judgment seeking rescission of contract

C.          Declaratory Judgment holding plaintiff's detention was illegal

D.          Declaratory Judgment seeking classification as a disabled veteran

E.          Declaratory Judgment seeking entitlement to combat medals

F.          Explanatory notice relief

G.          Future combat related medical expenses through Department of Veterans Affairs

H.          Rescission of employment contract

I.          Attorneys' fees

J.          Such other and further relief as the court may deem just and appropriate

K.          Writ quo warranto

Count IV and V

A.          Permanent and temporary injunction

B.          Declaratory Judgment

C.          Nominal Damages

D.          Compensatory damages

E.          Lost wages

F.          Notice relief

G.          Public posting of court decision and notice of legal rights

H.          Punitive damages

I.          A favorable reference

J.          Reinstatement

K.          Trial by jury

L.          Re-imposition of the writ of habeas corpus

M.          Such other and further relief as the court may deem just and appropriate

Count VI and VII (Individual Capacity and Official Capacities)

A.          Permanent and temporary injunction

B.          Declaratory Judgment

C.          Nominal damages

D.          Compensatory damages

E.          Lost wages

F.          Notice relief

G.          Public posting of court decision and notice of legal rights

H.          Punitive damages

I.          A favorable reference

J.          Reinstatement

K.          Trial by jury

L.          Such other and further relief as the court may deem just and appropriate.

Counts VIII through XVI:

A.          Permanent and temporary injunction

B.        Declaratory Judgment

C.        Nominal damages

D.        Compensatory damages

E.        Lost wages

F.        Front pay

G.        Notice relief

H.        Public posting of court decision and notice of legal rights

I.        Punitive damages

J.        A favorable reference

K.        Reinstatement

L.        Trial by jury

M.        Such other and further relief as the court may deem just and appropriate.

Count XVII through XX:

A.        Reinstatement of plaintiff and all class members

B.        Back pay

C.        Front pay

D.        Compensatory and punitive damages

E.        Medical and other expenses

F.        Medical monitoring

G.        Trial by jury

H.        Attorney fees

I.        Fines of 300 Dinars per violation paid to the Iraqi government

J.        Public posting

K.                    Declaratory judgment

L.                    Temporary, Preliminary, and Permanent injunctions

M.                    Notice relief

N.                    Accounting

O.                    Favorable reference

   Count XVIII:

A.            Civil Penalties

B.            Actual Damages, Trebled to Current Cost of War – $1, 404, 096, 000, 000


                                        Respectfully submitted,

                                        __/s/_____
                                        Michael Beattie
                                        2663 Manhattan Pl., Suite 106
                                        Vienna, VA 22180
                                        Ph: 703-698-0623