IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

**Mark Shallal**
13971 Coldwater Dr,
Sterling Heights, MI 48313         **JURY DEMAND**

v.                                  Civil Action No:_____

**Robert Gates, Secretary of the Defense**

**Francis Harvey, Secretary of the Army**

**L-3 Communications (Titan Group)**
1090 Vermont Ave., NW,
Washington, DC 20004

# COMPLAINT

## Parties

1. Mark Shallal worked for Titan as an undercover translator pursuant to a contract between Titan and the United States Department of Defense and/or Army. Shallal resides in Michigan.

2. US Department of Justice, under the Qui Tam (Whistleblower) action is in fact the primary plaintiff and would be entitled to 70% of anything recovered as a result of this claim.

3. Francis Harvey is the United States Secretary of the Army. He is sued in his official capacity. Robert Gates is the United States Secretary of Defense. The United States Army and/or the Department of Defense contracted with Titan for linguist and covert operative services. The government's principal place of business is Arlington, Virginia.

4. L-3 Communications purchase the Titan Corporation, and the entity now transacts business as L-3 Communications Titan Group. The Titan Group principal place of business is Virginia.

**Statement of Facts**

5. Titan Group contracted with Shallal to provide Arabic language translation services between the United States military and the Kuwaiti government, but upon landing in Kuwait, the government and Titan terminated him as a linguist and attempted to re-hire him as covert agent. The government required Titan to submit correct employee security clearance data in order for the government to conduct background checks on Titan employees.

6. Titan instructed employee to submit false, inaccurate, or incomplete information and rushed employees to complete the extremely complex forms. Upon receiving a clearance, Titan would have to dramatically increase the employee's salary, and Shallal took the assignment based on Titan's promise to promptly submit clearance data to the government.

7. Unbeknownst to Shallal, Titan had a pattern and practice of delaying submission of security clearance data to the government. The dilatory behavior enabled Titan to hold Shallal and hundreds others like him in a state of servitude, because they could not quit without having their security clearance denied. An employee who resigns is deemed by the government to have been denied a clearance. Persons denied a clearance are, for practical purposes, routinely denied future clearances based upon the fact that the first clearance was denied. Denial of the first clearance is deemed to mean that the employee is not trust worthy, because the individuals responsible for

investigating and adjudicating clearances assume incorrectly that the original clearance decision was based on the merits of the application or that the employee resigned because they knew they could not obtain a favorable adjudication.

8. Completing a clearance application requires the applicant to investigate themselves and provide extremely detailed information about their past and all their relationships. No person could possibly remember the type of information required, and the applicant must contact numerous individuals and comb their own files to obtain sufficient information to fill out the forms. By requiring Shallal and others to guess at the information and failing to give any time for research or contemplation, Titan set up a situation where employees were highly likely to write incomplete information. Government investigators frequently deny clearances based upon failure to capture all information in the application, because the government assumes the applicant intentionally omitted the information in an effort to hide derogatory information and deceive the government.

9. The government and Titan knew Shallal was a Caldean Christian who spent his childhood living in Iraq until his family fled oppression to come to the United States. Christians living in Iraq are subject to intense hostility, prejudice, and discrimination due solely to their faith.

10. Prior to the fall of Saddam Hussein, the Iraqi government has a well-known policy of imprisoning, killing, and/or torturing individuals who fled the country and then returned. Spies and Caldean Christians would face especially harsh treatment under Saddamm Hussein's policy.

11. After arrival to Kuwait, the government and Titan placed Shallal under cover even though he lacked any permanent security clearance. The contract between the government and Titan did not give the government the authority to contract for covert operative services. Spying is an inherently governmental service and thus federal law precludes contracting officers to award contracts and place task order for spying. In any event, Titan lacked authority to ask Shallal to conduct spying, because its contract with the government required such employee to have a permanent top secret clearance.

12. For the reasons set forth above, Titan knew it could not assign Shallal to be a spy. Titan attempted to bill for Shallal and others at a higher rate based upon the fact that Shallal and others had a clearance. Further, Titan billed the government as though Shallal and others were receiving hazardous duty pay, but Titan did not offer the employees hazardous duty pay or pay employees a supplement for the clearances that they were supposed to hold. Titan thereafter submitted false invoices.

