IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

ABDULWAHAB NATTAH, et al., )
                           )
Plaintiff                  )
                           )
              v.           )          Civil Action No. 06-CV-00700 RCL
                           )
GEORGE W. BUSH, et al.,     )
Defendant                  )
_____

**Reply To Federal Defendants' And Putative Defendant Secretary Of The Army's
Opposition To Plaintiffs' Motions To File Amended Complaint, To Join Additional
<u>Defendants And To Reconsider Or Vacate Judgment.</u>**

<u>TABLE OF CONTENTS</u>

**INTRODUCTION**...................................................................................... **2**

   **Question Presented** ................................................................................ **2**

   **Forward** ................................................................................................... **4**

**ANALYSIS** ............................................................................................... **7**

  **I.**   **Standard for Motion to Amend** ...................................................... **7**

    **A.**  **Delay Does Not Justify Denial Of Leave To Amend, As There Is No
Manifested Prejudice to the Defendant**.................................................... **9**

    **B.**  **Leave to Amend is Proper to Add Additional Party – Francis Harvey,
Secretary of the Army** .......................................................................... **14**

  **II. Amendment is Not Futile - Individual Liability**................................. **15**

   **A. Government Fraudulently Uses D.C.'s Three Year Statute of Limitations** . **15**

   **Plaintiff Still Prevail Under a Three Year Statute**................................. **17**

   **B. FTCA Exemption Have No Applicability to Individual Capacity Defendants**
.................................................................................................................. **20**

   **C. Soldiers are Not Entitled to Qualified Immunity** ........................... **21**

   **D. President Bush Is Not Now Entitled to Absolute Immunity** ........................... **25**

   **E. Immunity Under International Law**................................................... **30**

  **III.**  **Sovereign Immunity** .................................................................. **32**

   **A. Government Took Private Property without Compensation**........................ **32**

**B. First Amendment Can Be A Money Mandating** ............................................... 33

**C. Nattah Meets the Definition of Employee in Tucker Act** ................................ 33

**D. Congress Waived Sovereign Immunity of TVPA** ............................................ 37

**E. Mandamus against Secretary Does Not Violate Sovereign Immunity** .......... 37

**F. Third Party Beneficiary Theory Gives Nattah a Contract Remedy** .............. 39

**G. Military Pay Act** .................................................................................................. 39

**H. Little Tucker Act Claims Do Not Exceed $10,000 Threshold** ........................ 40

**I. Immunity Inapplicable to Thirteenth Amendment and Right to Travel** ....... 42

**J. Third and Fourth Amendment Claims Fall Within A.P.A.** ............................. 43

**K. Administrative Procedure Act Waives Immunity** ........................................... 43

**L. Specific Relief Sought Makes Sovereign Immunity Inapplicable** .................. 47

**M. War Crimes Act** ................................................................................................. 48

**N. Alien Tort Claims Act** ........................................................................................ 49

**O. Government Does Not Claim Immunity from Slavery Claim** ......................... 50

**P. Slavery Claim Gives Adequate Notice of Claim** .............................................. 50

**Q. Amendment to Add Francis Harvey Does Not Require Motion** ................... 56

**R. Plaintiff Does Not Move to Amend Claim as to Unnamed Soldiers** ............. 58

**S. Jurisdictional Discovery Needed** ....................................................................... 60

**T. Request for Oral Argument** ............................................................................... 60

<u>INTRODUCTION</u>

This is a case about slavery.   For the reasons stated below the federal defendant's motion to dismiss must be denied.

**Question Presented**

May the United States military intelligence officers purchase an African slave, afford him no compensation, provide him no due process to challenge his captivity, force him to work 20 hours per day in combat operations until the slave became disabled, and

then discard him as thoughtless as one discard him in the same manner as one might dispose of toilet paper?

The government says not only is there nothing illegal or unconstitutional about purchasing an African slave, sovereign immunity deprives a federal court from providing the former slave any remedy.  Without denying any of the facts, the government says the former slave should not even have the chance to prove his case in court.   To be perfectly clear, the government has brought a motion arguing Nattah fails to state valid cause of action.

This case involves a voluminous number of potential legal issues.  Plaintiff could not possibly brief them all at this time and expect defenses the government may raise at some future time.   The government's brief seeks dismissal based upon:   (1) the Federal Tort Claims Act foreign country exception precludes relief against individual defendants and the government, (2) the Federal Tort Claims Act's requires administrative exhaustion of remedies and plaintiff allegedly did not file an administrative complaint, (3) the D.C. statute of limitations bar the claims, (4) individual defendants are entitled to qualified or absolute immunity, (5) sovereign immunity bar the claims against the government.   As a result, the plaintiff limits this brief to only those issues.   Plaintiff contends some of the government's claims are completely frivolous, while the other legal defenses are not supported by any legal precedents or any evidence in the record.   While defendant is not foreclosed from arguing some of the issues in a summary judgment motion, it is enough to say that under Rule 12 (b) (6), the court cannot dismiss any of the claims against the government or the individual defendants.

Plaintiff further asks that the court take Titan's motion's to dismiss and place it side by side with the government's brief and consider the briefs at the same time.   Using this procedural mechanism, the issue is whether plaintiff can prove any set of facts against any defendant.   To rule the plaintiff is not entitled to any relief against defendant would work a horrendous injustice to a plaintiff who has suffered and continues to suffer from the most callous, arrogant, fraudulent, degrading, and injurious misconduct humanly imaginable.

### Forward

Ruling that a freeman can to be enslaved without the slightest due process and without the government paying him any compensation would set back Anglo-American law eight hundred years.    From the Magna Carta of 1215 through the Bill of Rights, the Civil Rights Movement, and the Americans with Disabilities Act, Anglo-American history has been a story of ever expanding civil rights and liberties, but the motion to dismiss shows government's attempt to set a legal precedent to reverse the trend.   This case now before the court is just one of many cases where the Department of Justice argues federal courts lack jurisdiction to grant victims of arbitrary detention any legal remedy.   From data mining, a nationwide dragnet warrant less wiretaps of reviewing millions of e-mail from American citizens without any suspicion of wrongdoing. Therefore, the government's claim that can enslave a person and then claim immunity is but one example of how the war of terrorisms is drifting the nation towards fascism. This case is an extremely egregious set of facts, because the government never claimed the plaintiff did anything wrong or represented a threat to anyone and further because plaintiff became disabled as a direct result of serving on behalf of the United States in

combat operations.   Yet, nowhere in the any of the government's pleadings has the government acknowledged or expressed the slightest degree of appreciate for his disabilitating service to the United States.  The government asserts a federal court cannot order compensation of an African American who was forcibly detained and enslaved without any notice or opportunity to be heard.   Furthermore, the government says the slave has no ability to bring a lawsuit seeking injunctive relief or declaratory judgment.

Plaintiff is an Arabic language translator, and the federal government is by far the largest employer of Arabic translators.   Although plaintiff would like one day to return to his profession, he cannot return to his profession knowing he could again be rounded up an impressed into service.   Therefore, plaintiff challenges not merely his own confinement but also the White House approved policy of picking up and detaining without any notice or any opportunity to be heard people found at the wrong time and wrong place on the battlefield.   Although the policy remains in place, the government argues Nattah cannot enjoin any future unlawful detention.  The government's brief attempts to set a reactionary legal precedent erasing the civil liberties victories of the 20th century and even the 13th Amendment.   The precedent sought by the government would take us back further rendering meaningless the Bill of Rights protection of the right to due process.   Even before the Bill of Rights though, the Constitution itself banned international slave trade, but the government now asserts that a victim of an international slave trade has no legal remedy.   Although the rights given under English law were weak compare to those eventually enjoyed in the United States, the Anglo-American protection of due process and the rule of law can be dated from the Magna Carta.  See:

http://www.magnacartaplus.org/magnacarta/#en3.    Section 19 guarantees courts will

hear the pleas of anyone coming before them, while section 29 provides:

39.  Imprisonment, &c. contrary to Law. Administration of Justice.

NO Freeman shall be taken or imprisoned, or be disseised of his Freehold, or Liberties, or

free Customs, or be outlawed, or exiled, or any other wise destroyed; nor will We not

pass upon him, nor condemn him, but by lawful judgment of his Peers, or by the Law of

the Land. We will sell to no man, we will not deny or defer to any man either Justice or

Right.


In the fight against terrorism and the war in Iraq, the government seeks a legal precedent

denying any remedy to a victim detained without any notice or any opportunity to be

heard.   Therefore, the legal precedent would take American civil liberties back to the

Dark Ages by contravening even the most basic rights guranteed in the Magna Carta of

1215.

        The government's legal position also offends public policy.   A damages remedy

is meant both to compensate the victim and deter future wrongdoing.   Courts classify

backpay as a form of equitable restitution.   If the United States government does not

need to pay compensation or even back pay to a victim compeled at gunpoint to serve in

the military, the government will have no incentive to discontinue this misbehavior.   The

misbehavior needs deterrence, but Mr. Nattah's case is not one isolated event but rather

just one example of the government's desperate attempt to win the war in Iraq and on

terrorism by repressing civil liberties and abandoning everything our troops have fought

for 230 years to protect.   The public has a profound stake enjoining the policy of

unlawful detention in this and the many similar cases now working there way through the court system.   Giving victims of unlawful detention a damages remedy is key to stopping future misconduct.   Should the court deny a damages remedy, the legal precedent will give the government a green light to arbitrarily detaining and compelling work from anyone found at the wrong place at the wrong time.   Dismissing this means none of us are safe, and the legal precedent set will take the nation a large step in the direction of fascism.

<u>ANALYSIS</u>

**I.       Standard for Motion to Amend**

Federal Rule of Civil Procedure 15(a) requires that leave to file an amended complaint "shall be freely given when justice so requires." The plaintiff was enslaved, forcefully taken to Iraq, where has suffered an injury while fighting on the front lines. His life was threatened as he desperately sought treatment, and then he was discharged without being paid. This case is clearly a case where the mandate of Rule 15(a) should be heeded. <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962) (<u>citing</u> 3 Moore, Federal Practice (2d ed. 1948), 15.08, 15.10). Leave is also sought to add an additional party, Francis Harvey, Secretary of the Army, since it is unknown at this time, whether the troops Nattah was with were with a Department Of Defense unit like the Defense Intelligence Agency, or they were in the Army.

"Leave to amend should ordinarily be freely granted to afford a plaintiff an opportunity to test his claim on the merits." <u>Gaubert v. Federal Home Loan Bank Bd.</u>, 863 F.2d 59, 69 (D.C.Cir. 1988). "[T]he grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without

any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." Foman v. Davis, 371 U.S. 178, 182 (1962).