13. Titan's contract with Shallal explicitly only hired him to work in Kuwait, and he was not receiving hazardous duty pay based upon the assumption that he would not be assigned to Kuwait. However, the officials at Titan who negotiated Shallal's pay in fact knew but did not disclose that Shallal would actually be working in Iraq.

14. The government and Titan assigned Shallal to infiltrate the Iraqi city of Basara prior to the United States invasion. Upon arrival, Shallal and other members of the covert team were to contact religious, civic, and political leaders hostile to the Iraqi government and foment a civil insurrection just before British forces reached the outskirts of the city. The team would enable and assist dissidents to take over the

city and thereby obviated the need for British forces to conduct a house to house assault. A successful operation would mean that British and perhaps U.S. forces would sustain substantially smaller casualties during the military campaign.

15. Saddam Hussein administered a highly authoritarian government and placed covert intelligence officers throughout Iraqi society. The purpose and affect was to detect and eliminate political dissidents. The proposed mission into Basara was virtually a suicide mission, because the covert team might contact people posing as dissidents, who were in fact government agents. The team was to contact fundamentalist Shite religious leaders. Shallal would be in any especially precarious role, because those dissidents might expose Shallal simply based upon this Caldean Christian faith.

16. Titan never submitted any permanent security data to the government. His application therefore was denied.

17. Army and Department of Defense policy does not notified applicants of a denial, but instead only contacts the contractor. The government is well aware however, that contractors routinely do not inform employees of denials. Government policy gives contractors the sole right to appeal or challenge security clearance denials. Applicants have no ability to challenge the denial. Titan learned of Shallal's denial, but the company refused to provide Shallal any information about the status of his case.

18. For the past many years, Shallal's employment has languished in a Kaufkeast bureaucratic limbo.

19. Shallal's career goal is to work as an Arabic language translator for the United States government or for a contractor. His desired profession required a clearance, and he can never pursue his desired occupation without judicial action.

20. Shallal applied for vast numbers of jobs with contractors, but he could not obtain employment, because his clearance had been denied. He further applied for jobs as a federal employee, but he was denied employment with the government solely based upon the Titan's clearance denial.

21. Shallal spent hundreds of hours contacting the government to disentangle his clearance status, but the government declined to rectify the situation. Various federal agencies blamed other federal agencies and Titan for the situation. Titan apparently blames the government for his predicament.

22. Surprisingly, Titan eventually hired Shallal as a translator without a clearance. Because he could not obtain a clearance, Shallal had to take a substantially lower paying job as a translator without a clearance. In 2007, Titan assigned him accompany United States troops in Iraq on various military operations. Due to lack of a clearance, Titan assigned him to work in extremely dangerous conditions on the front lines exposing him to hostile fire.

23. Shallal sustained injuries in a combat operation on August, 23 2007.

24. Titan terminated Shallal after the injury, but Titan did not report the work related injury to the appropriate Iraq authorities or pay Shallal worker's compensation for the injury.

25. Mark Shallal brings Count I-VI Titan. He asserts Count VII against Titan, Gates, and Harvey in their official capacity. Shallal focuses Count VIII and IX solely against defendants Gates and Harvey in their official capacities.

### Count I. Slavery, Human Trafficking, and Fraud

26. Plaintiff re-alleges paragraphs 1-25 above and incorporates them by reference.

27. Plaintiff asserts a claim under Count I based upon two theories. First, Titan tricked him into permitting Titan to transport him to Kuwait. Second, Titan held Shallal involuntary servitude by holding onto his security clearance paperwork. Thereby, Titan attempted to coerce Shallal into remaining as an employee. In the event an employee quits or is fired prior to approval of the clearance, they will be barred from getting a clearance from another contractor. Once the clearance is approved, Shallal and other similar employees become vastly more marketable, can command a much higher rate of pay, and can go to work for any contractor. Therefore, Titan held onto the clearance without submitting it in order to prevent Shallal from leaving and going to work for a competitor.