Ordinarily a motion to dismiss is not considered a responsive pleading under F.R.Civ.Pro 15(a), and the plaintiff is entitled to amend his complaint as of right. Cooper v. Shumway, 780 F.2d 27, 29 (10th Cir. 1985). There seems to be a conflict within the circuits regarding the standard for amending a complaint once a motion to dismiss has been granted. On the one hand a string of cases within the DC Circuit holds that amendment is available as of right prior to the granting of the motion to dismiss, and once a motion to dismiss has been granted, an amendment can be achieved through leave of Court. Adams v. Quattlebaum, 219 F.R.D. 195, 196 (D.D.C. 2004); James V. Hurson Associates, Inc. v. Glickman, 229 F.3d 277, 283 (C.A.D.C. 2000); Confederate Memorial Ass'n, Inc. v. Hines, 995 F.2d 295, 299 (C.A.D.C. 1993). On the other hand, other circuits held that a motion to dismiss is not a responsive pleading within the meaning of Federal Rules of Civil Procedure, allowing pleading to be amended before responsive pleading is served; neither the filing nor the granting of motion to dismiss before answer terminates the right to amend. Doe v. U.S., 58 F.3d 494, 496 (C.A.9 (Cal.) 1995); Breier v. Northern Cal. Bowling Proprietors' Ass'n, 316 F.2d 787 (C.A.Cal. 1963); Case v. State Farm Mut. Auto. Ins. Co., 294 F.2d 676, 678 (5th Cir. 1961) (dictum); Fuhrer v. Fuhrer, 292 F.2d 140, 142 (7th Cir. 1961).

Plaintiff respectfully asks this Court to adopt the later standard because this is the first amended complaint, and permit amendment of the complaint as of right, since a motion to dismiss is not a responsive pleading, and neither the filing nor the granting of such a

motion when responses obstructed by circumstances out the control of plaintiff's counsel should, before answer, terminate the right to amend. [Affidavit 1]. However, if the Court finds that it is necessary for leave to be granted in order for an amendment to occur, a response to federal defendant's opposition to amend is presented below.

The standard governing the granting of motions to amend has been laid out by the Supreme Court. "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.'" <u>Foman</u>, 371 U.S. at 182 (1962). Furthermore the Supreme Court has specifically said that "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." <u>Conley v. Gibson</u>, 355 U.S. 41, 48 (1957).

In the present situation, as is demonstrated in the accompanying affidavit there has been no bad faith or dilatory motive on the part of the movant and this is the first time plaintiff seeks to amend a pleading. This part will therefore focus on the following: a) there has been no undue delay, b) there is no undue prejudice to the federal defendants and c) that the amendment is not futile.

### A. Delay Does Not Justify Denial Of Leave To Amend, As There Is No Manifested Prejudice to the Defendant

Defendants' opposition cites undue delay with "obvious" prejudice to the federal defendants as two of the reasons why leave to amend should not be granted.

The D.C. appeals court held in <u>Harrison v. Rubin</u>, that where "amendment would do no more than clarify legal theories or make technical corrections," delay, without a showing of prejudice to opposing party does not justify denial of leave to amend. 174 F.3d 249, 253 (D.C. Cir. 1999) (<u>citing</u> <u>e.g</u>, <u>Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.</u>, 146 F.3d. 983, 991 (D.C. Cir. 1998)). The Court further opined that "although this circuit has recognized undue delay as a basis for denying a motion to amend, we have done so only where plaintiff sought to add new factual allegations." <u>Harrison</u>, 174 F.3d at 253. (<u>citing</u> <u>e.g.</u>, <u>Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.</u>, 810 F.2d 243, 247 (D.C. Cir. 1987)).

In the present case, plaintiff seeks to amend his original pleading for purposes of clarification and correction, the substance of the allegations remains the same, and no additional facts are presented in the amended complaint, that were not alleged in the original complaint against the federal defendants. This Circuit has recognized that "the crux of "the liberal concepts of notice pleading embodied in the Federal Rules" is to make the defendant aware of the facts." <u>Harrison</u> at 253. (<u>citing</u> <u>Hanson v. Hoffman</u>, 628 F.2d 42, 53 (D.C. Cir. 1980) (citations omitted)). "Unless a defendant is prejudiced on the merits by a change in legal theory," the court opined, "a plaintiff is not bound by the legal theory on which he or she originally relied." <u>Id.</u> at 53 n. 11.

Nor does the delay necessarily qualify as "undue." Considering that a six month portion of the delay consisted of plaintiff's counsel being suspended from the bar, the remaining twelve weeks do not constitute 'undue delay'. In <u>Dove v. Washington</u>

<u>Metropolitan Area Transit Authority</u>, this Court rejected an undue-delay argument, stating that "[a]s the D.C. Circuit teaches, a court should not deny leave to amend based solely on the time elapsed between the filing of the complaint and the request for leave to amend." 221 F.R.D. 246, 248 (D.D.C. 2004) (<u>citing</u> <u>Atchinson v. District of Columbia</u>, 73 F.3d 418, 426 (D.C. Cir. 1996)). This Court further stated that "[a]lthough in a perfect world pleaders would get it right the first time, Rule 15(a) exists in order to give litigants the opportunity to fix mistakes or omissions, such as the one in this case, rather than allow technical flaws to penetrate a case before a court may resolve it on the merits." (<u>citing</u> <u>Harris v. Sec'y, United States Dep't of Veterans Affairs</u>, 126 F.3d 339, 343 (D.C.Cir.1997)).

When the government moved to dismiss, plaintiffs counsel attempted to prepare an amended complaint and get it filed at the same time as the response to the motion to dismiss. Re-writing the complaint was a truly monumental task, consisting of well over 100 hours of pro bono work. Upon completion it was given to two associates to edit. The data containing these two documents as well as data on some other documents became corrupted and turned both documents into illegible garbage. The old data could not be recovered. Immediately thereafter, one associate got divorced and devoted all of her time to dealing with her own divorce and simultaneously the only other associate took off a great deal of time to plan wedding, she got married, and went on an extended honeymoon. By the time she returned, it was February 15, and the case had already been dismissed. It was not possible to devote the time to pro bono case while both associates were on leave. On March 6, 2007, the Virginia State Bar suspended counsel, and as he finished work on the amended complaint for Nattah, he attempted to file it. [Affidavit 1].

When the document got to the courthouse, counsel learned the District Court for D.C. entered a reciprocal suspension lasting until November. The six month period ended in October, but it took an additional month to get reinstated. Although the amendment complaint was done, plaintiffs attorney had to wait seven months to file it. Immediately after reinstatement, he started to polish the amended complaint with some new information discovered during the intervening nine months. After reinstatement the amended complaint got filed rather quickly. [Affidavit 1].

In Dove, this Court looked at cases where leave to amend was denied, emphasizing the large periods of time that elapsed between original filing and the time when leave to amend was sought, as well as extensive discovery that took place prior to such filing. 221 F.R.D. at 248 (citing Williamsburg Wax Museum, 810 F.2d at 247) ("denying leave to amend almost eight years "after [the movant] had filed its original [pleading], after the parties had conducted extensive discovery, and after the district court had granted a summary judgment motion against the [movant]").

Counsel for the Federal Defendants claims that more than a year passed between January 30th 2007, the date of judgment, and November 28, 2007, the date that motion to amend was filed [Opposition at 4]. This is clearly false, and may be an attempt to mislead this Court, as the actual time elapsed was slightly under 10 months.

Since the amendment before the Court today involves a mere technical clarification, and does not come at an advanced stage of the litigation, the federal defendants' argument that there has been undue delay, and that this delay should be a basis for denying leave to amend, must fail.

The federal defendant's opposition states that the amendment will unfairly prejudice federal defendants as they would be required to engage in significant new preparation. [Opposition 20]. However, the federal defendants fail to substantiate this claim in the present case. Under Rule 15(a), the non-movant generally carries the burden in persuading the court to deny leave to amend. Dove, 221 F.R.D. at 246.

The only change to the amended complaint was that some weak causes of action were taken out, and details added about statutes to fix jurisdictional issues. The original complaint said that the suit was for failure to provide due process, but it did not say anything about how it would get around sovereign immunity to get to the merits of the Due Process claim so references to statutes like the Tucker Act were added. However, the Tucker Act only acts as a vehicle by which to defeat sovereign immunity. No significant facts changed from the original complaint.

Undue prejudice is not mere harm to the non-movant, but a denial of opportunity to present facts and evidence, which would have been presented had such amendment been timely. Dove, 221 F.R.D. at 246. Examples of prejudice include situations where the proposed amendment will alter either the choice of counsel, or the nature of the opposing party's strategy. Id. at 246 (citing Atchinson v. District of Columbia, 73 F.3d 418, 426 (D.C.Cir.1996)). Also, this Court noted that although any amendment designed to strengthen the other side's case will in some way harm the opponent, it does not necessarily follow that such an amendment must be unduly prejudicial. Id. at 246, Fn. 3. Federal defendant's motion cites unreasonably prolonging discovery as one of the premises that have been recognized by the court in determining prejudice. However, there has been no discovery in this litigation and therefore it will certainly not be prolonged as

the federal defendant's allege. [Opposition 6]. Therefore, "[t]he plaintiff has neither demonstrated, nor has the court discovered, any comparable prejudice in this case," and "[w]hile the plaintiff characterizes the instant action as in a "late stage," this litigation actually is in its early stages given that the parties have yet to appear for an initial scheduling conference or commence discovery." Id. at 249 "Simply put, the defendant's proposed amendment does not come so late in the game as to confer an unfair strategic advantage over the plaintiff," and the unsubstantiated claims of prejudice advanced by the federal defendant's counsel must also fail. Id. at 249.

### B. Leave to Amend is Proper to Add Additional Party – Francis Harvey, Secretary of the Army

Leave of court is requested to add an additional party to the complaint. The allegations against Francis Harvey, are the same as towards Robert Gates, and the primary reason that the addition is requested is because at this stage in litigation it can not be ascertained whether the soldiers involved in abducting Nattah before the beginning of the Iraqi war, were a part of a Department of Defense Unit, such as military intelligence, or they were members of the Army.

In addition to satisfying Rule 15(a), the requirements of Rule 20 are also satisfied, since the proposed addition of a party requires only that the joined parties share a common question of fact or law arising in the action. Clearly in the present case the claims stemming from the conduct of Robert Gates are equally applicable to Francis Harvey, if in fact the soldiers responsible for the abduction were at the time part of the Army.

Claims of the plaintiff's counsel that qualified and person immunity bar claims against the Secretary of the Army are addressed below.

**II. Amendment is Not Futile - Individual Liability**

Plaintiff seeks damages against the soldiers who shanghaied him into the United States military and President Bush and Vice-President Cheney for enacting a policy leading directly to plaintiff's captivity and permanent disability.   Since a 12 (b) (6) motion turns on whether plaintiff can prove any facts entitling him to relief, the court should analyze each count separately to determine whether plaintiff states a cause of action against any of the defendants.   Nattah brings counts I, II, III, IV, and VI against President Bush and Vice-President Cheney in their individual capacity and Count III, V, and VI against the soldiers.    Nattah asks to voluntarily dismiss Count V against Bush and Cheney in their individual capacity, but Nattah is opposing the government's motion to dismiss Count V against the individual soldiers.

The government contends (1) the District of Columbia's three year statute of limitations prevents plaintiff from naming the unnamed soldiers,  (2) plaintiff failed to sue President Bush or Vice-President Cheney within D.C.'s three year statute of limitations, (3) plaintiff failed to exhaust administrative remedies prior to filing a Bivens tort as required by the Federal Tort Claims Act, (4) the foreign country exception contained with the Federal Tort Claims Act precludes recovering damages for a Bivens Tort, (5) absolute immunity protects the President from paying any monetary damages, and (6) Vice-President is protected by qualified immunity, and (6) the soldiers are protected by qualified immunity.   Plaintiff will demonstrate none of these defenses is legally sufficient to preclude liability.