28. Defendant offered plaintiff Shallal a job and the contract provided he was only to perform translations in Kuwait. The sole purpose of offering him this contract was to trick Shallal into flying to Kuwait. Defendant believed plaintiff would rely on the promise of job solely as a translator and solely performed in Kuwait. Plaintiff actually relied on promise that he would work only as a translator and only in Kuwait. The trick succeeded and plaintiff flew to Kuwait in reliance on defendant's false assurance. Defendant wanted him to go to Kuwait so that he could be coerced into working as a spy in Iraq.

29. Even if it is incorrectly assumed that defendant lacked the requisite scienter to prove fraud, plaintiff alternatively argues defendant's statements amounted to negligent misrepresentation. Plaintiff reliance on this misrepresentation caused considerable financial and social loses as well as coercing him into being exposed to dangerous circumstances without due compensation.

30. Defendant did cause the transportation of plaintiff Shallal from the United States to Kuwait and transport him within Kuwait.

31. Defendant Titan tricked Shallal into going to Kuwait by "giving of….payments" as the term is used in the Protocol.  The defendant perpetrated a "deception" upon plaintiff by telling him he would be a translator in Kuwait when in fact he was being sent to be a spy Iraq.

32. Defendant attempted to "coerce" plaintiff by threatening to terminate Shallal unless he accepted an extremely dangerous spy mission.

33. Titan sought to send plaintiff as a spy into Iraq solely for the purpose of reaping selfish financial reward.  Titan planned to accomplish this by failing to pay Shallal any sort of combat, hazardous duty, or overtime pay while at the same charging the federal government a higher than normal rate due to the extremely dangerous nature of the assignment.  Therefore, Titan's effort to overcharge the government and underpay falls within the definition of the term exploitation found in the Protocol.

34. Plaintiff asserts a claim under the Thirteenth Amendment of the United States Constitution, (2) the Protocol, (3) customary international law, (4) Kuwaiti law, and (5) Michigan, District of Columbia, and/or Virginia common law of fraud and negligent misrepresentation.  He further assert a breach of contract claim, because he

was the third party beneficiary of the contract between the government and Titan, and the government regulations incorporated into the contract with Titan prohibit Titan from trafficking in persons.

### Count II.  Breach of Contract (Security Clearances)(Kuwaiti Law)

35. Plaintiff re-alleges paragraphs 1-34 and incorporates them by reference.

36. Plaintiff premises the breach of contract claim regarding clearances based upon his own contract with Titan, and second as a beneficiary of the government's contract with Titan.

37. Titan and Shallal formed an employment contract.  Titan promised to promptly and accurately submit his application for a permanent clearance.  After Titan transported him to Kuwait, the company failed to process the paperwork or submit it to the government.  After Shallal respectfully pointed out the company's breach of contract, the company effectively terminated him.

38. Following the termination, plaintiff could not obtain employment in his chosen profession and experienced tremendous financial and wage losses.

39. Plaintiff Shallal was within the zone of persons intended to be protected by the clearance contractual provision, and he was a third party beneficiary of the requirement that Titan promptly and accurately submit security clearance data.

40. Had Titan followed the contract's clearance provisions, Shallal would have obtained lucrative employment and would be able to find future employment.

41. In addition to suing on the government's contract with Titan as a third party beneficiary, plaintiff also sues upon his own contract with Titan.

42. Shallal and the class of employees he represents contracted with Titan and under the contract, Titan agreed to give the employees time to complete their clearance applications. After being hired, but before actually being deployed to the Middle East, Shallal and his class reported for work and began filling out their clearance applications. Applications require an enormous amount of obscure information. Applicants must undertake extensive research to provide all the necessary information. Applicants must provide contact information for relatives who they may not have contacted for years or places of residence from long ago. The specificity demanded goes well beyond that available in one's memory.