**A. <u>Government Fraudulently Uses D.C.'s Three Year Statute of Limitations</u>**

First, the defendants' statute of limitations is misleading, completely frivolous, and merits sanctions.   Defendants state, "Bivens actions…are considered as personal injury claims and are governed by personal injury statute of limitations where the alleged injury occurred."   However, the brief deceptively attempts to lull the court into assuming D.C.'s three year statute of limitations precludes recovery of damages, because the government asserts that plaintiff's complaint "alleged injury occurred" within the District of Columbia.    The government's argument attempts to perpetrate a fraud upon the court.

The complaint does not allege any facts indicating the plaintiff suffered any injury in the District of Columbia or even imply that plaintiff ever visited D.C.   Count I through V related completely to harm Nattah in Kuwait.   Count VI slavery relates to harm suffered in both Kuwait and Iraq.   The United States Attorney proposes the court use a legal test using the statute of limitations of the place where the harm occurred. Therefore, under the government's analysis, the statute of limitations for count I through V is governed by Kuwaiti law and VI is governed by either Kuwaiti or Iraqi law. According to http://www.alqlist.com/SOL.asp, Kuwait has a ten year statute of limitations on all claims.   Most portions of Iraqi law cannot be found in English on the Internet, and an Internet search by Arabic translators could not find any statute of limitations for any civil causes of action.    The Library of Congress's Middle East reading room does not contain any materials providing an Iraqi civil statute of limitations, and plaintiff believes such documents can only be found in paper version law libraries in Iraq.   Since the statute of limitations is an affirmative defense though, the government bears the burden of proving the Iraqi statute of limitations, and there can be no doubt the government failed to meet this burden.

<u>Court Should not but Could Borrow Analogous Ten Year Statute</u>

Plaintiff asks the court to apply the government's test yielding a ten year period. If the court disagrees with the government's test, the court should still apply a ten year period.   When a party asserts a claim without any statute of limitations, parties sometimes ask the court to borrow the statute of limitations from a similar statute.   The Alien Tort Claims Act for example does not contain a statute of limitations, and as a result, federal courts have borrowed the statute of limitations contained within the Torture Victims Protection Act's ten year statute of limitations. <u>See</u> 28 U.S.C. 1350.   A Bivens tort borrows the statute of limitations of 42 U.S.C. 1983, and as a result, the statute of limitations is governed by the location of the harm.    Should the court depart from this rule, the court could elect to borrow the ten year statute of limitations from the TVPA. The Little Tucker Act has a six year statute of limitations. <u>Martinez v. United States</u>, 333 F.3d 1295, (Fed.Cir. 2003).

  Third, the court could utilize the statute of limitations advocated by President and the Department of Justice.   President Bush has supposedly made a major push to crack down on human trafficking, and human trafficking is the heart of Nattah's case, because the government used Nattah's forced labor without compensating him and because the government forced him to cross the international Kuwaiti-Iraqi border.   At the behest of President Bush, the Department of Justice researched international law and now strongly advocates each state incorporate a ten year statute of limitations for human trafficking and slavery.   Therefore, the court could accept the Department of Justice's interpretation of international law and employ a ten year statute of limitations.

<u>Plaintiff Still Prevail Under a Three Year Statute</u>

Assuming the court nevertheless employs a three year statute of limitations, there can be little doubt plaintiff filed his claim within three years.    None of the causes of action accrued until the military set him free from a military hospital in Germany on June 22, 2003.  (Complaint at 32).    The court should use June 22 as the date of accrual because his captivity was an on-going wrong, and therefore the court should use the last day of it.    Nattah's captivity commenced when U.S. soldiers pointed weapons at him and forced him to accompany them into Iraq.    In addition, Nattah participated in numerous combat operations in Iraq and was in close proximity to armed U.S. troops at all times, while Nattah himself had no weapon.    Like a prisoner or a minor, the court cannot expect Nattah to have left a firefight to draft a lawsuit.    Plaintiff filed suit on either May 22 or June 8, but in any event the suit was filed within three years.    The government's assertion that he filed beyond the three year limit appears to be a mathematical error or another intentional deception.    <u>See</u> Government Brief Page 12.    The government further argues that the amended complaint does not relate back to the original complaint. Rule 60 of the Federal Rules of Civil Procedure requires a plaintiff to set aside a judgment within one year of dismissal.    The timing of filing the amended complaint is important to the relation back argument.    The government claims that plaintiff filed the amended complaint more than one year after the court's dismissal.    "On January 30, 2007, this court granted federal defendants unopposed motion to dismiss….On November 26, 2007, more than one year after this court dismissed the claims against the named federal defendants plaintiff seeks to vacate the dismissal order and file an amended complaint…"    The government's chronology is patently false, because under the government's own version, plaintiff filed the amended complaint less than 10 months

after dismissal, and one can only speculate the government believes ten months is more than one year or is intentionally trying to trick the court into thinking that plaintiff cannot vacate the judgment or amend the complaint, because he filed more than one year after dismissal.

Conclusion

The government has argued November 27, 2007 is more than one year after January 30, 2007 and June 8, 2006 is more than three years after June 22, 2003.   Further, the government contends plaintiff's "harm occurred" in the District of Columbia.    The government contends the Federal Tort Claims Act's administrative exhaustion of remedies, statute of limitations, and foreign country exception each bar a Bivens tort claim when in fact the Westfall Amendment to the FTCA unambiguously says the FTCA has no applicability to suits based upon the constitution or federal statutes against government officials in their individual capacity.   One can only conclude that the government attempted to gloss over the facts and provide the court a conclusion bearing no relationship with the government's own version of the facts.    Ironically, defendants Bush and Cheney did the exact same thing in communicating false conclusions to the American people even though the government's own version of the facts about Iraqi WMD bore no relationship with either Bush or Cheney's conclusions.   The fact that Bush is still knowingly providing false conclusions based upon his own versions of the facts is startling, but the fact that Bush would agree to file such a brief under the penalties of Rule 11 is just one more example of the arrogance with which the Bush administration approached the entire war.   Indeed, the government's entire brief is premised on the very

theory that because of sovereign immunity "The king can do no wrong" and is therefore above the law.

## B. FTCA Exemption Have No Applicability to Individual Capacity Defendants

The government claims the Federal Tort Claims Act precludes plaintiff from maintaining a Bivens tort against the defendants in their individual capacity.    Such an assertion rises to the level of attempting to perpetrate a fraud upon the court and merits severe sanctions.   The Federal Tort Claim Act governs claims brought against the United States, its agencies, and officials sued in their official capacity.   Congress sought to overturn the decision in <u>Westfall v. Erwin</u>, 484 U.S. 292 (1988) where the Supreme Court placed limits on federal employee's individual liability from state tort law claims.   The Westfall Act Codified as 28 U.S.C. 2679 (b) (1) states:

The remedy against the United States provided by sections 1346 (b) and 2672 of this title for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is exclusive of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded without regard to when the act or omission occurred.

However, the Westfall Act:

**(2)** Paragraph (1) does not extend or apply to a civil action against an employee of the Government— **(A)** which is brought for a violation of the Constitution of the United States, or **(B)** which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized.

The Federal Tort Claims Act does not apply to any claims against individual employees for violations of the federal constitution.   The government mendacious argues that Bivens tort is a sub-set of torts falling within the ambit of the Federal Tort Claims Act when in fact they are parallel legal structures.   The foreign country exception, the administrative exhaustion of remedies, and statute of limitations sections of the Federal Tort Claims Act have no applicability to any of plaintiff's claims, because all the claims against the individual defendants are based upon the United States Constitution.

## C. Soldiers are Not Entitled to Qualified Immunity

The argument regarding qualified is blatantly preposterous and is not supported by any evidence or law.   The government acknowledges that under Rule 12 (b) (6) of Federal Rules of Civil Procedure all the allegations in the complaint are deemed to be true.   Yet, the government argues that a reasonable Army intelligence officer would not know slavery was illegal.   Qualified immunity is a common law doctrine shielding government officials from liability for the violation of an individual's federal constitutional rights. This grant of immunity is available to state or federal employees performing discretionary functions where their actions, even if later found to be unlawful, did not violate "clearly established law." The defense of qualified immunity was created by the U.S. Supreme Court, replacing a court's inquiry into a defendant's subjective state of mind with an inquiry into the objective reasonableness of the contested action. A government agent's liability in a federal civil rights lawsuit now no longer turns upon whether the defendant acted with "malice," but on whether a hypothetical reasonable person in the defendant's position would have known that her actions violated clearly

established law.   As outlined by the Supreme Court in <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982), qualified immunity is designed to shield government officials from actions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   <u>See</u> http://en.wikipedia.org/wiki/Qualified_immunity

During the planning of the invasion of Iraq, the U.S. military tasked Nattah's military unit with infiltrating behind enemy lines and seizing weapons and documents related to Iraq's WMD program.   Without a translator though, Nattah's unit had no chance of accomplishing its mission.   However, the military and Titan lacked a sufficient number of translators willing to go into Iraq.    As U.S. forces marched closer to the Iraq border in the days prior to the war, Nattah widely circulated his contract of employment with Titan among U.S. chain of command and his Titan supervisor pointing out that his contract with Titan only permitted him to work in Kuwait, and he would not go into Iraq in the event of hostilities.   Titan and the military struck a deal whereby the military would pay Titan an hourly rate in exchange for selling Nattah into slavery for the duration of the conflict.   Titan and the military further agreed the military need not pay Nattah or obtain his consent, because Nattah had already told both the military and the company that his religious convictions precluded him from going to Iraq.

At night on the eve of the invasion of Iraq, soldiers within Nattah's military unit ordered him at gunpoint to accompany them into Iraq.    None of the soldiers present gave Nattah any notice of the charges against him nor any mechanism to challenge the decision to challenge the validity of his captivity.   Nattah is an elderly African-

American.   His age is relevant, because even assuming the government wished to draft

him, Nattah is well beyond the drafting age limit.

According to the complaint, Nattah was in the middle of the vast desert with no

independent transportation, food, map, or water except those provided by the military.

In temperatures in excess of 90 degrees, Nattah had no chance of making it back to

Kuwait City alive.   Throughout the duration of Nattah's tour of duty, he was in a war

zone and unable to leave his unit.

By seeking qualified immunity for the troops, the government contends a

reasonable soldier under these circumstances would not realize their conduct to be illegal.

The government's traitorous remarks either indicate that defendant Bush either regards

the average soldier as extremely stupid or believes the average soldier does not know that

13th Amendment abolished all forms of forced servitude.   The Amendment reads:

**Section 1.** Neither slavery nor involuntary servitude, except as a punishment for crime
where of the party shall have been duly convicted, shall exist within the United States, or
any place subject to their jurisdiction.

There can be no doubt whatsoever U.S. forces in Kuwait operated under U.S. jurisdiction.

At the outset of the conflict, Iraqi political authority rapidly collapsed, and the United

States took over controlling Iraq's internal affairs.

The United States Military Code Military Justice codified as Title 10 § 897. Art.

97 states:

Unlawful detention
Any person subject to this chapter who, except as provided by law, apprehends, arrests,
or confines any person shall be punished as a court-martial may direct.