### Count III.    False Claims Act and Whistle Blower

43. Plaintiff re-alleges and incorporates paragraphs 1-42 above by reference.
44. Titan's contract with the government required the company to accurately and promptly submit employee applications and prohibited the hiring of employees for certain positions who lacked a clearance.
45. Titan required as a condition of employment to guess at questions on the clearance application and required employees to submit paperwork on such short notice that employees could not adequately research necessary data or contemplate their answers. As a result, numerous employees provided inaccurate or even false information. After employees submitted clearance application the company regularly held onto them but did not give them to the government as required by federal law. Holding onto the applications benefited Titan, because employees remained on the job until permanent clearance application received an initial determination. Submitting the application would speed up rejection of many of the

applications and thereby prevent the company from billing for unreliable employees. As a result, the contractor retained the services of employees who presented a security threat to United States forces.

46. Titan regularly placed employees in positions requiring a clearance even though the company knew the individual did not have the requisite clearance. For example, some of the Titan interrogators working at Abu Grave prison lacked clearances, but those employees participated in highly classified interrogations of suspected terrorists. Due to lack of screening, a Titan employee raped one of the prisoners at the Abu Grave prison.

47. Shallal respectfully pointed out problems with the clearance application process and with the company's illegal withholding of files from the government. Shallal also made Titan look bad by reporting that some of the Titan employees working on the contract were a security risk.

48. Shallal was just one of the employees tasked with duties requiring a high level clearance despite the fact he lacked a clearance.

49. The company effectively fired Shallal in retaliation for the reports, contract and security violations.

50. Titan sent invoices to the government certifying the employees included in the invoices had clearance when in fact the company knew the employees had no clearance. The government paid the invoices based upon the false assertion that employees held proper clearances. Hiring staff who did not pass clearance was void as a matter of law, and Titan had no right to bill any amount for work done by these employees. Assuming incorrectly Titan had the right to get paid something, Titan

should have only invoiced a lower hourly rate commensurate with non-cleared employees.

### Count IV.  Iraqi Employment Law

51. Plaintiff re-alleges paragraphs 1-50 above and incorporates them by reference.

52. Titan did not report to the Iraqi Ministry of Labor that injury that plaintiff sustained. In fact, injuries are sparsely reported to Iraqi authorities. Iraq is a sovereign government, and Titan needs to follow local laws.

53. Article 17 of the Coalition Provision Authority bars claims under Iraqi law in Iraqi courts. The authority has been dissolved, and the Iraqi Constitution says that the laws in affect are those of the old regime until they are repealed by the Iraqi government, and not the provisional authority.  Considering that Coalition Provisional Authority expired, article 17 is really no longer enforceable, because it was only in effect for the duration of CPA.

54. Status of Forces Agreement (SOFA) gives US troops immunity from Iraqi civil or criminal prosecution.  It does not give contractors any immunity.  SOFA is still in affect unlike Article 17, because the Iraqi government signed the SOFA.

55. However, even if Article 17 is in force, then it only bars claims under Iraqi law in Iraqi courts.  Article 17 explicitly says contractors of nations belonging to the coalition such as US and Poland must follow Iraqi law, but Iraqi laws can only be enforced in the courts of the member nations.

56. Considering that they do not need to follow US law when operating in Iraq (except for the Defense Bases Act), some law must be applied.

57. In accordance with the Iraqi Labor Code Titan should have paid plaintiff in Dinars. Since they paid in dollars the pay check is effectively irrelevant and ineffective. This means that payment must still be tendered in Dinars. Clause 42 of Employment Contracts section of the Iraqi Labor Code states in relevant parts:

> 42
> "(2) Wages shall be paid in Iraqi currency. Payment of wages in other currencies shall not release the employer from his or her obligations to the worker."

58. The Iraqi Labor Code also lays out the specifications on prior warning concerning that potential hazards that exist in the course of employment, and compensation during a work related injury. Clauses 107 and 112 of Safety Regulations and Hazard Pay section state in relevant parts:

> 107
> "An employer shall inform the worker, in writing and prior to engagement, of the occupational hazards posed and the measures of protection to be taken. The employer shall also provide for prominently posting instructions which indicate the occupational hazards and the measures of protection to be taken in accordance with instructions drawn up by the Ministry of Labor and Social Affairs."

> 112 (1, 2i, 2ii)
> "(1) Provisions on occupational injuries contained in the Law on pensions and social security for workers shall also apply to non-insured workers.
> (2i) …if the injury has resulted in the worker's partial incapacity, the contribution shall be in the amount of 50% of the worker's daily or monthly wages over the period of one year.
> (2ii) …if the injury has resulted in the worker's total incapacity or death, it shall be 100% of the worker's daily or monthly wages over the period of one year."