The court needs to keep in mind that the individual government employee or soldier need

not know that they could personally be sued civilly.    Instead, they only need a

reasonable belief their conduct violated a clearly established statute or constitutional provision.   Plaintiff contends that a reasonable soldier would have a rudimentary knowledge about each the offenses in the UCMJ and realize they could not detain Nattah simply because they needed him.   Given that Nattah made his intent to remain in Kuwait quite clear, the service members in Nattah's unit had ample opportunity to research or investigate whether detaining him would be lawful.   Nattah pointed out that his contract with Titan only permitted him to work in Titan, and therefore, they knew that if Nattah entered Iraq he would no longer be working for Titan.   Under these circumstances, no reasonable soldier could believe they could induct Nattah into the military without compensation.   Furthermore, reasonable knowledge of the statutory and constitutional provisions needs to acknowledge the modern circumstances.   It is common knowledge that U.S. forces operate with extremely advanced technology and troops have access to the Internet.   Legal research is no longer an arcane art.   Troops have means to contact military attorneys or can do their own cursory legal research.

The fact that Nattah is African-American is legally and factually important. Race is an on-going hot topic of debate and controversy.   No American can help forget America's tragic history of legalized slavery.   Most if not nearly all Americans know racism is immoral as well as illegal.   A reasonable soldier would realize the Nattah's captivity would give the appearance of racism.   Any American watching a modest amount of television has seen news coverage of discrimination lawsuits.   Under the circumstances in Kuwait, a reasonable soldier would become apprehensive about appearance of racism and would think carefully and/or consult military publications or superiors.

In conclusion, the government bears the burden of proving affirmative defenses including qualified immunity.   The government gave the subject less than a paragraph in their brief and did not come forward with any testimony or evidence.   For the reasons above, any reasonable soldier would know this conduct to be civilly and criminally punishable.

## D. President Bush Is Not Now Entitled to Absolute Immunity

Due to the volume of factual and legal misrepresentations, plaintiff files a motion for sanctions against the defendants.   Under Article III of the United States Constitution, courts have an inherent authority to regulate conduct of parties before them, and Rule 11 of the Federal Rules of Civil Procedure clarifies courts Article III powers.   Plaintiff asks the court to strike defendant's entire brief and deny defendant's motion with prejudice as a Rule 11 sanction.   Therefore, the court need not reach the government request for absolute immunity.   However, should the court choose to impose a lesser section plaintiff will now explain the rationale for denying the President's request for absolute immunity.

Neither President Bush nor Dick Cheney attempted to prove and thus is not entitled to absolute immunity.   Federal courts do not issue regulations and instead adopt a case by case approach to adjudicating controversy, and in Harlow v. Fitzgerald, the Supreme Court decided the President is not automatically entitled to absolute immunity. 457 U.S. 800 (1982).  Instead, absolute immunity is an affirmative defense, and like any other affirmative defense the moving party bears the burden of proof.   The government's brief devotes one paragraph to discuss qualified and absolute immunity.   The brief does not purport to contain any factual information supporting a claim of absolute immunity,

and the government did not attach any exhibits or affidavits.   The complaint contains six counts each of which involve rather complex factual and legal issues.   A motion to dismiss does not throw a dragnet over an entire lawsuit.    Instead, the facts and law regarding each count must be analyzed separately.   Officials can be immune from some but not all the counts.   However, Bush's request for absolute immunity does not mention the legal issues involving any of the counts against him or point to any facts specific to this case justifying any immunity.

Justice Powell wrote:

For executive officials in general, however, our cases make plain that qualified immunity represents the norm. In Scheuer v. Rhodes, 416 U.S. 232 (1974), we acknowledged that high officials require greater protection than those with less complex discretionary responsibilities. Nonetheless, we held that a governor and his aides could receive the requisite protection from qualified or good-faith immunity. Id., at 247-248. In Butz v. Economou, supra, we extended the approach of Scheuer to high federal officials of the Executive Branch. Discussing in detail the considerations that also had underlain our decision in Scheuer, we explained that the recognition of a qualified immunity defense for high executives reflected an attempt to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, 438 U.S., at 504 -505, but also "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Id., at 506. Without discounting the adverse consequences of denying high officials an absolute immunity from private lawsuits alleging constitutional violations - consequences found sufficient in Spalding v. Vilas, 161 U.S. 483 (1896), and Barr v. Matteo, 360 U.S. 564 [457 U.S. 800, 808]   (1959)….. …. In Gravel, for example, we emphasized that Senators and their aides were absolutely immune only when performing "acts legislative in nature," and not when taking other acts even "in their official capacity." 408 U.S., at 625 . See  Harlow at 808.

An employee seeking to receive any immunity bears the burden of proving that they acted within the official capacity, but here Bush and Cheney fail to even allege they were acting within the scope of their employment.   28 U.S.C. 2879 (d) (1) provides:

Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be

deemed an action against the United States under the provisions of this
title and all references thereto, and the United States shall be
substituted as the party defendant.

In <u>Rasul v. Myers</u> Case Number 06-5209 (D.C. Circuit January 11, 2008), this circuit

pointed out the importance of an Attorney General certification.   Curiously, the Attorney

General has not attached such a certification regarding Bush or Cheney to this brief, and

as a result, the court has before it no evidence that Bush or Cheney were acting with the

scope of their employment.    Since such evidence is a necessary but not sufficient

condition to granting an immunity motion, the one paragraph immunity motion must be

denied for now.

Absolute immunity is based upon "public policy".   It must be established by

movant that immunity is "Essential for the conduct of public business" <u>Butz v. Economu</u>

438 U.S. 478, 507 (1978).   In Butz, the court wrote:


> Our system of jurisprudence rests on the assumption that all
> individuals, whatever their position in government, are subject to
> federal law:   "No man in this country is so high that he is above the
> law. No officer of the law may set that law at defiance with impunity.
> All the officers of the government, from the highest to the lowest, are
> creatures of the law, and are bound to obey it." <u>United States v. Lee</u>,
> 106 U.S., at 220 .   <u>See also</u> <u>Marbury v. Madison</u>, 1 Cranch 137 (1803);
> <u>Scheuer v. Rhodes</u>, 416 U.S., at 239 -240. In light of this principle,
> federal officials who seek absolute exemption from personal liability
> for unconstitutional conduct must bear the burden of showing that
> public policy requires an exemption of that scope.

As the court wrote in <u>Harlow</u>, "An executive official's claim to absolute immunity must

be justified by reference to the public interest in the special functions of his office, not the

mere fact of high station.   <u>Id.</u> at 812.

<u>Harlow</u> and <u>Economu</u> mandate denial of the President's request for absolute

immunity.   George Bush and Vice-President Cheney seeks immunity purely because of

their high station.   They do not make the slightest attempt to justify the need for immunity to this particular case or the public interest.

Nattah's claims his captivity and resulting physical and mental disabilities arose from (1) the President's policy authorizing arbitrary detention of persons found on the battlefield, (2) the President's policy of non-compliance with the Geneva Convention, and (3) initiation of a war of aggression.   Directly due to the President's policy, the military did not give Nattah any opportunity to challenge his detention.   Nattah is not asserting any claim for respondeat superior.   Instead, he claims the President's illegal policies are the proximate cause of his harm.   It may be bold for any plaintiff to challenge the legality of critical Presidential decisions, and yet the Supreme Court has explicitly recognized the imperative need for such suits.

> Indeed, the greater power of such officials affords a greater potential for a regime of lawless conduct. Extensive Government operations offer opportunities for unconstitutional action on a massive scale. In situations of abuse, an action for damages against the responsible official can be an important means of vindicating constitutional guarantees.

Like immunity, an assertion that the plaintiff lacks standing forecloses the plaintiff from any chance to prove their claim, and Justice Stewart correctly observed, "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept that conclusion.   United States v. Scrap, 412 U.S.669, 678 (1973).

The Supreme Court has previously denied the President absolute immunity.   The special counsel appointed to investigate the Watergate scandal, named the President as an

unindicted co-conspirator and subpoenaed the President to produce tapes of the most sensitive Oval Office conservations many of which involved delicate national security issues and discussed highly classified information.   Nevertheless, the court ordered the President to turn over the tapes, and disclosure of the tapes promptly forced President Nixon's resignation.  Finally, in Clinton v. Jones 520 U.S. 681 (1997), President claimed immunity from civil discovery, but the court concluded immunity did not shield the President Clinton from the duty of every American to cooperate with civil discovery requests.   Following the decision, attorneys for Jones took Clinton's deposition, and that deposition led directly to the House of Representative approving Articles of Impeachment.    Suffice it to say that courts have not shied away from issuing orders with the most profound impact on Presidential powers and absolute immunity has limitations and boundaries.

Harlow requires the President and Vice-President to bear the burden of proof justifying either absolute or qualified immunity.    Bush and Cheney did not merely fail to meet their burden; they did not even attempt to offer a public policies justification responsive to the facts of this specific case.   The complaint goes to great length to provide an exhaustive accounting of the facts support the contention that Bush and Cheney initiated a war of aggression and a precise test for determining whether an executive act constitutes a war crime.  None of the government defendants challenged this legal assessment.   The government defendants could have filed a 12 (b) (6) claiming the facts alleged failed to meet the international law definition of war crimes.   Likewise, the defendants did not suggest the facts alleged do not make out a constitutional law right to travel or due process claim.   The question presented by defendant's motion is whether

this particular President and Vice-President are entitled to absolute immunity from civil war crimes charges.   A court decision holding the President and Vice-President are automatically immune from war crimes charges regardless of their actions, would be a shot heard around the world laying bear America's claim that our nation is a beacon and inspiration for human rights around the globe.   Just as the scandal at Abu Grave left a stain on America's reputation, dismissal of this case could damage American moral leadership for decades.

### E. Immunity Under International Law

Prior to considering defendant's immunity defense, the court needs to make a choice of law decision and decide whether to use American common law or international law.   Broadly speaking, the U.S. Constitution is superior to a statute, and a statute is superior to the common law.    International law is the law of the land, and treaties and customary international law have legal force equal to a federal statute.    Plaintiff contends that where there is a collision between an international law and domestic common law, international law takes precedence.    To say otherwise would give the judiciary the ability to overrule provisions of treaties based upon their own views. Therefore, the President Bush and Vice-President Cheney enjoy the immunity conferred by international law rather than that conferred by the common law doctrine of absolute immunity.

Under international law, a head of state is entitled to both civil and criminal immunity, and yet international law also prohibits war crimes.    International law recognizes a select few offenses including launching a war of aggression as jus cogens (a

pre-emptory norm).   Where a peremptory norm such as prohibiting war crimes collides

with a non-peremptory norm such as immunity, the jus cogens norm prevails.

Since 1945 the United States has always recognized that a head of state has no

immunity to initiate war crimes or launch a war of aggression.       Supreme Court Justice

Robert H. Jackson served as the chief American prosecutor of the Nuremburg war crimes

trials and helped developed the Nuremburg Principles.    The principles include:

**Principle I**. Any person who commits an act which constitutes a crime under
international law is responsible therefore and liable to punishment.

**Principle II**. The fact that internal law does not impose a penalty for an act which
constitutes a crime under international law does not relieve the person who committed the
act from responsibility under international law.

**Principle III**. The fact that a person who committed an act which constitutes a crime
under international law acted as Head of State or responsible government official does
not relieve him from responsibility under international law.