59. Titan has failed to abide by the above laws, causing harm and injuring the plaintiff.

### Count V. Violations of International Law and Wrongful Discharge

60. Plaintiff re-alleges paragraphs 1-59 above and incorporates them by reference.

61. The Alien Tort Claims Act provides Shallal a vehicle through which to vindicate his rights under international law.

62. Titan's firing of Shallal constitutes wrongful discharge, because the personnel action violated international law.

63. As a citizen of Iraq, plaintiff Shallal was a "protected person" within the meaning of the term found in Article 39. Plaintiff Nattah is also a protected person under Article 39.

64. As a direct result of the war, plaintiff Shallal lost his employment.

65. Defendants did not allow plaintiff any opportunity to find paid alternative employment. At the time of the commencement of hostilities, Shallal was located in Kuwait, but he was not provided the same employment opportunities as those available to Kuwaiti citizens.

66. The Geneva Convention lists a discreet number of jobs which may be performed by foreign nationals. The job of spy is not on the list and is thus prohibited. Shallal was at the time a citizen of Iraq and thus fell within the scope of protection afforded by the Convention. The above named defendants violated the Geneva Convention by requiring plaintiff Shallal to undertake a job prohibited under the Convention. Defendants' termination of plaintiff was both wrong and illegal both because the assignment given violated international law and the termination sprang from a desire to retaliate against plaintiff for asserting his rights under international law.

67. The above named defendants violated international law by terminating plaintiff based upon his refusal to collaborate in the violation of Section 1 Article 36 and Section 1 Article 36. The violation of international law led directly and proximately to Shallal's termination.

68. Since the invasion of Iraq, without prior warning violated international law, any personnel actions pursuant to illegal invasion are likewise illegal. Shallal therefore asserts a wrongful termination claim under international law, and a retaliation claim for opposing and refusing to participate in a plan to violate international law.

69. Iraq and the United States concluded a truce in 1990. Due to the truce, commerce and traffic could move between Iraq and Kuwait. The United States used the cessation in fighting to infiltrate Iraq to slip military forces into Iraq prior to the Presidential order threatening to use military force within 48 hours. Defendants planned to use the truce to slip Shallal and other secret agents and military force into Iraq using false names and papers.

70. Defendants terminated plaintiff because he would not participate in this plot.

### Count VI.   U.S. Common Law and Federal Tort Claims Act Violate Hague Convention and Due Process

71. Plaintiff re-alleges facts above in paragraphs 1-70 and incorporates them by reference.

72. The Alien Tort Claims Act provides Shallal a vehicle through which to vindicate his rights under international law.

73. Plaintiff Shallal seeks a declaratory judgment to invalidate provision of United States federal common law, Department of Defense regulations, the Federal Tort Claims Act which violate of the Hague Convention.

74. At the time of his termination, Shallal was a citizen of a hostile nation (Iraq). He suffered economic losses due to United States military's demand that they accompany American forces during the invasion of Iraq. The Status of Forces Agreement may

prohibit Shallal from bringing this suit or other actions against the United States government or its agents. The purpose and affect of both the Department of Defense regulations and the SOFA is to prevent Iraqi claimants from having access to U.S. Courts. The Status of Forces Agreement is invalid on its face, because it explicitly violates the Hague Convention, and plaintiff brings this action seeking a declaratory judgment to finding provisions of the SOFA are illegal.

75. The theory of sovereign immunity holds the United States government cannot be held liable for wrongs committed by the government. Absent some exception, adherence to the theory means citizens of hostile nations such as Shallal have no right to sue the United States government.