**Principle VI a:   Crimes against peace**:  Planning, preparation, initiation or waging of a
war of aggression or a war in violation of international treaties, agreements or assurances;

<u>See</u>  http://home.earthlink.net/~platter/nuremberg/nuremberg-principles.html

As Justice Jackson proclaimed:

Law is more than power….It is futile to think, as extreme nationalists do, that we can
have an international law that is always working on our side. And it is futile to think that
we can have international courts that will always render the decisions we want to promote
our interests. We cannot successfully cooperate with the rest of the world in establishing
a reign of law unless we are prepared to have that law sometimes operate against what
would be our national advantage.  <u>See</u>  http://www.roberthjackson.org/Man/theman2-7-
7-1/

This case asks the exact question posed by Justice Jackson.     Does United States law

provide that the head of state of every nation except our own is liable for war crimes?

The rule of law prevents us from allowing individuals who we admire avoid liability while imposing harsh sentences on individuals with low public approval ratings. For this reason, there is only one international law, and the same rules of international law bind all nations.   As Justice Jackson argued, there are not different legal standards for the victors and vanquished.   Americans have great sympathy for their Presidents, and nationalism creates a temptation to give the President a benefit of the doubt, but a commitment to the international law and the rule of law should take precedence over our emotional devotion to the President.   A judicial holding in this case, that America need not follow the international law restrictions we demand of other nations, would hold our nation up to international ridicule and charges of hypocrisy.

## III.  Sovereign Immunity

The government claims sovereign immunity from claims for back pay and damages brought by an African American slave.   The government's position is so brazen that every American should rise up in righteous indigation.   The D.C. Circuit has chided the government for arguing the Adminstrative Procedures Act's waiver of sovereign immunity applies to only claims under the A.P.A., because the court has repeatedly rejected such an argument.   See:  Trudeau v. F.T.C. 05-00400 (D.C. Cir. 12-28-06). Chamber of Commerce v. Reich 74 F.3d. 1322, 1328 (D.C. Cir. 1996).

### A. Government Took Private Property without Compensation

Plaintiff brings a claim pursuant to the takings clause of the 5th Amendment. Nattah had a property interest in own body and labor.   The government essentially rented

plaintiff for three months and paid him nothing.    To rule that Nattah had no private

property rights over his own body would mean the law elevates ownership in land and

intellectual property over and above private ownership of one's labor.    Since the takings

clause is a money mandating provision, at least a portion of plaintiff's due process claim

should not be dismissed.

## B. First Amendment Can Be A Money Mandating

Plaintiff claims the government violated his First Amendment right to freedom of

association by forcing him to participate in military action in Iraq, and    1st Amendment

can be a money mandating constitutional provision.    In Kennedy v. United States 5

Cl.Ct. 792 (1984), an Army employee brought a Tucker Act claim seeking lost wages for

a ten day suspension imposed in retaliation for violating her rights of free speech.    The

Civil Service Reform Act precluded any remedy, because it only permitted appeals of

suspensions last 14 days or longer.    Nevertheless, the court ruled that the Tucker Act

created a method for Kennedy to bring his free speech claim.    Nattah therefore has a

remedy for either the amount should have been paid by the Army, the amount he would

have been paid by Titan if the Army had not captured him, or the reasonable value of his

labor.

## C. Nattah Meets the Definition of Employee in Tucker Act

The plaintiff claims the military drafted and inducted him as an E-4 specialist in

March, 2003.    After being drafted he ceased to be an employee of Titan.    Further, his

employment contract with Titan only permitted him to work in Kuwait.    According to

Black's Law Dictionary (8th ed. 2004):

**Employee.** A person who works in the service of another person (the

employer) under an express or implied contract of hire, under which the
employer has the right to control the details of work performance.

From March 2003, Nattah was no longer an employee of Titan, because he did not have

an expressed or implied contract to work in Iraq.    Second, the Blacks Law definition

indicates Nattah may never have been an employee of Titan while working in Kuwait,

because Titan was not able and did not have "the right to control the details of work

performance".

The government writes, "Plaintiff alleges that he was employed by a private

contractor Titan, and fails to allege that he was ever an employee of a federal agency."   It

makes no sense to say that because plaintiff worked for Titan between November 2002

and March 6, 2003, he could not possibly have been a federal employee from March 7,

2003 through March 22, 2003.    Each year thousands of employees of defense

contractors either join the military or join a civilian defense agency, and saying these

individuals are not government employees is bizarre.   Plaintiff does not know the

government's own definition of the word "employee" or the term "agency".  There can

be no doubt that plaintiff alleges he was drafted as an E-4 in March and "honorable

discharged in Germany" on June 22, 2003 based upon the severity of his war injuries.

Plaintiff does not know whether the government defines an enlisted soldier as an

employee nor does he know whether the government believes the Army is an "agency" of

the federal government.   If the government actually believes Nattah failed to allege that

he was an employee, the government is obligated to provide the court a legal definition of

the term citing specific statutes.   The government does not even explain whether the term

employee is governed by United States law, international law, D.C. law, Kuwaiti law, or

as Titan contends Virginia law.   The government has grossly misrepresented the facts,

failed to cite relevant legal authorities, or argued a disputed fact in a 12 (b) (6) motion.

The Back Pay Act ("the Act") provides:

  [a]n *employee* of an agency who ... is found by appropriate authority under applicable
law, rule, regulation or collective bargaining agreement, to have been affected by an
unjustified or unwarranted personnel action which has resulted in the withdrawal or
reduction of all or part of the pay, allowances, or differentials of the employee is entitled
... to receive for the period for which the personnel action was in effect an amount equal
to all or any part of the pay, allowances, or differentials, as applicable which the
employee normally would have earned or received during the period if the personnel
action had not occurred.   Id. (emphasis added). For purposes of Title 5, under which the
Act is codified, "employee" is defined to mean "an officer and an individual" who is (1)
"appointed in the civil service" by one of several listed officials, (2) "engaged in the
performance of a Federal function under authority of law or an Executive act," and (3)
"subject to the supervision of [the appointing official] while engaged in the performance
of the duties of his position." Id. § 2105(a) (1994).

See 5 U.S.C. § 5596(b)(1)(A)(i) (2000).

First, courts determine whether an employee was "appointed in the civil service"

based upon whether the employee was actually hired.   There are a variety of cases

brought by people who should have been hired and brought claims seeking back pay for

periods either prior to the actual date of appointment or after their retirement.   Ainslie v.

United States, cited by defendant involved a member of the National Guard who applied

to re-enlist. 55 Fed.Cl.103 (2003).   The statute provided that he was entitled to be

appointed within six months of the date of his application, but it actually took the

government one year to find him a position.   Ainslie filed suit in district court seeking to

have his service record reflect an additional six months of credit, and the district court

ruled in his favor.   Ainslie then went to the Federal Court of Claims seeking back pay for

the six month period the government had illegally delayed processing his application.

The Court of Claims decided Ainslie was not appointed until his actual start date rather

than the date listed on his service records writing, "Essentially, Ainslie seeks to erase the distinction between being appointed and being employed. He argues that any difference between the two terms should be treated as merely semantic."   Similarly, in <u>Smith v. United States</u>, a U.S. Marshall met various civil service requirements to become a permanent U.S. Marshall, but due to a clerical error, Smith was not appointed to a permanent position. 823 F.2d. 523 (Fed.Cir.1987). Smith sued in District Court seeking injunctive and mandamus relief, and the district court ordered the government to appoint Smith to the position he would have held effective the date that he should have been appointed.   Smith then commenced an action in the Court of Claims seeking back pay. The Court ruled Smith had not met the appointment requirement, because he had not actually started the job during the period for which he sought back pay.  <u>See</u> <u>Smith v. U.S.</u>, 823 F.2d 532 (C.A.Fed.1987).

Second, plaintiff was "engaged in the performance of a Federal function under authority of law or an Executive act."   The initiation of hostilities was an Executive Act, and Nattah was engaged in the performance of the translation of documents related to weapons of mass destruction which was supposedly the causus beli for the war.

Third, he was subject to the supervision of the appointing official. The individuals who drafted Nattah continued to supervise him at all times. Nattah received no supervision from Titan and was not even permitted to contact them until after his hospitalization.

In short, Nattah worked for the government from March 20, 2003 through June 22, 2003. Nattah was a government employee, and the failure to pay him was an "unwarranted personnel action" within the meaning of the Back Pay Act.

**D. Congress Waived Sovereign Immunity of TVPA**

Assuming incorrectly that passage of the 13th Amendment did not waive

sovereign immunity, Congress certainly waived sovereign immunity during the passage

of the Trafficking Victims Protection Reauthorization Act of 2003 (TVPA).   18 U.S.C.

1595 provides:

> **(a)** An individual who is a victim of a violation of section 1589, 1590,
> or 1591 of this chapter may bring a civil action against the perpetrator
> in an appropriate district court of the United States and may recover
> damages and reasonable attorneys fees.

Plaintiff can bring a civil action under 1595, because he is a "victim" of a violation of

Section 1590.   Section 1590 reads:

> Whoever knowingly recruits, harbors, transports, provides, or obtains
> by any means, any person for labor or services in violation of this
> chapter shall be fined under this title or imprisoned not more than 20
> years, or both. If death results from the violation of this section, or if
> the violation includes kidnapping or an attempt to kidnap, aggravated
> sexual abuse, or the attempt to commit aggravated sexual abuse, or an
> attempt to kill, the defendant shall be fined under this title or
> imprisoned for any term of years or life, or both.

Plaintiff contends that the Department of the Army is the "perpetrator".   The army

needed a translator to perform their duties, and the soldiers captured Nattah to fulfill their

combat assignments.   Therefore, the soldiers acted as agents for the government.

Ordering the government to pay money damages would not violate sovereign immunity,

because the government waived immunity from such claims.

**E. Mandamus against Secretary Does Not Violate Sovereign Immunity**

Plaintiff asserts a cause of action under 18 U.S.C. 1595.   Assuming sovereign

immunity applies to this statute, plaintiff can still obtain mandamus and forfeiture.

22 U.S.C. 7104 (g) provides:

> Termination of certain grants, contracts and cooperative agreements
> The President shall ensure that any grant, contract, or cooperative agreement provided or entered into by a Federal department or agency under which funds are to be provided to a private entity, in whole or in part, shall include a condition that authorizes the department or agency to terminate the grant, contract, or cooperative agreement, without penalty, if the grantee or any subgrantee, or the contractor or any subcontractor **(i)** engages in severe forms of trafficking in persons or has procured a commercial sex act during the period of time that the grant, contract, or cooperative agreement is in effect, or **(ii)** uses forced labor in the performance of the grant, contract, or cooperative agreement.

The word 'shall' means the government must do it. The government has no choice but to cancel its contract with Titan. Cancellation of the government's contract would not involve plaintiff getting any money damages and thus would not violate sovereign immunity. Plaintiff is not saying 22 U.S.C. 7104 creates a private right of action instead once the court acquires jurisdiction under 18 U.S.C. 1895, the court can issue equitable relief enjoining Titan from making contracts with the government. Further, the Defense Bases Act incorporates the provisions of 22 U.S.C. 7104. Under the DBA, Titan agreed to abstain from using forced labor in the performance of its contracts. DFARS Case 2004-D017 – "Defense Federal Acquisition Regulation Supplement; Combating Trafficking in Persons." 71 Fed. Reg. 62560 makes prohibition of human trafficking a term of government contracts, requires the contracting officer to notify commanding officer, State Department, and Justice Department about the allegation, and terminate the government contract with penalties. Breach of this provision also required the government to cancel the contract. President Bush declared a "zero tolerance" for human trafficking among Defense Contractors in Iraq. Shockingly though Nattah's situation is not unique. Haliburton for example has been linked to enslaving 12 Nepalese

citizens in federal contracts in Iraq. <u>See</u> http://www.corpwatch.org/article.php?id=12976. <u>See also</u> http://www.corpwatch.org/article.php?id=13514.