76. Unlike the Iraq situation, some treaty obligations can be resolved through arms length bargaining between nations, and a citizen of a foreign nation can look to their government to press their claims on their behalf. In sharp contrast, Iraq has not achieved the status of a sovereign nation much yet a functioning legal and diplomatic structure. To date, the United States does not even have a consulate in Iraq, and instead all consular affairs dealing with Iraq must be performed in Jordan. The United States created the Coalition Provisional Authority which in turn developed constitutional and election procedures, and until recently Iraqi military units operated under the control of United States commanders. To date, the Iraqi government is not sovereign entity with control over its own territory. Non-governmental militias and insurgents exercise control over most Iraqi territory. American and Iraqi forces enter a town, take control, and then depart thus returning the area to a state of anarchy. The Iraqi government is totally dependent on United States military forces and

operates as an American protectorate. To the extent effective government exists, it is controlled by Shiite religious fundamentalists. Plaintiff Shallal is a Christian, and even if Iraq one day constituted a sovereign government, the new Shite fundamentalist regime would not bargain on behalf of Shallal. The unavailability of hope for a diplomatic resolution of Shallal's Hague Convention claims makes judicial enforcement essential.

77. The plaintiff seeks a declaratory judgment holding the government violated plaintiffs' rights under the Hague Convention. If the court finds, the Federal Tort Claims Act does not impinge on rights guaranteed by the Hague Convention, then the court should go forward and make factual findings. Should the court rule the Federal Tort Claims Act extinguishes a claim for damages that would otherwise be available, plaintiff asks for a declaratory judgment holding SOFA and the Federal Tort Claims Act violate the treaty and thus the U.S. is not in compliance with the treaty.

78. The Federal Tort Claims Act has been superseded by the War Crimes Act. U.S.C prohibits violations of the Hague Convention. Since the Federal Tort Claims Act bars foreign plaintiffs access to United States Courts, the earlier statute is barred by the treaty, and the law passed later in time takes precedence. Assuming the Federal Tort Claims Act does not automatically violate the treaty, the filing of a motion to dismiss applied to these facts. Filing a motion to dismiss seeking to prevent Shallal from bringing claims under the Hague Convention would in of itself constitute a war crime.

## Count VII. Denial of Substantive and Procedural Due Process

79. Plaintiff re-alleges paragraphs 1-30 above and incorporates them by reference. Plaintiff Shallal brings this count on behalf of himself and a class of similarly situated Titan employees.

80. Spokesperson for the Department of Defense states that once an employee of a government contractor applies for a clearance with one company, the employee cannot seek a clearance from another company until the government issues a final decision on the first application. Department of Defense further states that plaintiff's application for a permanent application was never denied but instead the application is pending, because the Department is waiting for Titan to submit necessary paperwork.

81. Titan and other contractors deny the claims of the Department of Defense that fault lies with Titan. Instead, Titan says Shallal's clearance application has been denied, but Titan will not provide any explanation or permit him to contest the denial.

82. Titan and other contractors blame the government for the failure to provide plaintiff any notice or opportunity to be heard.

83. The reason Shallal does not know whether his clearance was denied is that he is not entitled to any notice. If the government does deny a clearance, the denial is sent only to the contractor. DOD does not send a notice to the applicant.

84. Plaintiff makes his living as an Iraqi dialect translator. Arabic dialects vary dramatically. Almost all of the jobs in plaintiff's field require at least a low level interim security clearance. Salaries for Iraqi translators are highly dependant on the level of the security clearance.

85. In addition to jobs with government contractors, federal government jobs also require a security clearance. An individual who has previously been denied a clearance will have extreme difficulty in obtaining a clearance for a federal job. Some federal agencies may even deny him employment, because he might eventually fail the background investigation.

86. Plaintiff has a liberty interest in his ability to contract and his ability to seek gainful employment. The government did not provide Shallal any notice or any opportunity to be heard to taking away his ability to seek gainful employment.

WHEREFORE plaintiff seeks the following relief:

1. A declaratory judgment
2. Writ of mandamus
3. Writ quo warranto
4. Preliminary injunction and temporary restraining order
5. Class certification
6. Permanent injunction
7. Liquidated damages
8. Compensatory damages
9. Lost wages and back pay
10. Punitive damages
11. Medical and travel expenses
12. Re-instatement
13. Front pay
14. Favorable reference

Respectfully submitted,

_____
Michael Beattie
2663 Manhattan Place Suite 106
Vienna, VA 22180
703-698-0623 Phone
antiwarattorney@yahoo.com