Federal law relating to human trafficking also mandates the forfeiture of any vehicle or property used to transport forced labor. Assuming sovereign immunity applies, civil forfeiture does not involve payment of damages. Forfeiture would require the government to give Nattah the Humee used to transport Nattah from Kuwait to Iraq and the Bradley Armored Fighting vehicle used to cage him in Iraq. Although federal law might prohibit private weapons on the vehicle, the government could still disarm the vehicle prior to forfeiting to plaintiff.

Plaintiff seeks an injunction requiring the Department of Defense to enforce these regulations. The government has been aware of Nattah's allegations for two years and yet has done nothing to investigate them. A court could order the Department to enforce its own regulations. Even if the court declined to terminate Titan's contract, the court could still issue an injunction requiring the contracting to investigate Nattah's allegations and enforce penalties if the contracting officer concludes Titan breached its contractual obligations.

### F. Third Party Beneficiary Theory Gives Nattah a Contract Remedy

The plaintiff can enforce the contract between the DOD and Titan as a third party beneficiary. The Trafficking Victims Protection Act and Department of Defenses permit a third party beneficiary suit. Assuming the TVPA does not allow such a remedy, the plaintiff also has a contract claim against the government pursuant to the Tucker Act.

### G. Military Pay Act

The Tucker Act's waiver of sovereign immunity applies to money-mandating statutes of constitutional provisions, and it is well established that the Military Pay Act is a money-mandating statute.  See  Dysart v. United States, 369 F.3d 1303, 1315 (Fed. Cir. 2004). 37 U.S.C. § 204 provides:  **a)** The following persons are entitled to the basic pay of the pay grade to which assigned or distributed, in accordance with their years of service computed under section 205 of this title--

**(1)** a member of a uniformed service who is on active duty; and

37 U.S.C. 101 defines the key terms in a Military Pay Act claim:

(3) The term "uniformed services" means the Army, Navy, Air Force, Marine Corps, Coast Guard, National Oceanic and Atmospheric Administration, and Public Health Service.
(14) The term "enlisted member" means a person in an enlisted grade.

(15) The term "grade" means a step or degree, in a graduated scale of office or rank, that is established and designated as a grade by law or regulation.

**(23)** The term "member" means a person appointed or enlisted in, or conscripted into, a uniformed service.

Nattah alleges that military intelligence conscripted him into the Army and inducted him as an E-4 specialist.   As a result, Nattah was a "member".   The Army is a "uniformed service".   E-4 is an enlisted grade.    Therefore, Nattah meets the definition of a "member of the uniformed services" as that term in used in 37 U.S.C. 204.   The military did not pay him any money.  Therefore, the Army owes Nattah three months pay at the rank of E-4.

**H. Little Tucker Act Claims Do Not Exceed $10,000 Threshold**

The "Little" Tucker Act gives federal district court concurrent jurisdiction with the Federal Court of Claims over cases involving $10,000 or less.    The government asks to dismiss the case "because plaintiff appears to seek more than $10,000".    Under Rule 12 (b) (6), a court may only dismiss a case if the allegations and inferences drawn therefrom indicate plaintiff can prove no set of facts entitling him to relief.    The plaintiff's claims under the Military Pay Act and the Back Pay Act seek lost wages, because the government did not pay him for three months.    Calculating the amount of money sought at this stage is not easy, because military personnel receive a range of benefits in addition to basic pay.    Since an E-4 is a rather low rank, it is quite unlikely that plaintiff could have made more than $3,000 per month for three months.    Despite exclusive jurisdiction of Federal Court of Claims with respect to claims against the United States for money damages exceeding $10,000, district court does not lose jurisdiction over a claim for nonmonetary relief simply because it later may be basis for a money judgment.    Laguna Hermosa Corp. v. Martin, 643 F.2d 1376 (C.A.9 (Cal.) 1981). The 8th Circuit concluded the original claim must be $10,000 or less and that does not prevent from receiving more than $10,000.    Where physician who was discharged from his position at Veterans' Administration hospital, filed action seeking reinstatement and seeking to clear his name, where claims were primarily nonmonetary and, when suit was first filed, back pay claim was worth only $6,000, and where, had it not been for substantial delay monetary claim would not have reached $70,000, the fact that jurisdiction to award back pay in excess of $10,000 lay exclusively in the Court of Claims [now Court of Federal Claims] rather than in district court did not deprive district court of jurisdiction over equitable claims for reinstatement, nor was physician required

to waive all damages over $10,000. Giordano v. Roudebush, 617 F.2d 511 (C.A.8 (Iowa) 1980). For these reasons, the Tucker Act claims should not be dismissed.

**I. Immunity Inapplicable to Thirteenth Amendment and Right to Travel**

Plaintiff need not resort to the Tucker Act to claim damages for a claim under the 13th Amendment, because such claims are either exempt from immunity or Congress waived immunity.

Unlike any other provisions of the U.S. Constitution, 13th Amendment and right to travel can be enforced against private parties. Their unique nature also justified special treatment in the context of sovereign immunity. Sovereign immunity is premised upon the notion that sovereign immunity existed in England prior to the Revolution, and thus the founding fathers without saying as much surely have intended it to continue the British view.

However, sovereign immunity for claims involving slavery and the right to travel never existed in England. The Magna Carta of 1293 explicitly prohibited the King from either enslaving a person or interfering with their inviable right of travel. The Magna Carta further gave individuals legal rights to enforce its provisions against the King in court. Unlike America, England recognized prior to our Revolution that a slave automatically became free the moment they touched English soil.

Further, the right to travel in America sprang from both British law and the Article of Confederation and thus predates the establishment of sovereign immunity. If examining the intent of the founders is any measurement of sovereign immunity, there can be little doubt that sovereign immunity did not apply to either claims of slavery or the right to travel. Indeed, even in the colonial period, counsel can find no record of the

federal government ever owning slaves.   Slavery and the right to travel are therefore

exceptions to overall rule of sovereign immunity.

Assuming they are not considered an exception to sovereign immunity, When it

sent the 13th Amendment to states, Congress waived sovereign immunity.   Indeed,

Congress banned the slave trade in the District of Columbia in 1830 and banned slavery

in the District in 1862 prior the Emancipation Declaration.

Because there is no immunity for slavery or right to travel claims, plaintiff can

claim damages against the government beyond those available under the Tucker Act.

Assuming incorrectly that Congress has not waived sovereign immunity, plaintiff could

still claim damages and/or lost wages based on the slavery claim, because the 13th

Amendment is a money mandating amendment.   A slave is entitled to be paid, and

therefore the government owes an amount of money equal to reasonable fair market value

of his labor.

**J. Third and Fourth Amendment Claims Fall Within A.P.A.**

Plaintiff brings a claim under the First, Third, and Fourth Amendment claiming

these amendments and a penumbra therefore.    In the absence of statutory authorization,

the government may not conscript a citizen.   The Third and Fourth Amendment are not

money mandating but are relevant to the plaintiff's Administrative Procedure Act claim.

**K. Administrative Procedure Act Waives Immunity**

The government erects a straw man incorrectly asserting that plaintiff is using an

Administrative Procedure Act claim to challenge the legality of the entire war.   Count I

deals with both the Administrative Procedure Act and due process.   The complaint's

prayer for relief recites:

Count I and Count II

A.    Declaratory Judgment seeking rescission of contract

B.    Declaratory Judgment holding plaintiff's detention was illegal

C.    Declaratory Judgment seeking classification as a disabled veteran

D.    Declaratory Judgment seeking entitlement to combat medals

E.    Explanatory notice relief

F.    Future combat related medical expenses through Department of Veterans Affairs

G.    Rescission of employment contract

H.    Attorneys' fees

I.    Appointment of a court monitor

J.    Appointment of special counsel immune to conflict of interest

Nowhere in the list of relief does the plaintiff make any reference declaring the war to be illegal or unconstitutional.   One of the 11 requests for relief asks the court to determine his detention was illegal.   There are a variety of legal authorities making plaintiff's captivity illegal.   One method to establish the illegally of the detention would be proving that international law's prohibition on launching a war of aggression divests the soldiers of the authority to take him into custody.    However, plaintiff does not need to prove the illegality of his detention in order to win the other 10 requested remedies.

The Administrative Procedure Act 5 U.S.C. 702 provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

Dismissal of a complaint under Rule 12 (b) (6) is only appropriate where "Plaintiff can prove no set of facts in support his claim which would entitle him to relief."

See Browning v. Clinton, 292 F.3d. 235, 241 (D.C. Cir. 2002).   Therefore, the proper

question is whether plaintiff can obtain any legal relief under the Administrative

Procedure Act.   Plaintiff contends the Army drafted him without giving him a hearing

before a draft board and without giving him the opportunity to claim status as a

conscienscious objector.   Further, plaintiff asks the court to determine he was

conscripted and honorably discharged.   The government could be ordered to correct the

military records, give him benefits accorded to other veterans such as perhaps educational

benefits, classify him as a disabled veteran, and provide the medical coverage for combat

related injuries.   Some of the remedies might need to be stayed while claims are pending

with federal agencies, but absent relief from the court, plaintiff would not even be able to

initiate administrative claims.   Further, where as here the government declined to

provide him any notice or opportunity to be as required by the A.P.A. and/or the Due

Process clause, the court would have the ability to enter a preliminary injunction during

the pendency of the administrative process.   When plaintiff originally filed an

administrative complaint with the government in 2003, the government claimed only

Titan was liable for plaintiff's injuries.   As a result, it would be a futile gesture to go

through an administrative process when the government has already ruled plaintiff is not

entitled to any relief and must look to relief solely from Titan.    Given these facts, the

court quite possibly might determine he exhausted his administrative remedies and make

a ruling without remanding the cases to the V.A. or the Army.

       Although the government claims the plaintiff failed to exhaust his administrative

remedies, the complaint clearly says he sought administrative remedies, but the

government declined to afford any mechanism to prove his allegations.

Further, plaintiff is entitled to injunctive relief.   If the plaintiff no longer feared another instance of abuse and if he received proper medical care, he could return to his profession as work as a military translator.   Plaintiff's claim resembles Doe v. Hagee. 473 F.Supp.2d 989 (N.D.Cal.2007). Plaintiffs, who alleged that they were sexually assaulted by United States Marine Corps (USMC) recruiters when they were underage high school students, had no adequate remedies at law for claims of future injury as a result of their fear of future sexual assault if they enlisted in the USMC, and thus the availability of other legal remedies for the sexual assaults did not bar their claims for relief under the Administrative Procedure Act (APA) enjoining USMC from violating their constitutional rights in the future and requiring USMC to properly train and supervise USMC recruiters and service members.   Similarly, Federal court had jurisdiction over claim by a noncommissioned Air Force officer to review the officer's discharge under the general federal question jurisdictional statute and the Administrative Procedure Act, because the A.P.A. waived sovereign immunity in such situations. Secora v. Fox, 747 F.Supp. 406 (S.D.Ohio 1989).  In Beller v. Middendorf, the plaintiff sought an order (1) prohibiting the Navy from barring her reenlistment based upon the fact she had been discharged based upon homosexual behavior, (2) requiring any future enlistment decisions be acted on based on the merits, (3) purging of negative information from service records, and (4) stopping the military from disseminating information about her original discharge, and the court held such relief was permissible under the A.P.A. and would not violate sovereign immunity. 632 F.2d 788 (C.A.Cal., 1980)

A sovereign immunity claim must be assessed with the context of a Rule 12 (b) (1) motion.   The argument that the court lacks jurisdiction must be judged based upon

whether plaintiff can prove any set of facts entitling him to relief.   To understand Rule

12's requirement, the court should refer back to Rule 8 (a) (2).

Rule 8 (a) (2) and (a) (3) provide:

> (2) a short and plain statement of the claim showing that the pleader is
> entitled to relief; and (3) a demand for the relief sought, which may
> include relief in the alternative or different types of relief.

   The government asserts it has not waived sovereign immunity from claims of money

damages.   This defense does not meet the requirements of Rule 12 or Rule 8.   The court

needs to assess plaintiff's ability to obtain any relief.   The plaintiff provides alternative

methods of obtaining relief.   The court should reject the government's request, as the

court should not punish the plaintiff for seeking money damages by nullifying an ability

to seek equitable relief permitted by the Constitution and the Administrative Procedure

Act.

## L. Specific Relief Sought Makes Sovereign Immunity Inapplicable

Plaintiff does not seek an award of money damages but instead only asks for

equitable specific relief, and any specific relief would be in addition to any money

damages for a claim under the Tucker Act.   Circuit Judge Ruth Bader Ginsburg

explained "Money damages refers a legal rather than equitable remedy Bowen v.

Massachussets 487 F.2d 879, 893, 895 (1988)."   Judge Ginsburg then quoted a D.C.

Circuit opinion citing Bowen.   "Money damages refers to a sum of money used for

compensatory relief given to plaintiff as a substitution of a suffered loss.   Maryland

Department of Human Resources v. Department of Health and Human Services, 763 F.2d

1441 (D.C. Cir. 1995).   She went on to write, "The equitable remedy of specific relief on

the other hand, does not attempt the plaintiff a substitute for consequential loss, but rather

'attempts to give the plaintiff exactly the thing he was entitled.'  <u>Bowen</u>, 487 U.S. at

895."  The exact amount of specific relief is difficult to calculate at this time, but it

would at least include the amount of wages he would have earned as an E-4 or the

reasonable fair market value of his labor.  <u>See also</u>  <u>Larson</u>, 337 U.S. at 688, 69 S.Ct. at

1460.  Specific relief is not a waiver of sovereign immunity but rather an exception to

the doctrine.   To qualify for this exception, a plaintiff must claim that the federal officer

has acted either in excess of his statutory authority or unconstitutionally.   <u>See</u> <u>Dalton v.</u>

<u>Specter</u>, 511 U.S. 462, 472, 114 S.Ct. 1719, 1726, 128 L.Ed.2d 497 (1994); <u>Malone v.</u>

<u>Bowdoin</u>, 369 U.S. 643, 647, 82 S.Ct. 980, 983, 8 L.Ed.2d 168 (1962); <u>Larson</u>, 337 U.S.

at 689-90, 69 S.Ct. at 1461-62; <u>American Policyholders Ins. v. Nyacol Products</u>, 989 F.2d

1256, 1265 (1st Cir.1993).   This court also ruled that it had subject matter jurisdiction

over government contractor's claims that Department of Housing and Urban

Development (HUD) refused to perform existing contracts with contractor, and

contractor was not required to bring the claims in Claims Court, as the claims alleged

retaliation in violation of free speech rights and due process violations, and contractor

was not seeking monetary damages, but instead was seeking to enjoin HUD from

obstructing contract performance and from procuring other contractors to perform the

contractor's work. <u>Ervin and Associates, Inc. v. Dunlap</u>, 33 F.Supp.2d 1 (D.D.C.1997).

In conclusion, specific relief is guaranteed by the constitution, and in not subject to the

doctrine of sovereign immunity.   Therefore, the Federal Tort Claims Act does not bar

and indeed constitutionally could not bar specific relief, and relief under the Tucker Act

is in addition to relief given for the equitable remedy of specific relief.

**M. War Crimes Act**

The War Crimes Act prohibits violations of the Geneva Convention and the Hague Convention.   The complaint outlines in great deal a variety of violations of both treaties.   Courts have held that the War Crimes Act is a criminal statute that does not create a private right of action.   However, the Supreme Court ruled that Guantanamo detainees could use the habeas statute as a vehicle to bring a claim under the Geneva Convention.   The trend of Supreme Court cases appears headed in the direction of recognizing the type of claim brought by the plaintiff.   Even if the court does not find the statute creates a private right of action, plaintiff seeks to offer the statute as evidence of customary international law.   Further, some scholars disagree about the scope claims covered by the doctrine of jus cogens under international law.   Plaintiff intends to use the War Crimes Act's list of prohibited conduct as evidence the United States recognizes the offenses within the War Crimes Act as jus cogens.   In the context of the trend of Supreme Court cases, plaintiff contends cases within this circuit have been wrongly decided.   Plaintiff brings the claim under the War Crimes Act making a good faith effort to modify existing law.

**N. Alien Tort Claims Act**

The government seeks to dismiss Alien Tort Claims Act claims against the official capacity defendants, because plaintiff is a U.S. citizen.   The plaintiff contends the term "alien" refers to an individual who is a citizen of another country, because Nattah holds dual U.S. and Libyan citizenship, he falls within the coverage of the statute. This court previous ruled that the Federal Tort Claims Act does not waive sovereign immunity of the Department of the Army with respect to constitutional torts. Dancy v. Department of Army, 897 F.Supp. 612 (D.D.C.1995).

**O. Government Does Not Claim Immunity from Slavery Claim**

The government has only asserted sovereign immunity from claims involving the Torture Victims Protection Act, Alien Tort Claims Act, Tucker Act, 5th Amendment, the Administrative Procedure Act, and the Back Pay Act.   The government has not asserted sovereign immunity from Count V which include violations of 18 U.S.C. 1595, 42 U.S.C. 1994, and the Thirteenth Amendment.   Instead, the government has asked to dismiss all claims, and then listed what it purports to be an exhaustive list of the claims.    Thereby, the government attempts to gloss over plaintiff's strongest and most important claim.

**P. Slavery Claim Gives Adequate Notice of Claim**

In the government's section on individual liability the government claims the individuals should be liable, because the claims asserted are "conclusory". http://www.merriam-webster.com/dictionary/conclusory defines the term conclusory as, "consisting of or relating to a **conclusion** or assertion for which no supporting evidence is offered."   In the context of a 12 (b) (6) motion, the plaintiff does not come forward with evidence to prove his claim.    Instead, the facts alleged and inferences therefrom are deemed to be true.   Under the dictionary definition, a complaint could not be conclusory, and defendant cites no cases for the proposition that the legal test for dismissing a case is established merely be claiming the complaint is conclusory.    Indeed, the government's own argument in its brief is conclusory.    The government does not point to any specific paragraph containing defective allegations.   If conclusory means a failure to prove a fact, then conclusory allegations are insufficient grounds to dismiss a complaint.   Federal courts require notice pleading rather than fact pleading.    A lawsuit needs to give the defendant sufficient notice of claims that the defendant will be able to formulate an

intelligent answer or motion to dismiss.    There can be no doubt that the complaint places the government on more than sufficient notice.    Assuming incorrectly that the government needs clarification, the proper course of action would be to file a motion for a more definite statement rather than a motion to dismiss.

The government's claim that the complaint is conclusory must be assessed within the legal frame governing Rule 8 (a) of the Federal Rules of Civil Procedure.    Rule 8 (a) provides:

> A pleading that states a claim for relief must contain:    (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;

Federal pleading provides the government sufficient information to place the defendant on notice of the claim so that the defendant can formulate an informed defense.    If the government believes a complaint is defective, the government must cite its reasoning for believing it could come forth with an informed defense.    Were the court to hold the allegations were not sufficient, the proper remedy would be to deny the motion to file a first amended complaint without prejudice and give the plaintiff leave file a 1st amended complaint with sufficient detail.    Since the government is not challenging the sufficient of any paragraph or claiming the complaint lacks who, what, when, where, how, or why. The plaintiff would have no idea what would constitute an adequate pleading and therefore could only guess at a method to cure the alleged defect.    Contrary to the government's brief, federal court do not require detailed fact pleading.

Whether the complaint is factual conclusory must be judged based upon the text. The complaint states:

100.    During the two months preceding the American invasion of Iraq, the military forces guarding plaintiff progressed to the frontier with Iraq. Plaintiff consistently informed the appropriated military and civilian supervisors for Titan that he would not go into Iraq.

101.    Prior to the invasion of Iraq, defendant Titan was aware that plaintiff would not voluntarily go into Iraq and that military officials wanted to impress and draft plaintiff into military service. Defendant could have prevented plaintiff from serving in Iraq by withdrawing him from Kuwait. Instead, defendant sold plaintiff as a slave to the military. Defendant sent the military invoices to consummate the sale. The military purchased the plaintiff as a slave and paid invoices for his slave labor.

102.    After the military purchased plaintiff from the defendant, the U.S. military made plaintiff one of the first prisoners of war. Mr. Nattah informed the military that he did not sign a contract with Titan to work in Iraq or to enter a war zone. Military officials did not believe Mr. Nattah and did not take his statements as truth. Military officials told Mr. Nattah that he did not have a choice and that he had to go where they went. With the defendant's permission, the military forced plaintiff into Iraq against his will.

103.    On March 20, 2003, Mr. Nattah was deployed to Iraq as an Arabic-English interpreter for the military. At this time the military was engaged in operations in Iraq. Plaintiff served in the vanguard of the coalition's invasion force and was among the first military units entering Iraq. Plaintiff's placement on the battlefield made him particularly susceptible to injury. Defendants required plaintiff to ride in a humvee without protection against small arms or explosives. On several occasions plaintiff and company rode on the front lines of war in the unprotected humvee. During his tenure as an

interpreter, Mr. Nattah was stationed on the front line in Iraq. In fact, Mr. Nattah even served time in a tank. Plaintiff endured days of driving up and down mountains and through the desert in intolerable conditions. Due to the defendants' refusal to provide proper winterized gear, plaintiff's jaw froze shut in the night, while daylight unleashed unbearable heat and sandstorms. Plaintiff objected to his confinement, but neither the military nor Titan would agree to release him from bondage.

104.    The humvee crew drove for four days continuously, except for ten-minute breaks to refill the fuel tank. Plaintiff could not sleep due to the extreme cold and rough terrain. Plaintiff did not receive any sort of overtime, combat, or hazardous duty pay to compensate for the risks or conditions.

105.    Plaintiff witnessed mistreatment of prisoners of war including the needless infliction of pain, broken legs and ribs, refusal of medical care, deprivation of food and water, and a physical dispute injuring numerous prisoners. As prisoners died due to lack of medical care, plaintiff counseled the dying victims. Plaintiff witnessed horrific scenes of violence and gore. Defendants subjected plaintiff to the horrors of war.

106.    A rocket-propelled grenade nearly hit plaintiff, and he spent the night in a bunker under constant shelling.

107.    Plaintiff's unit penetrated Saddam Hussein's castle and ordered plaintiff to translate documents for clues about weapons of mass destruction.

108.    Plaintiff's unit experienced incessant exposure to toxic black and fires. During his tenure, Mr. Nattah was exposed to loud noises as a result of excessive shelling and explosions, especially of mortar shells. During the campaign, plaintiff worked under highly dangerous conditions. His outfit became involved in a full-fledged artillery battle.

109.     Defendants next conscripted plaintiff to ride in a Bradley tank without providing training in operating such a vehicle.  Iraqi forces attacked the tank using a variety of weapons.  Comrades working with plaintiff described him as a war hero.  One Soldier noted plaintiff's indispensable role in the unit's mission success.  Plaintiff later received the Medal of Honor.

110.     Plaintiff later served in Mosul and Baghdad.  Due to the suspension of the writ of habeas corpus and unavailability of U.S. or Iraqi courts, plaintiff could not seek his freedom.

111.     During this time period, Mr. Nattah experienced loss of hearing and ringing sounds in his ears, difficulty sleeping, and recurring nightmares.  Mr. Nattah was examined at the American Clinic in Iraq.  His physician recommended Mr. Nattah travel to Germany for a more detailed medical examination.  While en route to Germany, two doctors examined Mr. Nattah in Qatar.

240.     Six unknown Army intelligence officers pointed loaded guns at Nattah and told him he was being drafted into the United States military.   When Nattah again stated that he would not go into Iraq, the soldiers told him he would be shot for desertion if he failed to report for duty.   To avoid being shot, Nattah then followed the unit into battle.

242.     Nattah did not receive any compensation for the work he performed and was not allowed to leave U.S. military service until he was honorable discharged in Germany.


There is nothing whatsoever conclusory about the allegations.   The complaint alleges that time, place, and date of specific events.    Absent providing a diary of day by day

events, there is little Nattah could do to be more specific.   Considering Nattah worked in

an Army intelligence unit reviewing documents regarding WMD and interrogating

prisoners of war - much of the details might well be classified, and the government would

actually prefer if Nattah did not go into intensely specific details.   Normally, a plaintiff

can make a Freedom of Information Act request to get some information prior to filing

suit.    However, there can be little doubt that the details which the government desires

Nattah to provide would be exempt from disclosure under FOIA or releasing data on

military personnel would violate the Privacy Act.   The complaint alleges that military

personnel drafted him in the nighttime hours immediately proceeding commencement of

hostilities.   With guns pointed at him at night, Nattah was in a rather poor bargaining

position to get the military personnel to give him detailed information.

The government claims that 13th Amendment Claim is "undermined" by the allegation

that he worked for Titan while in Iraq.    The complaint is rather clear on this point.

Nattah had an employment contract with Titan, but the contract only provided he would

work in Kuwait, and Nattah told the military and Titan he would not be going into Iraq.

From this point, the military drafted him and ordered him to move out or be shot for

desertion, he ceased to be an employee of Titan.   Therefore, his claims regarding Titan

do not undermine those against the military.   The government is free to depose Mr.

Nattah and ask him questions about this issue.   At most, the government has raised an

interesting fact question for the jury. However, a court cannot dismiss a case because

defendant finds the allegations to be less than credible.

Finally, the government argues, "noting that involuntary active duty does not

violate Thirteenth Amendment" and refers to Simoy v. United States, 117 Fed.Appx.129

(D.C.Cir.1994).   <u>Richards v. Duke University</u>, 480 F.Supp.2d. 222, 238 (D.D.C. 2007).

This racial discrimination suit by a Duke law student and Duke University has nothing

whatsoever to do with military service.    In Simoy, the court solely considered the issue

of res judicata, because plaintiff had previously brought the same claim in a different

Circuit.    The D.C. Circuit did not "note" that involuntary military service does not

amount to slavery.   Instead, the court decided that res judicata prohibited the court from

even reaching that issue.   The government brought court martial charges against Simoy

prior to the end of terms of service, and the government involuntarily extended the term

of service to permit the court martial to go forward.   Nattah's case is clearly

distinguishable from Simoy.    The two factual scenarios are could hardly be more

different and the case has no precedential value whatsoever.

     In conclusion, the government has not claimed sovereign immunity from claims

related to slavery.    The government assertion Nattah's allegations are conclusory is

completely frivoulous.

**Q. Amendment to Add Francis Harvey Does Not Require Motion**

     Where the plaintiff adds a new party a motion to amend is necessary.   Although

the complaint has been amended as to Harvey as of right and a motion to amend to add

Harvey is not needed, Harvey claims a statute of limitations defense arguing the amended

complaint does not relate back to the original complaint.  The plaintiff is still unaware

about the relationship between the Army and the Department of Defense, and he is

seeking to ascertain whether the Department of Defense or the Army is liable for

plaintiff's injury or whether both are jointly liable.   The government has established a

rather broad policy giving military forces the authority to detain individuals on the

battlefield without any probable cause to believe the individual has committed any particular offense.   Counsel conducted rather exhaustive research to determine to source for the policy.    Certain declassified White House document demonstrates the President, Vice-President, and White House Counsel all played a role in the decision.   The directive enabling roving authority to apprehend individuals on the battlefields of Afghanistan and Iraq may have originate from the Department of Defense and then passed to each of the uniformed services or the directive may have been expressed in a rather vaguely phrased White House policy and then disseminated directly to the Army.   Press reports of individuals with no connection to the Taliban or Al Queda being arrested and detained in Guantonamo Cuba are too numerous to enumerate.

The plaintiff filed an amended complaint adding the Secretary of Army, because he was and still is unclear whether the Army or DOD should be liable for the policy. Plaintiff now realizes that the policy itself might not be critical, because the Army should be liable for the actions of its troops.   Plaintiff has proceeded and continues to proceed under the belief that both federal and Kuwaiti law dictate a ten year statute of limitations. Further, plaintiff filed the amended complaint on the premise that a motion to amend was unnecessary, because the DOD had not served a responsive pleading.

Plaintiff contends that the ten year statute of limitations makes any argument about whether the amended complaint relates back to the original complaint irrelevant. Assuming the court finds this argument unpersuasive, the amended complaint does relate back to the original complaint.    In an official capacity suit against the head of a federal agency, the United States is the true party.   Therefore, whether captioned as Francis Harvey or Robert Gates, the true party has not changed.    Under Rule 15 c of the Federal

Rules of Civil Procedure, courts have recognized a claim relates back to the original complaint where there is a strong identity of interest between the previous defendant and the new defendant.   In civil rights action, plaintiffs were entitled to amend complaint after applicable limitation period had run so as to add city and county as defendants, where claims against city and county arose from same conduct alleged against all defendants in original proceeding, where city and county had ample notice of institution of action, and where there would be no unfair prejudice to city or county in requiring them to defend on merits since there was close identity of interest between city and county officials named as original defendants and city and county which were paying cost of defense for officials. Hampton v Hanrahan, 522 F Supp 140, (ND Ill 1981).   As the nation currently faces a global war on terror, Afghanistan, and Iraq one would hope the Department of Defense and the Army are both on the same page and have a strong identity of interest.   Second, only the government knows the true source of the policy. Third, since the government is the true party, the government had notice of the original complaint.    Since the original complaint referenced facts about the action of Army troops, the government was obviously on notice of the claim and would not be prejudiced by adding Harvey.

**R. Plaintiff Does Not Move to Amend Claim as to Unnamed Soldiers**

In October 2006, the government did not ask to dismiss the claims against the individual soldiers, and the court order did not dismiss them, and plaintiff's amendment is not bringing them back into the case and instead only refining legal arguments without alleging any new claims.   Since the unknown soldiers were not dismissed and the claims

against them have not changed, there is no need to file a motion to amend against them, as to them, the case is automatically amended as of right.

However, the government seeks an advisory opinion holding that if and when the plaintiff attempts to add their names and motion to join them as parties at some future date would be untimely. Notice to the new party is one factor in determining whether the amended complaint relates back to the original complaint. Without knowing the names of these individuals, it is totally unclear whether the individuals had notice of the suit. Discovery is needed simply to discern whether the individual (1) had notice, (2) has an identity of interest with the government, (3) the individual has been prejudiced. The individual soldiers have not explained any rationale for finding the individual has been prejudiced. It is quite possible some but not all the offending soldiers meet the criteria and some do not.

The government is opposing a motion to join them when no such motion has been filed or could be possibly be filed at this time. The Privacy Act concludes plaintiff from learning the identities and contact information for the soldiers and the classified nature of their bar disclosure under either the Privacy Act or the Freedom of Information Act. The complaint explains that plaintiff was shanghaied at gunpoint at night and was therefore not in a position to bargain and demand to know their names, addresses, and phone numbers, and without their addresses plaintiff is unable to serve a complaint. For purposes of a Rule 12 motion, a facts pleaded are deemed to be true. An advisory opinion dismissing unnamed parties would preclude anyone in plaintiff's situation from filing suit and thereby allow government officials to act as they please so long as they are not stupid enough to give the plaintiff sufficient information to file a lawsuit.

An Assistant U.S. Attorney who has sought 13 continuances now seeks to make her own pattern to needless delaying tactics and punish plaintiff by running the statute of limitations during her own continuances.   Because the soldiers only raised the statute of limitations after counsel's 13th continuance, a question arises as to whether counsel made the motions in bad faith or intentionally frustrate plaintiff or whether the U.S. Attorney's office assigned an attorney to the case who they knew would need numerous continuances due to a variety of anticipated family and personal difficulties.

The court further must take judicial notice of the fact plaintiff is proceeding in forma pauperis, and counsel stated previously he is working on the case pro bono.   With these facts already on the record, the plaintiff was financially in no position to hire a private investigator to infiltrate classified files and find the soldiers' names and addresses.   The government's assertion that plaintiff had plenty of time and ability to find the names and addresses of the individual is bizarre.

For these reasons, the government petition for an advisory opinion regarding a future joinder motion must be denied with prejudice.   The motion's flimsiness merits the sanction of denial with prejudice which would preclude the government and soldiers from raising the statute of limitation defense at some later time.   Assuming the court is inclined to seriously entertain the motion, the proper course would be to allow discovery for the limited purpose of the facts necessary to make an informed decision.

**S. Jurisdictional Discovery Needed**

Assuming the court may be inclined to dismiss, plaintiff should be permitted discovery to determine facts relevant to individual liability and sovereign immunity.

**T. Request for Oral Argument**

This case involves profound questions of federal constitutional law, and the case could set an important precedent.    Therefore, plaintiff asks for oral argument to ensure the legal issues are fully explained.


Respectfully submitted,



_____

Michael J. Beattie
Nattah Education and Legal Defense Fund
2663 Manhattan Place Suite 106
Vienna, VA 22180
703-698-0623
antiwarattorney@yahoo.com




Copies to:


Michael J. Beattie
2663 Manhattan Place
Suite 106
Vienna, VA 22180
(703) 698-0623
Email: antiwarattorney@yahoo.com

Marina Utgoff Braswell
US ATTORNEYS OFFICE FOR THE

DISTRICT OF COLUMBIA
555 Fourth Street, NW
Room 10-413
Washington, DC 20530
(202) 514-7226
Fax: (202) 514-8780
Email: Marina.Braswell@usdoj.gov

Matthew Harrold Sorensen
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard
McLean, VA 22102
(703) 749-1348
Email: sorensenm@gtlaw.com